UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

PASQUALE A. LA PIETRA, Individually and :    Civil Action No.
on Behalf of All Others Similarly Situated,   :

                 :    COMPLAINT

             Plaintiff,    :    **'09 CIV    7439**

    vs.                  :

RREEF AMERICA, L.L.C., DEUTSCHE    :
ASSET MANAGEMENT, INC., DWS RREEF :
REAL ESTATE FUND, INC., DWS RREEF   :
REAL ESTATE FUND II, INC., MICHAEL   :
G. CLARK and PAUL H. SCHUBERT,    :

           Defendants.    :

—————————————————————————— x   JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1.     This is a class action on behalf of all persons or entities who purchased the common

shares of DWS RREEF Real Estate Fund, Inc. or DWS RREEF Real Estate Fund II, Inc. ("DWS

RREEF I" and "DWS RREEF II," collectively, the "Funds"), during the period from March 8, 2007

through November 17, 2008 (the "Class Period") and who were damaged thereby. The action

pursues remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2.     The common stock of DWS RREEF I and DWS RREEF II was initially offered for

sale by defendant Deutsche Asset Management, Inc. ("Deutsche Asset Management"), the brand

name in the U.S. for Deutsche Bank AG's ("Deutsche Bank") retail asset management organization,

and thereafter traded on the American Stock Exchange under the symbols "SRQ" and "SRO,"

respectively.

3.     DWS RREEF I and DWS RREEF II are closed-end, non-diversified, management

investment companies organized under Maryland law. The Funds' stated objectives are high current

income and capital appreciation by investing primarily in domestic real estate securities. DWS RREEF I was formed in October 2002, and DWS RREEF II was formed in 2003.

4.      The Funds' stated focus was to invest at least 90% of their respective total assets in income-producing common stocks, preferred stocks and other equity securities issued by real estate companies, such as "real estate investment trusts" ("REITs"). At least 80% of DWS RREEF I's and 70% of DWS RREEF II's total assets were to be invested in income-producing equity securities issued by REITs. The Funds could invest up to 10% of total assets in debt securities issued or guaranteed by real estate companies. The Funds were not to invest more than 20% of total assets in preferred stock or debt securities rated below investment grade (commonly known as "junk bonds") or unrated securities of comparable quality. Although the Funds invested primarily in equity securities that are publicly traded, the Funds could invest up to 20% of their total assets in illiquid real estate investments.

5.      During the Class Period, the Funds issued reports that misrepresented the Funds would "continue to maintain positions in the highest-quality assets and real estate markets that we believe to be fundamentally strong" and that the Funds' focus on "total return through a combination of high current income and capital appreciation potential by investing primarily in real estate securities."

6.      In fact, throughout the Class Period, the Funds had been recklessly leveraged to such a degree to make the Funds much riskier than represented and much riskier than other real estate funds. The leverage was particularly risky given the Funds used auction rate preferred securities ("ARPS") for financing.

7.      The true facts and risks concerning an investment in the Funds, which were omitted from the statements made by defendants during the Class Period, were as follows:

(a)    The Funds were leveraged to a much greater degree as compared to other real estate funds, and further, the Funds' leverage was in ARPS, a combination which proved fatal when the investments deteriorated in value and the auctions for the ARPS failed;

(b)    The ARPS were subject to vagaries in the auction market, such that the auctions for these ARPS would fail absent intervention by Deutsche Bank AG entities (Deutsche Bank Trust Company Americas, an affiliate of the Investment Manager and the Investment Advisor, was the auction agent with respect to the Funds' ARPS) stepping in to make bids and prevent failures;

(c)    Once the auctions for the ARPS failed as a result of Deutsche Bank AG entities failure to continue to step in an make bids, the Funds ability to leverage and pay dividends was severely compromised;

(d)    As a result of the highly leveraged nature of the Funds, (i) the Funds were exposed to higher volatility of the net asset value and market value of their common shares; (ii) any decline in the net asset value of the Funds' investments would be borne entirely by common shareholders, as a result, if the market value of the Funds' portfolio declined, the leverage would result in a greater decrease in net asset value to common shareholders than if the Funds were not leveraged;

(e)    if the asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds would be required to sell Funds' assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions would result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which would have a material adverse effect on the value of the Funds' common shares;

(f)     To the extent that the Funds were required to redeem any ARPS, the Funds would need to liquidate investments to fund such redemptions or prepayments. Liquidation  at times of adverse economic conditions would result in capital losses and reduce returns to common shareholders.  In addition, any such redemption or prepayment would result in the Funds seeking to terminate early all or a portion of any swap or cap transaction which would result in a termination payment by or to the Funds;

(g)     The Funds were using interest rate swaps to such a level as to be speculating on interest rates rather than a risk-reducing hedge;

(h)     The Funds were diverting from their required focus on publicly held investments by investing in a risky private venture; and

(i)     The Funds' internal controls were inadequate to prevent defendants from taking on excessive risk.

8.     Due to defendants' false and misleading statements, investors purchased the common stock of the Funds during the Class Period at artificially inflated prices and were damaged thereby.

9.     Defendants scheme to fail to disclose the risks of investing in the common stock of the Funds was motivated by greed.  Since the management fees paid to the Deutsche Bank defendants were calculated based on the Funds' average daily total managed assets, which included the liquidation preference of any ARPS and the principal amount of any outstanding borrowings, defendants were motivated to, and did,  highly leverage the Funds in reckless or knowing disregard of the risks to investors.  Thus, defendants knowingly or recklessly ignored the precarious nature of the risks of the Funds' investment strategy, and used the proceeds of the ARPS to highly leverage the Fund in an aggregate amount of approximately 35% of the Fund's total capital, in an effort to increase management fees paid to defendants.

10.     On September 12, 2008, the Funds started a downward spiral when DWS announced the Funds would have to begin redeeming the ARPS issued by the Funds in order to de-leverage the Funds' assets.

11.     As this news was absorbed by the market, the prices of DWS RREEF I and DWS RREEF II common stock dropped from $16.61 per share to $6.15 per share and from $11.75 per share to $2.10 per share, respectively by October 27, 2008.

12.     On October 29, 2008, DWS confirmed that its ability to leverage through borrowings was impaired and that it would need to liquidate Funds' assets in order to redeem the outstanding ARPS.  On November 17, 2008, DWS RREEF I announced a redemption effective that day for 1,700 shares at $25,000 per share.

13.     These redemptions resulted in the unwinding of much of the Funds' leverage and confirmed to the market that distributions to common shareholders would have to cease.  This was later confirmed in December 2008.

14.     As a result of these disclosures which caused investors to realize that distributions would cease, the Funds' prices dropped.  The price per share of DWS RREEF I dropped from $3.45 per share on November 14, 2008. to $2.65 on November 18, 2008, and the price per share of DWS RREEF II dropped from $1.90 per share on November 14, 2008 to $1.42 per share on November 18, 2008.

15.     On December 11, 2008, the Funds confirmed market expectations as to the effect of the redemptions on the Funds' common shareholders, and disclosed that:

> *The Funds are also announcing that they will not declare any distributions to common shareholders in December 2008 because market conditions have resulted in a decline in portfolio values causing the Funds to currently not meet the preferred share asset coverage ratio that is a precondition to the declaration of common share distributions under the Investment Company Act of 1940.*

16.     The Funds' common stock continued to decline as the news was absorbed by the markets.

17.     The collapse of the Funds was so great that the defendants determined to liquidate the Funds since the dwindled assets could not allow them to continue to reap huge management fees. On March 18, 2009, the Fund's board of directors issued a press release announcing a special shareholder meeting, which stated in part:

> The Board of Directors of each Fund plans to submit a proposal to adopt a Plan of Liquidation and Dissolution for vote at a special meeting of shareholders, currently expected to be held on May 20, 2009. Shareholders of record at the close of business on March 27, 2009 will be entitled to vote at the special shareholder meeting and any adjournments or postponements thereof. Subject to shareholder approval of the Plan of Liquidation and Dissolution adopted by the Board, each Fund plans to sell its assets, discharge or reserve for its liabilities, and distribute the net proceeds to shareholders.
>
> There can be no assurance that shareholders of a Fund will approve the proposed Plan of Liquidation and Dissolution. Each Fund's shareholders are advised to read the Fund's proxy statement and other materials when they become available, as they will contain important information. These materials will be mailed to shareholders and will be available on the SEC's website.

18.     The Funds have never recovered and DWS RREEF I trades at less than $2 per share and DWS RREEF II trades at less than $0.60 per share.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the Funds are headquartered in this District, do business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

22.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

23.     Plaintiff Pasquale A. La Pietra purchased 64 shares of DWS RREEF II at $17.95 per share on October 8, 2007 for the Pasquale A La Pietra Roth IRA, as set forth in the accompanying certification, and has been damaged thereby. On August 20, 2009, those shares were trading at $.75 per share.

24.     Defendant DWS RREEF I is a non-diversified, closed-end management investment company. The Fund's stated objectives are high current income and capital appreciation by investing primarily in domestic real estate securities. According to the Fund's Registration Statement/Prospectus on Form N-2 dated August 6, 2002, the Fund's asset portfolio is to be as follows: (i) 90% of its total assets in income producing common stocks, preferred stocks and other equity securities issued by real estate companies, such as real estate investment trusts ("REITs"); (ii) at least 80% of the Fund's assets (net assets, plus any borrowings for investment) will be invested in income producing equity securities issued by REITs; and (iii) the Fund may invest up to 10% of its total assets in debt securities issued or guaranteed by real estate companies. DWS RREEF I was formerly known as Scudder RREEF Real Estate Fund, Inc. The Fund's principal office is located in New York, New York.

25.     Defendant DWS RREEF II is a non-diversified, closed-end management investment company. The Fund, formerly known as Scudder RREEF II, was incorporated in Maryland on May

5, 2003 and is registered as an investment company under the 1940 Act. The Fund's stated objectives are high current income and capital appreciation by investing primarily in domestic real estate securities. According to the Fund's Registration Statement/Prospectus on Form N-2 dated August 26, 2003, the Fund's asset portfolio is to be as follows: (i) 90% of its total assets in income producing common stocks, preferred stocks and other equity securities issued by real estate companies, such as REITs; (ii) at least 70% of the Fund's assets (net assets, plus any borrowings for investment) will be invested in income producing equity securities issued by REITs; and (iii) the Fund may invest up to 10% of its total assets in debt securities issued or guaranteed by real estate companies. In February 2006, Scudder RREEF II became DWS RREEF II.   The Fund's principal office is located in New York, New York.

26.    Defendant Deutsche Asset Management is the Funds' Investment Manager. Under its Investment Management Agreement with the Funds, the Investment Manager is responsible for managing the Funds' affairs and supervising all aspects of the Funds' operations, subject to the general oversight of the Board of Directors of the Funds. The Investment Manager also provides persons satisfactory to the Directors of the Funds to serve as officers of the Funds. Such officers, as well as certain other employees and Directors of the Funds, may be directors, officers, or employees of the Investment Manager.   Deutsche Asset Management is part of the United States asset management activities of Deutsche Bank AG.   Deutsche Asset Management's principal office is in New York, New York

27.    Defendant RREEF America L.L.C. ("RREEF America" or the "Investment Adviser"), pursuant to Investment Advisory Agreements, acts as the Investment Advisor to the Funds, and at all relevant times has had responsibility for the day-to-day management of the Funds' investment portfolios. RREEF America is the U.S. arm of DB Real Estate, the real estate investment

management group of the United States asset management operations of Deutsche Bank. RREEF America has offices located in New York, New York.

28.    Defendant Michael G. Clark ("Clark") is, and at all relevant times was, President of the Funds. Clark signed the Funds' Annual and Semi-annual Reports to Stockholders disseminated by the Funds.

29.    Defendant Paul H. Schubert ("Schubert") is, and at all relevant times was, Treasurer and Chief Financial Officer of the Funds. Schubert signed the Funds' Annual and Semi-annual Reports to Stockholders disseminated by the Funds.

30.    The defendants Clark and Schubert are referred to herein as the "Individual Defendants."

**CLASS ACTION ALLEGATIONS**

31.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of either of the Funds during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of DWS RREEF I, DWS RREEF II, Deutsche Asset Management and RREEF America members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, shares of the Funds' common stock were actively traded on the American Stock Exchange in an efficient market. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by defendants or the Funds'

transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Funds have approximately 58 million shares of common stock issued and outstanding.

33.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violations of federal law that is complained of herein.

34.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)    whether public statements made by defendants to the investing public misrepresented or omitted material facts about the business, operations and management of the Funds; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**BACKGROUND**

37.    Closed-end funds, like DWS RREEF I and II, differ from open-end funds (which are generally referred to as mutual funds) in that closed-end funds are not continuously offered. There is a one time public offering and once issued, shares of closed-end funds are sold in the open market on a stock exchange. In a mutual fund, if the shareholder wishes to sell shares, the mutual fund will redeem or buy back the shares at "net asset value." In contrast, shares of Closed-end funds like DWS RREEF I and II are traded on a market exchange such as the American Stock Exchange.

38.    DWS RREEF I and DWS RREEF II are non-diversified, closed-end management investment companies with an investment objective of total return through a combination of high current income and capital appreciation potential by investing in real estate securities.

39.    As the Funds' Investment Manager, Defendant Deutsche Asset Management is responsible for managing the Funds' affairs and supervising all aspects of the Funds' operations.

40.    As the Funds' Investment Advisor, Defendant RREEF America has had at all relevant times responsibility for the day-to-day management of the Funds' investment portfolios, including the composition of the Funds' holdings of securities and other investments.

41.    Deutsche Asset Management and RREEF America are wholly owned subsidiaries of Deutsche Bank.

42.    The Funds pay the Investment Manager a monthly investment management fee computed at the annual rate of 0.85% of average daily total managed assets (i.e., the net asset value of Common Shares plus the liquidation preference of any Fund preferred shares plus the principal amount of any borrowings). As a result, the Investment Manager's fees rise when the Funds utilize leverage, because the fees paid are calculated based on the Funds' total managed assets, which

include the liquidation preference of preferred stock, and the principal amount of any outstanding borrowings.

### The Funds Use Leverage to Increase Total Managed Assets

43.     Prior to and during the Class Period, the Funds used financial leverage in an effort to increase returns (and management fees) through the issuance of ARPS in an aggregate amount of approximately 35% of the Funds' total capital. ARPS are unique in that interest rates on ARPS are determined through a Dutch auction process. Investors enter bids through broker/dealers specifying the number of shares they wish to purchase with the lowest interest rate they are willing to accept. Each bid and order size is ranked from lowest to highest minimum bid rate. The lowest bid rate at which all the shares can be sold at par establishes the interest rate, otherwise known as the "clearing rate". This rate is paid on the entire issue for the upcoming period. Investors who bid a minimum rate above the clearing rate receive no bonds, while those whose minimum bid rates were at or below the clearing rate receive the clearing rate for the next period. When there are insufficient bids, the interest rates can go to extremely high levels and the auction can even "fail".

44.     Pursuant to the Investment Company Act of 1940, as amended (the "1940 Act"), the Funds are not permitted to issue ARPS unless immediately after their issuance the value of the Funds' total assets are at least 200% of the liquidation value of the outstanding preferred shares (the "asset coverage ratio") (i.e., such liquidation value may not exceed 50% of the Funds' total assets less liabilities other than Borrowings). In addition, the Funds are not permitted to declare any cash dividend or other distribution on its common shares unless, at the time of such declaration, the value of the Funds' total assets less liabilities is at least 200% of such liquidation value.

45.     On August 6, 2002, defendants caused DWS RREEF I (then called the Scudder RREEF REIT Fund) to file with the SEC a Registration Statement on Form N-2. The Registration

Statement emphasized the Fund's total return through a combination of high current income and capital appreciation potential by investing primarily in real estate securities. DWS RREEF I began trading in January 2003.

46.    On September 25, 2003, defendants caused DWS RREEF II (then called the Scudder RREEF Real Estate Fund, II, Inc.) to file with the SEC an initial Registration Statement on Form N-2. The DWS RREEF II Registration Statement emphasized the Fund's objective was total return through a combination of high current income and capital appreciation potential by investing in real estate securities.

47.    In the ensuing years following the Funds' initial public offerings, during the Class Period, while the Funds were traded on the American Stock Exchange, Defendants failed to disclose to investors the high risks of their strategy of using the proceeds of the ARPS to highly leverage the Funds' investments.

48.    The true facts and risks concerning an investment in the Funds, which were omitted from the statements made by defendants during the Class Period, were as follows:

(a)    The Funds were leveraged to a much greater degree as compared to other real estate funds, and further, the Funds' leverage was in ARPS, a combination which proved fatal when the investments deteriorated in value and the auctions for the ARPS failed;

(b)    The ARPS were subject to vagaries in the auction market, such that the auctions for these ARPS would fail absent intervention by Deutsche Bank AG entities (Deutsche Bank Trust Company Americas, an affiliate of the Investment Manager and the Investment Advisor, was the auction agent with respect to the Funds' ARPS) stepping in to make bids and prevent failures;

(c)     Once the auctions for the ARPS failed as a result of Deutsche Bank AG entities failure to continue to manipulate the auctions, the Funds ability to leverage and pay dividends was severely compromised;

(d)     As a result of the highly leveraged nature of the Funds, (i) the Funds were exposed to higher volatility of the net asset value and market value of their common shares; (ii) any decline in the net asset value of the Funds' investments would be borne entirely by common shareholders, as a result, if the market value of the Funds' portfolio declined, the leverage would result in a greater decrease in net asset value to common shareholders than if the Funds were not leveraged;

(e)     if the asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds would be required to sell Funds' assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions would result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which would have a material adverse effect on the value of the Funds' common shares;

(f)     To the extent that the Funds were required to redeem any ARPS, the Funds would need to liquidate investments to fund such redemptions or prepayments. Liquidation at times of adverse economic conditions would result in capital losses and reduce returns to common shareholders.  In addition, any such redemption or prepayment would result in the Funds seeking to terminate early all or a portion of any swap or cap transaction which would result in a termination payment by or to the Funds;

(g)     The Funds were using interest rate swaps to such a level as to be speculating on interest rates rather than a risk-reducing hedge;

(h)    The Funds were diverting from their required focus on publicly held investments by investing in a risky private venture; and

(i)    The Funds' internal controls were inadequate to prevent defendants from taking on excessive risk.

49.    Due to defendants' false and misleading statements and omissions, investors purchased the common stock of the Funds during the Class Period at artificially inflated prices.

50.    Defendants knowingly or recklessly ignored, and failed to disclose, the risks of the Funds' investment strategy, and used the proceeds of the ARPS to highly leverage the Fund in an aggregate amount of approximately 35% of the Fund's total capital, in an effort to increase management fees paid to defendants.

51.    On June 30, 2006, the common shares of DWS RREEF II was trading at $16.40 per share and DWS RREEF I was trading at $21.94 per share. By this time the Funds were already engaging in the reckless behavior which would ultimately lead to their demise.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMMISSIONS DURING THE CLASS PERIOD

52.    As discussed herein, during the Class Period, the Funds' Annual and Semiannual Reports and other public statements did not disclose the Funds' risk of leverage through issuing ARPS whose interest rates were dependent on auctions, the illiquidity of the auction-rate market and its dependence on Deutsch Bank AG entities to manipulate the auctions in order to keep the ARPS liquid, the Funds' leverage amount and leverage risk, the risk of loss of dividends and illiquidity.

53.    On March 8, 2007, defendants caused DWS RREEF I to file its 2006 Annual Report to Stockholders. Defendants stated in the Annual Report:

Overall, REIT prices continue to be driven by strong investor demand for real estate. The market is benefiting from strengthening fundamental factors across all property types. These include low interest rates and constricted supply in many areas. Of course, the biggest positive factor in the near term has been M&A activity, where

more than 20 REITs have been privatized or acquired in the past 18 months. Though the REIT sector could consolidate some of its gains in the coming year, *we believe that the longer-term outlook for REITs remains compelling: The companies that have historically created the most value now comprise a greater percentage of the REIT investment universe following the recent host of acquisitions. Going forward, we will continue to maintain positions in the highest-quality assets and real estate markets that we believe to be fundamentally strong.*

54.    With respect to the highly leveraged and risky nature of an investment in DWS

RREEF I as a result of the issuance of the auction rate preferred securities (ARPS), the 2006 Annual

Report to Stockholders falsely, misleadingly stated:

The Fund has issued and outstanding 3,200 shares of Series A and 3,200 shares of Series B Preferred Shares, each at a liquidation value of $25,000 per share. The Preferred Shares are senior to and have certain class-specific preferences over the common shares. The dividend rate on each series is set through an auction process, and the dividends are generally paid every seven days. At December 31, 2006, the average annual dividend rate, as set by the auction process, for Series A and Series B was 4.83% and 4.84%, respectively. The 1940 Act requires that the Preferred Shareholders of the Fund, voting as a separate class, have the right to: a) elect at least two directors at all times, and b) elect a majority of the directors at any time when dividends on the Preferred Shares are unpaid for two full years. Unless otherwise required by law or under the terms of the Preferred Shares designation statement, each Preferred Share is entitled to one vote and Preferred Shareholders will vote together with common shareholders as a single class and have the same voting rights. Dividends on the Preferred Shares are all cumulative. The Fund is subject to certain limitations and restrictions while the Preferred Shares are outstanding. Under the 1940 Act, the Fund is required to maintain asset coverage of at least 200% with respect to the Preferred Shares as of the last business day of each month in which any shares are outstanding.

55.    Similarly, on March 9, 2007, defendants caused DWS RREEF II to file its 2006

Annual Report to Stockholders. Defendants stated in the Annual Report that:

Overall, REIT prices continue to be driven by strong investor demand for real estate. The market is benefiting from strengthening fundamental factors across all property types. These include low interest rates and constricted supply in many areas. Of course, the biggest positive factor in the near term has been M&A activity, where more than 20 REITs have been privatized or acquired in the past 18 months. Though the REIT sector could consolidate some of its gains in the coming year, *we believe that the longer-term outlook for REITs remains compelling: The companies that have historically created the most value now comprise a greater percentage of the REIT investment universe following the recent host of acquisitions. Going*

> *forward, we will continue to maintain positions in the highest-quality assets and*
> *real estate markets that we believe to be fundamentally strong.*

56.    With respect to the highly leveraged and risky nature of an investment in DWS

RREEF II as a result of the issuance of the auction rate preferred securities (ARPS), the 2006

Annual Report to Stockholders misleadingly stated:

> The Fund has issued and outstanding 2,800 shares of Series A, 2,800 shares of Series
> B, 2,800 shares of Series C, 2,800 shares of Series D and 2,800 shares of Series E
> Preferred Shares, each at a liquidation value of $25,000 per share. The Preferred
> Shares are senior to and have certain class-specific preferences over the common
> shares. The dividend rate on each series is set through an auction process, and the
> dividends are generally paid every seven days. At December 31, 2006, the average
> annual dividend rate, as set by the auction process, for Series A, Series B, Series C,
> Series D and Series E was 4.82%, 4.81%, 4.83%, 4.82% and 4.83%, respectively.
> The 1940 Act requires that the Preferred Shareholders of the Fund, voting as a
> separate class, have the right to: a) elect at least two directors at all times, and b)
> elect a majority of the directors at any time when dividends on the Preferred Shares
> are unpaid for two full years. Unless otherwise required by law or under the terms of
> the Preferred Shares designation statement, each preferred share is entitled to one
> vote and Preferred Shareholders will vote together with common shareholders as a
> single class and have the same voting rights. Dividends on the Preferred Shares are
> cumulative. The Fund is subject to certain limitations and restrictions while the
> Preferred Shares are outstanding. Under the 1940 Act, the Fund is required to
> maintain asset coverage of at least 200% with respect to the Preferred Shares as of
> the last business day of each month in which any shares are outstanding.

57.    The DWS RREEF I and II 2006 Annual Reports to Stockholders, however, failed to

disclose that as a result of defendants' conduct, investors were exposed to the following undisclosed

risks:

(a)    that the Funds were using the proceeds of the ARPS to highly leverage

the Fund in an aggregate amount of approximately 35% of the Fund's total capital, in an

effort to increase management fees paid to defendants;

(b)    if the Funds' portfolios were invested in securities that provided a

lower rate of return than the dividend rate of the ARPS, the leverage would cause common

shareholders returns to fall;

(c)     At any time the Deutsche Bank AG entities stopped intervening in auctions for the ARPS, such auctions would fail and the Funds ability to leverage and pay dividends to Funds shareholders would be severely compromised;

(d)     as a result of the highly leveraged nature of the Funds, (i) the Funds were exposed to higher volatility of the net asset value and market value of the common shares; (ii) any decline in the net asset value of the Funds' investments would be borne entirely by common shareholders, as a result, if the market value of the Funds' portfolio declined, the leverage would result in a greater decrease in net asset value to common shareholders than if the Funds were not leveraged;

(e)     if the asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds would be required to sell Fund assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions would result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which could have a material adverse effect on the value of the Funds' common shares; and

(f)     to the extent that the Funds were required to redeem any ARPS, the Funds would be required to liquidate investments to fund such redemptions or prepayments. Liquidation at times of adverse economic conditions would result in capital losses and reduce returns to common shareholders. In addition, any such redemption or prepayment would likely result in the Funds seeking to terminate early all or a portion of any swap or cap transaction which could result in a termination payment by or to the Fund.

58.     On August 28, 2007, defendants caused DWS RREEF II to file its 2007 Semi-annual Report to Stockholders. Defendants stated in the Semi-annual Report that:

.Going forward, we currently plan to maintain approximately 20% of the fund's net assets in preferred stocks because of their attractive yields. *The fund's leveraging activities had no material effect on performance during the period.*

\*          \*          \*

We also think that REIT market fundamentals – in the form of rent growth, large pools of capital available for investment and continued high "replacement costs" (i.e., high construction costs that make it more expensive to add supply to the market) – look promising. Going forward, we will continue to maintain positions in the highest-quality assets and real estate markets that we believe to be fundamentally strong.

59.    With respect to the highly leveraged and risky nature of an investment in DWS

RREEF II as a result of the issuance of the auction rate preferred securities (ARPS), the 2007 Semi-

annual Report to Stockholders falsely, misleadingly disclosed:

The Fund has issued and outstanding 2,800 shares of Series A, 2,800 shares of Series B, 2,800 shares of Series C, 2,800 shares of Series D and 2,800 shares of Series E Preferred Shares, each at a liquidation value of $25,000 per share. The Preferred Shares are senior to and have certain class-specific preferences over the common shares. The dividend rate on each series is set through an auction process, and the dividends are generally paid every seven days. At December 31, 2006, the average annual dividend rate, as set by the auction process, for Series A, Series B, Series C, Series D and Series E was 4.82%, 4.81%, 4.83%, 4.82% and 4.83%, respectively. The 1940 Act requires that the Preferred Shareholders of the Fund, voting as a separate class, have the right to: a) elect at least two directors at all times, and b) elect a majority of the directors at any time when dividends on the Preferred Shares are unpaid for two full years. Unless otherwise required by law or under the terms of the Preferred Shares designation statement, each preferred share is entitled to one vote and Preferred Shareholders will vote together with common shareholders as a single class and have the same voting rights. Dividends on the Preferred Shares are cumulative. The Fund is subject to certain limitations and restrictions while the Preferred Shares are outstanding. Under the 1940 Act, the Fund is required to maintain asset coverage of at least 200% with respect to the Preferred Shares as of the last business day of each month in which any shares are outstanding.

60.    Similarly, on August 28, 2007, defendants caused DWS RREEF I to file its 2007

Semi-annual Report to Stockholders.  Defendants stated in the Semi-annual Report the following:

Going forward, we currently plan to maintain approximately 20% of the fund's net assets in preferred stocks because of their attractive yields. The fund's leveraging activities had no material effect on performance during the period.

\*    \*    \*

Going forward, we will continue to maintain positions in the highest-quality assets and real estate markets that we believe to be fundamentally strong.

61.    With respect to the highly leveraged and risky nature of an investment in DWS RREEF I as a result of the issuance of the auction rate preferred securities (ARPS), the 2007 Semi-annual Report to Stockholders falsely, misleadingly stated the following:

The Fund has issued and outstanding 3,200 shares of Series A and 3,200 shares of Series B Preferred Shares, each at a liquidation value of $25,000 per share. The Preferred Shares are senior to and have certain class-specific preferences over the common shares. The dividend rate on each series is set through an auction process, and the dividends are generally paid every seven days. At December 31, 2006, the average annual dividend rate, as set by the auction process, for Series A and Series B was 4.83% and 4.84%, respectively. The 1940 Act requires that the Preferred Shareholders of the Fund, voting as a separate class, have the right to: a) elect at least two directors at all times, and b) elect a majority of the directors at any time when dividends on the Preferred Shares are unpaid for two full years. Unless otherwise required by law or under the terms of the Preferred Shares designation statement, each Preferred Share is entitled to one vote and Preferred Shareholders will vote together with common shareholders as a single class and have the same voting rights. Dividends on the Preferred Shares are all cumulative. The Fund is subject to certain limitations and restrictions while the Preferred Shares are outstanding. Under the 1940 Act, the Fund is required to maintain asset coverage of at least 200% with respect to the Preferred Shares as of the last business day of each month in which any shares are outstanding.

62.    The DWS RREEF I and II 2007 Semi-annual Reports to Stockholders, however, failed to disclose that as a result of defendants' conduct, investors were exposed to the following undisclosed risks:

(a)    that the Funds were using the proceeds of the ARPS to highly leverage the Fund in an aggregate amount of approximately 35% of the Fund's total capital, in an effort to increase management fees paid to defendants;

(b)    if the Funds' portfolios were invested in securities that provided a lower rate of return than the dividend rate of the ARPS, the leverage would cause common shareholders returns to fall;

{00015315.1}20 -

(c)    At any time the Deutsche Bank AG entities stopped intervening in auctions for the ARPS, such auctions would fail and the Funds ability to leverage and pay dividends to Funds shareholders would be severely compromised;

(d)    as a result of the highly leveraged nature of the Funds, (i) the Funds were exposed to higher volatility of the net asset value and market value of the common shares; (ii) any decline in the net asset value of the Funds' investments would be borne entirely by common shareholders, as a result, if the market value of the Funds' portfolio declined, the leverage would result in a greater decrease in net asset value to common shareholders than if the Funds were not leveraged;

(e)    if the asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds would be required to sell Fund assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions would result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which could have a material adverse effect on the value of the Funds' common shares; and

(f)    to the extent that the Funds were required to redeem any ARPS, the Funds would be required to liquidate investments to fund such redemptions or prepayments. Liquidation at times of adverse economic conditions would result in capital losses and reduce returns to common shareholders. In addition, any such redemption or prepayment would likely result in the Funds seeking to terminate early all or a portion of any swap or cap transaction which could result in a termination payment by or to the Fund.

63.     On February 28, 2008, defendants issued a press release entitled, "DWS Scudder Provides Information on Recent Auction Rate Securities Market Activity Involving . . . DWS RREEF Real Estate Fund, Inc. (NYSE: SRQ) and DWS RREEF Real Estate Fund II, Inc. (NYSE: SRO)." The press release went on to state that, "Like many other closed-end funds throughout the industry, the above-mentioned three DWS closed-end funds have recently experienced failed auctions of their auction rate preferred shares. As further explained in the Q&A, such auction failures do not constitute a default-the preferred shares of affected DWS funds remain outstanding and continue to pay dividends, which, during a period of failed auctions, are at a 'maximum rate' determined in accordance with the specific terms of each such security. Moreover, the preferred shares of the affected DWS funds continue to be triple-A rated by their respective rating agencies."

64.     Defendants' press release, however, was known to Defendants to be materially false and misleading at the time they caused it to be issued because Defendants knew but failed to disclose that:

(a)     if the Funds' asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds could be required to sell Fund assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions could result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which could have a material adverse effect on the value of the Funds' common shares; and

(b)     to the extent that the Funds were required to redeem any ARPS, the Funds could need to liquidate investments to fund such redemptions or prepayments. Liquidation at times of adverse economic conditions could result in capital losses and reduce

returns to common shareholders. In addition, any such redemption or prepayment would

likely result in the Funds seeking to terminate early all or a portion of any swap or cap

transaction which could result in a termination payment by or to the Funds.

65.     On March 6, 2008, defendants caused DWS RREEF II to file its 2007 Annual Report

to Stockholders. Defendants stated in the Annual Report that:

> Going forward, we foresee only a mild pullback in growth. With this in mind, we
> anticipate modestly positive returns within the REIT sector for 2008.

66.     With respect to the highly leveraged and risky nature of an investment in DWS

RREEF II as a result of the issuance of the auction rate preferred securities (ARPS), the 2007

Annual Report to Stockholders misleadingly disclosed:

> The Fund has issued and outstanding 2,800 shares of Series A, 2,800 shares of Series
> B, 2,800 shares of Series C, 2,800 shares of Series D and 2,800 shares of Series E
> preferred shares ("Preferred Shares"), each at a liquidation value of $25,000 per
> share. The Preferred Shares are senior to, and have certain class-specific preferences
> over, the Fund's common shares. The dividend rate on each series of Preferred Shares
> is set through a "Dutch" auction process, and the dividends are generally paid every
> seven days. In the auction process, holders of the Preferred Shares indicate the
> dividend rate at which they would be willing to hold or sell their Preferred Shares.
> An auction fails if there are more Preferred Shares offered for sale than there are
> buyers. If an auction fails, the Preferred Shares' dividend rate adjusts to a "maximum
> rate," which, based on current Preferred Share ratings (AAA as of December 31,
> 2007), is the greater of (i) 125% of the applicable AA Composite Commercial Paper
> Rate and (ii) 2.5% plus the applicable AA Composite Commercial Paper Rate. In
> addition, existing Preferred Shareholders that submit sell orders in a failed auction
> may not be able to sell any or all of the shares for which they have submitted sell
> orders. Preferred Shareholders may sell their shares at the next scheduled auction,
> subject to the same risk that the subsequent auction will not attract sufficient demand
> for a successful auction to occur. Broker-dealers may also try to facilitate secondary
> trading in the Preferred Shares, although such secondary trading may be limited and
> may only be available for shareholders willing to sell at a discount.
>
> At December 31, 2007, the average annual dividend rate, as set by the auction
> process, for Series A, Series B, Series C, Series D and Series E was 5.36%, 5.35%,
> 5.35%, 5.38% and 5.36%, respectively. The 1940 Act requires that the Preferred
> Shareholders of the Fund, voting as a separate class, have the right to: a) elect at least
> two directors at all times, and b) elect a majority of the directors at any time when
> dividends on the Preferred Shares are unpaid for two full years. Unless otherwise
> required by law or under the terms of the Preferred Shares designation statement,

each preferred share is entitled to one vote and Preferred Shareholders will vote together with common shareholders as a single class and have the same voting rights. Dividends on the Preferred Shares are cumulative. The Fund is subject to certain limitations and restrictions while the Preferred Shares are outstanding. Under the 1940 Act, the Fund is required to maintain asset coverage of at least 200% with respect to the Preferred Shares as of the last business day of each month in which any shares are outstanding.

67.     On March 6, 2008, defendants caused DWS RREEF I to file its 2007 Annual Report

to Stockholders. Defendants stated in the Annual Report that:

Three major factors detracted the most from fund returns for the period. First, the fund's leveraged capital structure contributed to its underperformance versus the benchmark. Second, the fund's holdings in mortgage REITs, which were hurt by problems in the subprime market and then the general credit crunch that pervaded financial markets, detracted from performance. Third, the fund's overall preferred stock position represented a detractor. This is because of two individual issues held by the fund – Eagle Hospitality Properties Trust, Inc. and Equity Inns, Inc. Both became privately held, and as a result their preferred stock became illiquid.

In addition, stock selection added to performance in all REIT sectors except hotels during the 12-month period, but most sector weightings (as compared with the benchmark) detracted from returns. Our underweight position in the health care REIT sector, which investors viewed as defensive during a period of intense market volatility, represented the most significant drag on performance from a sector standpoint.

68.     With respect to the highly leveraged and risky nature of an investment in DWS

RREEF I as a result of the issuance of the auction rate preferred securities (ARPS), the 2007 Annual

Report to Stockholders misleadingly disclosed:

The Fund has issued and outstanding 3,200 shares of Series A and 3,200 shares of Series B preferred shares ("Preferred Shares"), each at a liquidation value of $25,000 per share. The Preferred Shares are senior to, and have certain class-specific preferences over, the Fund's common shares. The dividend rate on each series of Preferred Shares is set through a "Dutch" auction process, and the dividends are generally paid every seven days. In the auction process, holders of the Preferred Shares indicate the dividend rate at which they would be willing to hold or sell their Preferred Shares. An auction fails if there are more Preferred Shares offered for sale than there are buyers. If an auction fails, the Preferred Shares' dividend rate adjusts to a "maximum rate," which, based on current Preferred Share ratings (AAA as of December 31, 2007), is the greater of (i) 125% of the applicable AA Composite Commercial Paper Rate and (ii) 2.5% plus the applicable AA Composite Commercial Paper Rate. In addition, existing Preferred Shareholders that submit sell orders in a

failed auction may not be able to sell any or all of the shares for which they have submitted sell orders. Preferred Shareholders may sell their shares at the next scheduled auction, subject to the same risk that the subsequent auction will not attract sufficient demand for a successful auction to occur. Broker-dealers may also try to facilitate secondary trading in the Preferred Shares, although such secondary trading may be limited and may only be available for shareholders willing to sell at a discount.

At December 31, 2007, the average annual dividend rate, as set by the auction process, for Series A and Series B was 5.36% and 5.37%, respectively. The 1940 Act requires that the Preferred Shareholders of the Fund, voting as a separate class, have the right to: a) elect at least two directors at all times, and b) elect a majority of the directors at any time when dividends on the Preferred Shares are unpaid for two full years. Unless otherwise required by law or under the terms of the Preferred Shares designation statement, each Preferred Share is entitled to one vote and Preferred Shareholders will vote together with common shareholders as a single class and have the same voting rights. Dividends on the Preferred Shares are all cumulative. The Fund is subject to certain limitations and restrictions while the Preferred Shares are outstanding. Under the 1940 Act, the Fund is required to maintain asset coverage of at least 200% with respect to the Preferred Shares as of the last business day of each month in which any shares are outstanding.

69.    The DWS RREEF I and II 2007 Annual Reports to Stockholders, however, were known to defendants to be materially false and misleading at the times defendants caused these Reports to be issued because defendants knew, but failed to disclose that:

(a)    if the Funds' asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds could be required to sell Fund assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions could result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which could have a material adverse effect on the value of the Funds' common shares; and

(b)      to the extent that the Funds were required to redeem any ARPS, the

Funds could need to liquidate investments to fund such redemptions or prepayments.

Liquidation at times of adverse economic conditions could result in capital losses and reduce

returns to common shareholders. In addition, any such redemption or prepayment would

likely result in the Funds seeking to terminate early all or a portion of any swap or cap

transaction which could result in a termination payment by or to the Funds.

70.      On June 10, 2008, defendants issued a press release concerning the Funds' ARPS:

> DWS Scudder announced today further progress in the refinancing of the
> auction rate preferred shares ("ARPS") issued by DWS RREEF Real Estate Fund,
> Inc. (AMEX: SRQ) ("RREEF I") and DWS RREEF Real Estate Fund II, Inc.
> (AMEX: SRO) ("RREEF II") (together, the "Fund(s)"), each a closed-end
> management investment company. The Funds have secured committed new
> financing from two major financial institutions, which, as discussed in more detail
> below, will be used to facilitate the redemption of the Funds' ARPS.
>
> The Funds' Board of Directors has approved the basic terms and
> implementation of the proposed borrowing arrangements and the full redemption of
> the Funds' ARPS. The Board and management believe that the proposed borrowing
> arrangements and ARPS redemption are appropriate and in the best interests of each
> Fund, taking into account the interests of both common and preferred shareholders.
> The new borrowing arrangements are expected to benefit the Funds' common
> shareholders by reducing each Fund's borrowing costs as compared to current
> dividend payments on the Fund's ARPS at mandatory maximum rates. While the new
> borrowing arrangements are expected to have an initial term of 364 days (as is
> common for fund bank loan facilities), management has advised the Board that it will
> seek to renew the arrangements several months prior to expiration and take other
> steps to mitigate non-renewal risk well in advance of expiration.

71.      Defendants' June 10, 2008 press release, however, was false and misleading because

it failed to disclose the risk that as a result of the deteriorating real estate markets, it would not be

able to use these lines of credit, but would be required to liquidate Funds investments to fund such

redemptions of the ARPS, and that liquidation at times of adverse economic conditions would result

in capital losses and reduce returns to common shareholders. In addition, any such redemption or

prepayment would likely result in the Funds seeking to terminate early all or a portion of any swap

or cap transaction which could result in a termination payment by or to the Funds.

72.    On September 4, 2008, defendants caused DWS RREEF I to file its 2008 Semi-

annual Report to Stockholders. Defendants stated in the Semi-annual Report that:

> Going forward, we will continue to maintain positions in the highest quality assets
> and real estate markets that we believe to be fundamentally strong.

73.    Similarly, on September 4, 2008, defendants caused DWS RREEF II to file its Semi-

annual Report to Stockholders. Defendants stated in the Semi-annual Report that:

> Going forward, we will continue to maintain positions in the highest quality assets
> and real estate markets that we believe to be fundamentally strong.

74.    In addition, the DWS RREEF I and II Semi-annual Reports stated with respect to the

ARPS:

> Lastly, the fund's position in preferred stocks subtracted from returns as several
> preferred holdings were taken private and were consequently viewed as illiquid by
> investors. The fund's mortgage REIT positions also detracted from performance
> based on the severe shrinkage of liquidity within the mortgage market over the past
> six months.
>
> Since February 2008, industry-wide developments in the auction-rate preferred
> shares market have caused auctions for the fund's Preferred Shares to fail. The failed
> auctions have impacted the fund by increasing the Preferred Shares' dividend rate to
> a maximum rate that is at a premium to short-term taxable yields, increasing the
> fund's borrowing costs. In response, the fund has entered into a secured credit
> facility, which will be used to facilitate the redemption of the fund's outstanding
> Preferred Shares later this year. In conjunction with the new financing arrangements,
> the fund will reduce its leveraged position. Fund management believes that a
> reduction in the fund's outstanding leverage is appropriate given the current market
> conditions.

75.    The foregoing statements were false and misleading because defendants failed to

disclose the risk that as a result of the deteriorating real estate markets, the Funds could not use these

lines of credit, but would be required to liquidate investments to fund such redemptions of the

ARPS, and that liquidation at times of adverse economic conditions would result in capital losses

and reduce returns to the Funds' common shareholders.  In addition, any such redemption or

prepayment would likely result in the Funds seeking to terminate early all or a portion of any swap

or cap transaction which could result in a termination payment by or to the Funds.

76.    The Funds later issued reports that represented the Funds would *"continue to*

*maintain positions in the highest-quality assets and real estate markets that we believe to be*

*fundamentally strong"* and that the Funds' focus on "total return through a combination of high

current income and capital appreciation potential by investing primarily in real estate securities."

### Defendants' Fraudulent Scheme Begins to Unravel

77.    On September 12, 2008, the market prices of the Funds shares started a downward

spiral when DWS announced the Funds would have to begin redeeming the ARPS:

> Update on other DWS Funds with Auction Rate Preferred Shares:
>
> Effective August 26, 2008, each of DWS RREEF Real Estate Fund, Inc. ("RREEF
> I") and DWS RREEF Real Estate Fund II, Inc. ("RREEF II") has entered into a
> secured credit facility, which will be used to facilitate the redemption of each fund's
> auction rate preferred shares ("ARPS"). Subject to, among other things, the
> satisfaction of notice and other legal requirements applicable to the redemption of the
> funds' ARPS, management anticipates that the full redemption of each fund's ARPS
> will be completed sometime in the late third/early fourth quarter of 2008. Further
> details on the redemption of RREEF I's and RREEF II's ARPS will be provided in a
> future press release and will be posted on the DWS funds web site, www.dws-
> investments.com.

78.    As this news was absorbed by the market, the prices of DWS RREEF I and DWS

RREEF II dropped from $16.61 per share to $6.15 per share and from $11.75 per share to $2.10 per

share, respectively by October 27, 2008.

79.    On October 29, 2008, defendants confirmed that its ability to leverage through

borrowings was impaired, and disclosed that it would be required to redeem ARPS not by way of the

previously disclosed credit facilities, but by selling Funds' assets into a depressed market:

> DWS Investments announced today that, due to ongoing market volatility and market
> declines, DWS RREEF Real Estate Fund, Inc. ("DWS RREEF I") and DWS RREEF

Real Estate Fund II, Inc. ("DWS RREEF II") (each, a "Fund," and together, the "Funds") are proceeding with plans to redeem outstanding auction rate preferred shares ("ARPS"), but are postponing their previously announced plans to leverage through borrowings made under secured credit facilities. As further described below, each Fund now intends to make a partial redemption of its outstanding ARPS. Each Fund currently maintains a line of credit through a secured credit facility, which, so long as it remains in place, will allow the Fund to leverage through bank borrowings when it is in the interest of the Fund and its shareholders to do so. There is no assurance that either Fund will maintain its present line of credit or seek to maintain any amount of leverage in the future.

Currently, each Fund intends to redeem a substantial portion of its outstanding ARPS, as detailed below. The Funds' Board of Directors has approved the proposed partial redemptions, which are expected to be funded with cash on hand. The redemptions will be accomplished by each Fund on a pro-rata basis among each Fund's series of ARPS. Depository Trust Company ("DTC"), the record holder for each of the ARPS, will conduct a lottery to determine the allocation of redemptions among broker-dealer firms, and each broker-dealer will, in turn, determine how redeemed ARPS are to be allocated among its underlying beneficial owners. Allocation procedures among different broker-dealers may vary, and the Funds have no control over the allocation process of DTC or the broker-dealers. As a result, beneficial owners of ARPS may not be redeemed on a strictly pro-rata basis or may not have any ARPS redeemed.

DWS RREEF I intends to redeem $85 million of its currently outstanding $160 million of ARPS. For DWS RREEF I, the table below lists, on a per series basis, the total number of ARPS to be redeemed, the total dollar amount to be redeemed, and currently scheduled redemption dates:

| DWS REEF Real Estate Fund ARPS Series | CUSIP | Total Number of Shares Redeemed | Total Amount Redeemed | Redemption Dates |
|---|---|---|---|---|
| Series A | 81119Q209 | 1,700 | $42,500,000 | November 13, 2008 |
| Series B | 81119Q308 | 1,700 | $42,500,000 | November 17, 2008 |
| | | | $85,000,000 | |

DWS RREEF II intends to redeem $250 million of its currently outstanding $350 million of ARPS. For DWS RREEF II, the table below lists, on a per series basis, the total number of ARPS to be redeemed, the total dollar amount to be redeemed, and currently scheduled redemption dates:

| DWS REEF Real Estate Fund II ARPS Series | CUSIP | Total Number of Shares Redeemed | Total Amount Redeemed | Redemption Dates |
|---|---|---|---|---|
| Series A | 81119R207 | 2,000 | $50,000,000 | November 12, 2008 |
| Series B | 81119R306 | 2,000 | $50,000,000 | November 12, |

| | | | | 2008 |
|---|---|---|---|---|
| Series C | 81119R405 | 2,000 | $50,000,000 | November 13, 2008 |
| Series D | 81119R504 | 2,000 | $50,000,000 | November 14, 2008 |
| Series E | 81119R603 | 2,000 | $50,000,000 | November 17, 2008 |
| | | | $250,000,000 | |

In addition to the above-described partial ARPS redemptions, the Funds' Board has also authorized such additional ARPS redemptions as may be necessary to ensure the Funds' compliance with applicable ARPS asset coverage requirements. In the event DWS Investments intends to pursue such additional redemptions, notification will be made to shareholders.

80.    On November 17, 2008, DWS RREEF I announced a redemption effective that day for 1,700 shares at $25,000 per share.

81.    These redemptions essentially resulted in the unwinding of much of the Funds' leverage and confirmed to the market that distributions to common shareholders would have to cease. This was later confirmed in December 2008.

82.    As a result of these disclosures which caused investors to realize that distributions would cease, the Funds' prices dropped. The DWS RREEF I Fund dropped from $3.45 per share on November 14, 2008 to $2.65 on November 18, 2008. DWS RREEF II Fund dropped from $1.90 per share on November 14, 2008 to $1.42 per share on November 18, 2008.

83.    On December 11, 2008, the Funds confirmed market expectations as to the effect of the redemptions on common shareholders, in a release which stated in part:

DWS RREEF Real Estate Fund, Inc. ("DWS RREEF I") and DWS RREEF Real Estate Fund II, Inc. ("DWS RREEF II") (each, a "Fund," and together, the "Funds") announced today that they are making additional partial redemptions of their outstanding auction rate preferred shares ("ARPS"). Each Fund's Board of Directors has approved the proposed partial redemptions, which will be funded with cash on hand. The proposed ARPS redemptions will be accomplished by each Fund in accordance with its charter documents on a pro-rata basis among each Fund's series of ARPS. Depository Trust Company ("DTC"), the record holder for each of the ARPS, will conduct a lottery to determine the allocation of redemptions among broker-dealer firms, and each broker-dealer will, in turn, determine how redeemed ARPS are to be allocated among its underlying beneficial owners. Allocation

procedures among different broker-dealers may vary, and the Funds have no control over the allocation process of DTC or the broker-dealers. As a result, beneficial owners of ARPS may not be redeemed on a strictly pro-rata basis or may not have any ARPS redeemed.

DWS RREEF I intends to redeem $40,000,000 of its currently outstanding $75 million of ARPS.

*       *       *

DWS RREEF II intends to redeem $67,000,000 of its currently outstanding $100 million of ARPS.

*       *       *

**The Funds are also announcing that they will not declare any distributions to common shareholders in December 2008 because market conditions have resulted in a decline in portfolio values causing the Funds to currently not meet the preferred share asset coverage ratio that is a precondition to the declaration of common share distributions under the Investment Company Act of 1940.**

84.    The Funds continued to decline as the news and subsequent disclosures were absorbed by the markets.

85.    On March 11, 2009, defendants caused DWS RREEF II to file its Annual Report to Stockholders which stated that:

The fund had a closing value of $0.66 per share based on market price ($0.90 per share based on net asset value) as of December 31, 2008. The fund underperformed its benchmark and peer group by a wide margin mainly because of the fund's large leverage position, which badly hurt performance when investors began selling real estate assets indiscriminately during the early part of the fourth quarter as the worldwide credit crunch intensified. (Past performance is no guarantee of future results. Please see pages 4 and 5 for more complete performance information.) Over the same period, the Dow Jones Industrial Average, Standard & Poor's 500® (S&P 500) Index and the Nasdaq Composite Index returned -33.84%, -37.00% and -40.89%, respectively.

*       *       *

Most significantly, the fund's performance was negatively affected by the leverage position it maintained throughout the year. As of December 31, 2008, the fund's outstanding leverage, in the form of auction-rate preferred shares, represented approximately 39.7% of the fund's total assets. Over time and in up markets, leverage will benefit the yield and total return of a portfolio. Of course, the opposite is true in down markets. The calendar year 2008 was the worst performance year in

the history of the REIT asset class. As expected, the fund's leverage position exacerbated this poor performance. The fund's underperformance versus its benchmark was due mainly to the fund being significantly leveraged during a drastically negative market. (In contrast, the benchmark is not leveraged.) Similarly, the fund's underperformance relative to its peer group was principally due to the fund being more highly leveraged than other similar funds during 2008. The fund's leverage, as a percentage of total assets, increased as REIT prices plunged in the early part of the fourth quarter. In addition, to meet various asset coverage requirements, we began redeeming preferred shares and reducing the fund's leverage in late November 2008, which also detracted from potential upside when the market rallied late in the year. The extreme volatility during 2008, particularly in the fourth quarter, caused additional stress on fund performance.

Lastly, the extreme downward volatility in the REIT market during the fourth quarter caused the fund to sell portfolio assets at an inopportune time in order to meet various leverage asset coverage requirements.

86.    On March 11, 2009, defendants caused DWS RREEF I to file its Annual Report to

Stockholders which stated that:

Most significantly, the fund's performance was negatively affected by the leverage position it maintained throughout the year. As of December 31, 2008, the fund's outstanding leverage, in the form of auction-rate preferred shares, represented approximately 40.7% of the fund's total assets. Over time and in up markets, leverage will benefit the yield and total return of a portfolio. Of course, the opposite is true in down markets. The calendar year 2008 was the worst performance year in the history of the REIT asset class. As expected, the fund's leverage position exacerbated this poor performance. The fund's underperformance versus its benchmark was due mainly to the fund being significantly leveraged during a drastically negative market. (In contrast, the benchmark is not leveraged.) Similarly, the fund's underperformance relative to its peer group was principally due to the fund being more highly leveraged than other similar funds during 2008. The fund's leverage, as a percentage of total assets, increased as REIT prices plunged in the early part of the fourth quarter. In addition, to meet various asset coverage requirements, we began redeeming preferred shares and reducing the fund's leverage in late November 2008, which also detracted from potential upside when the market rallied late in the year. The extreme volatility during 2008, particularly in the fourth quarter, caused additional stress on fund performance.

87.    The collapse in the NAV of the Funds was so great, that defendants decided that the

management fees they earned based on a percentage of the assets under management, was not large

enough to warrant their efforts. Thus, defendants determined to liquidate the Funds, and on March

18, 2009, the Fund's board of directors issued a press release announcing a special shareholder

meeting, which stated in part:

> The Board of Directors of each Fund plans to submit a proposal to adopt a Plan of
> Liquidation and Dissolution for vote at a special meeting of shareholders, currently
> expected to be held on May 20, 2009. Shareholders of record at the close of business
> on March 27, 2009 will be entitled to vote at the special shareholder meeting and any
> adjournments or postponements thereof. Subject to shareholder approval of the Plan
> of Liquidation and Dissolution adopted by the Board, each Fund plans to sell its
> assets, discharge or reserve for its liabilities, and distribute the net proceeds to
> shareholders.

> There can be no assurance that shareholders of a Fund will approve the proposed
> Plan of Liquidation and Dissolution. Each Fund's shareholders are advised to read
> the Fund's proxy statement and other materials when they become available, as they
> will contain important information. These materials will be mailed to shareholders
> and will be available on the SEC's website.

88.     The Funds have never recovered and DWS RREEF I trades at less than $2 per share

and DWS RREEF II trades at less than $0.60 per share.

89.     The true facts and risks concerning an investment in the Funds, which were omitted

from the statements made by defendants during the Class Period, were as follows:

(a)     The Funds were leveraged to a much greater degree as compared to

other real estate funds, and further, the Funds' leverage was in ARPS, a combination which

proved fatal when the investments deteriorated in value and the auctions for the ARPS failed;

(b)     The ARPS were subject to vagaries in the auction market, such that

the auctions for these ARPS would fail absent intervention by Deutsche Bank AG entities

(Deutsche Bank Trust Company Americas, an affiliate of the Investment Manager and the

Investment Advisor, was the auction agent with respect to the Funds' ARPS) stepping in to

make bids and prevent failures;

(c)     Once the auctions for the ARPS failed as a result of Deutsche Bank AG entities failure to continue to step in an make bids, the Funds ability to leverage and pay dividends was severely compromised;

(d)     As a result of the highly leveraged nature of the Funds, (i) the Funds were exposed to higher volatility of the net asset value and market value of their common shares; (ii) any decline in the net asset value of the Funds' investments would be borne entirely by common shareholders, as a result, if the market value of the Funds' portfolio declined, the leverage would result in a greater decrease in net asset value to common shareholders than if the Funds were not leveraged;

(e)     if the asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds would be required to sell Funds' assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions would result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which would have a material adverse effect on the value of the Funds' common shares;

(f)     To the extent that the Funds were required to redeem any ARPS, the Funds would need to liquidate investments to fund such redemptions or prepayments. Liquidation at times of adverse economic conditions would result in capital losses and reduce returns to common shareholders. In addition, any such redemption or prepayment would result in the Funds seeking to terminate early all or a portion of any swap or cap transaction which would result in a termination payment by or to the Funds;

(g)     The Funds were using interest rate swaps to such a level as to be speculating on interest rates rather than a risk-reducing hedge;

(h)     The Funds were diverting from their required focus on publicly held investments by investing in a risky private venture; and

(i)     The Funds' internal controls were inadequate to prevent defendants from taking on excessive risk.

## LOSS CAUSATION

90.    Defendants' unlawful conduct alleged herein directly caused the losses incurred by plaintiff and the Class.    The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and to the investing public. Those false and misleading statements, which materially misrepresented the Funds' investment practices, among other things, caused and maintained the artificial inflation in the price of Fund shares. The Funds' announcements during September 2008 to November 2008 began to correct the previously issued false and misleading statements by revealing that the Funds' holdings were much riskier than previously represented. The drops were significant with the Funds losing 90% of their value, and were much worse performers than similar funds.

91.    These disclosures began to correct the artificial inflation in the price of Funds shares. As a result of their purchases of Funds shares during the Class Period, plaintiff and the Class suffered economic harm, *i.e.*, damages, under the federal securities laws.

## SCIENTER

92.    During the Class Period, the defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a

course of business that operated as a fraud or deceit on purchasers of the common stock of the Funds during the Class Period.

93.     Defendants were motivated to perpetrate their scheme in order to continue to garner the Investment Manager's fees which were inflated by the defendants use of leverage.

94.     Defendants' scheme to fail to disclose the risks of investing in the common stock of the Funds was motivated by greed. Since the management fees paid to the Deutsche Bank defendants were calculated based on the Funds' total managed assets, which include the liquidation ARPS, and the principal amount of any outstanding borrowings, defendants were motivated to highly leverage the Funds in reckless or knowing disregard of the risks to investors. Thus, defendants knowingly or recklessly ignored the precarious nature of the risks of the Funds' investment strategy, and used the proceeds of the ARPS to highly leverage the Fund in an aggregate amount of approximately 35% of the Fund's total capital, in an effort to increase management fees paid to defendants.

## COUNT I

### For Violations of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

95.     Plaintiff incorporates ¶¶ 1-94 by reference.

96.     This Count is asserted against all defendants for violations of §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

97.     Prior to and throughout the Class Period, defendants, individually and in concert with others, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails and a national securities exchange, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Fund shares, which were intended to, and, during the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, regarding, among other things, the Funds' compliance with its stated investment policies; and (ii) cause plaintiff and the Class to purchase Fund shares at artificially inflated prices.

98.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or managers of the Fund named in this Count were able to control and did control the content of the public statements contained herein and, with knowledge or in reckless disregard, they caused the above complained of public statements to contain misstatements and omissions of material facts as alleged herein.

99.     Defendants DWS RREEF I, DWS RREEF II, Deutsche Asset Management and RREEF America are liable for each of the materially false and misleading statements set forth therein, including each of the statements of the Individual Defendants, under the principles of *respondeat superior*.

100.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fund shares. Plaintiff and the Class would not have purchased Fund shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

101.    The Funds and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Funds were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal

securities law.

### COUNT II

**Under §20(a) of the 1934 Act Against**
**Deutsche Asset Management, RREEF AMERICA**
**and the Individual Defendants**

102.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set

forth herein. This Count is asserted against Deutsche Asset Management, RREEF America and the

Individual Defendants for liability under §20(a) of the 1934 Act for violations of §10(b) of the 1934

Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

103.    Deutsche Asset Management, RREEF America and the Individual Defendants who

were officers and/or managers of the Funds committed a primary violation of §10(b) of the 1934

Act, 15 U.S.C. §78j(b), and Rule 10-5, 17 C.F.R. §240.10b-5, promulgated thereunder, by making

the false and misleading statements of material facts, identified above, in connection with the

purchase or sale of securities, which constituted a fraud on the market and were, therefore, presumed

to have been relied upon by plaintiff and the Class. At the time that they made these false and

misleading statements, the defendants named in this Count either knew of, or recklessly disregarded,

their falsity.

104.    Each of these defendants had direct control and/or supervisory involvement in the

operations of the Fund prior to and during the Class Period, and therefore had the power to control or

influence the particular transactions giving rise to the violations of the 1934 Act by the Fund as

alleged herein, and exercised the same.

105.    By reason of their status as officers and/or trustees of the Fund during the Class

Period, the Individual Defendants, Deutsche Asset Management and RREEF America are

"controlling persons" of the Fund within the meaning of §20(a) of the 1934 Act because they had the

power and influence to cause the Fund to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants, Deutsche Asset Management and RREEF America were able to, and did, directly or indirectly, control the conduct of the Funds' business, the information contained in its filings with the SEC, and public statements about its business.

106.    As set forth above, each of the Individual Defendants, Deutsche Asset Management and RREEF America controlled the Funds, which violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as "controlling persons," these defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate cause of the wrongful conduct set forth in this Count, plaintiff and other members of the Class suffered damages in connection with their purchases of Fund shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, and awarding plaintiff's counsel fees and expenses;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury

DATED:  New York, New York
        August 24, 2009

HORWITZ, HORWITZ & PARADIS,
ATTORNEYS AT LAW

BY:

PAUL O. PARADIS (PP-9335)
MICHAEL A. SCHWARTZ (MS-2352)
FRANK SCHIRRIPA (FS-1960)

405 Lexington Ave, 61st Fl
New York, NY  10174
Telephone:  212/986-4500
Facsimile:  212/986-4501

_____

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

*Attorneys for Plaintiff*