UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                   :

PASQUALE A. LA PIETRA, Individually and On      :
Behalf of All Others Similarly Situated,                :

                                                  :

              Plaintiff,                   :        No. 09-cv-07439 (JGK)

                                                  :

       vs.                                     :

                                                  :       **ECF Case**

RREEF AMERICA, L.L.C., DEUTSCHE            :
INVESTMENT MANAGEMENT AMERICAS,      :
INC., MICHAEL G. CLARK and PAUL H.        :
SCHUBERT,                                       :

                                                  :

             Defendants.             :

                                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

SIDLEY AUSTIN LLP

A. Robert Pietrzak
Andrew W. Stern
Alex J. Kaplan
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

    A.  Parties ........................................................................................................................ 3

    B.  The Funds' Investment Objectives and Leverage ................................................ 4

    C.  Auction Rate Preferred Securities ......................................................................... 5

    D.  Investment and Leverage Risk ............................................................................... 7

    E.  Fund Performance and Redemption of Auction Rate Preferred Securities ......... 8

    F.  Plaintiffs' Purported Fraud Allegations ............................................................... 11

ARGUMENT ....................................................................................................................... 12

I.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM
      FOR VIOLATION OF SECTION 10(b) ............................................................. 13

    A.  The Amended Complaint Fails Adequately To Allege
        An Actionable Misrepresentation or Omission ................................................... 15

        1.  Each of the Allegedly Omitted "True Facts and Risks" Was Disclosed ........ 17

        2.  The Remaining Alleged Misstatements and Omissions Are Immaterial ........ 27

    B.  The Complaint Fails Adequately to Allege a Strong
        Inference of Scienter ............................................................................................. 29

    C.  The Complaint Fails Adequately To Plead Loss Causation ................................ 31

    D.  The Complaint Fails Adequately To Allege Reliance .......................................... 33

II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM
      FOR VIOLATION OF SECTION 20(a) ............................................................. 34

CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Affiliated Ute Citizens of Utah v. United States,
406 U.S. 128 (1972).................................................................................................33

Alexandra Global Master Fund, Ltd. v. IKON Office Solutions, Inc.,
No. 06 Civ. 5383, 2007 WL 2077153 (S.D.N.Y. July 20, 2007) .............................................3

Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.,
968 F.2d 196 (2d Cir. 1992).......................................................................................12

ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007).......................................................................................13

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (2007)...........................................................................................12

Berson v. Applied Signal Tech., Inc.,
527 F.3d 982 (9th Cir. 2008) ....................................................................................22

Defer LP v. Raymond James Fin., Inc.,
654 F. Supp. 2d 204 (S.D.N.Y. 2009)................................................................................30

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005)...........................................................................................32, 33

Edison Fund v. Cogent Invs. Strategies Fund, Ltd.,
551 F. Supp. 2d 210 (S.D.N.Y. 2008)............................................................................32, 34

Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,
343 F.3d 189 (2d Cir. 2003)....................................................................................33, 34

Ernst & Ernst v. Hochfelder,
425 U.S. 185 (1976)...............................................................................................28

Frigitemp Corp. v. Financial Dynamics Fund,
524 F.2d 275 (2d Cir. 1975).......................................................................................20

Garfield v. NDC Health Corp.,
466 F.3d 1255 (11th Cir. 2006) ...................................................................................14

Halperin v. eBanker USA.com, Inc.,
295 F.3d 352 (2d Cir. 2002).......................................................................................28

Hoffman v. UBS-AG,
591 F. Supp. 2d 522 (S.D.N.Y. 2008)................................................................................15

In re Alcatel Secs. Litig.,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................................................16

In re Bristol-Myers Squibb Secs. Litig.,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................31

In re Citigroup Auction Rate Secs. Litig.,
    No. 08 Civ. 3095 (LTS), 2009 WL 2914370 (S.D.N.Y. Sept. 11, 2009) .........29, 31

In re Cross Media Mktg. Corp. Secs. Litig.,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004) ................................................................29

In re Crude Oil Commodity Litig.,
    No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ........14, 29

In re IPO Secs. Litig.,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005),
    aff'd, 2006 WL 1423785 (2d Cir. May 19, 2006) ...............................................33

In re Livent, Inc. Noteholders Secs. Litig.,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................13

In re Loral Space & Comm'ns Ltd. Secs. Litig.,
    No. 01 Civ. 4388 (JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ...........29-30

In re Nokia Oyj (Nokia Corp.) Secs. Litig.,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) ................................................................28

In re Omnicom Group, Inc. Secs. Litig.,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) ................................................................32

In re PXRE Group, Ltd., Secs. Litig.,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) .............................................................30-31

In re Sotheby's Holdings, Inc. Secs. Litig.,
    No. 00 Civ. 1041(DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ..........29, 35

In re Take-Two Interactive Secs. Litig.,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................14

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ...............................................................................30

Kemp v. Universal Am. Fin. Corp.,
    No. 05 CIV 9883 (JFK), 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) .....................28

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005) .....................................................................13, 32, 33

Levitin v. PaineWebber, Inc.,
    159 F.3d 698 (2d Cir. 1998)................................................................28

Ley v. Visteon Corp.,
    No. 06-2237, 2008 WL 4460192 (6th Cir. Oct. 6, 2008) ........................14

Lovelace v. Software Spectrum Inc.,
    78 F.3d 1015 (5th Cir. 1996) ...............................................................19

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,
    547 U.S. 71 (2006)...............................................................................14

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000)..................................................................30

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004)..................................................................16

Santa Fe Indus., Inc. v. Green,
    430 U.S. 462 (1977)..............................................................................27

SEC v. Siebel Sys., Inc.,
    384 F. Supp. 2d 694 (S.D.N.Y. 2005)...............................................20, 28

Sheppard v. TCW/DW Term Trust 2000,
    938 F. Supp. 171 (S.D.N.Y. 1996)................................................ 16-17, 27

Stevelman v. Alias Research Inc.,
    174 F.3d 79 (2d Cir. 1999)....................................................................29

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,
    128 S. Ct. 761 (2008)............................................................................13

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,
    No. 05 Civ. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006),
    aff'd, 546 F.3d 196 (2d Cir. 2008)..........................................................34

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S. Ct. 2499 (2007).................................................................13, 29, 31

Titan Group, Inc. v. Faggen,
    513 F.2d 234 (2d Cir. 1975),
    cert. denied, 423 U.S. 840 (1975) ..................................................... 33-34

Whirlpool Fin. Corp. v. GN Holdings, Inc.,
    67 F.3d 605 (7th Cir. 1995) ...................................................................22

**STATUTES AND RULES**

15 U.S.C. §78j (Sections 10(b) and 20(a) of the Securities Exchange Act of 1934)................1, 11

15 U.S.C. § 78u-4(b).................................................................................28, 32

15 U.S.C. § 80a-18..................................................................................8, 22

Fed. R. Civ. Proc. 9(b) ............................................................................1, 13, 16

Fed. R. Civ. Proc. 12(b)(6) .....................................................................1, 12

Defendants RREEF America, L.L.C. ("RREEF"), Deutsche Investment Management Americas, Inc. ("DIMA"), Michael G. Clark and Paul H. Schubert respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint (the "Amended Complaint" or "FAC") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This putative class action arises directly from the unprecedented global financial crisis that erupted in the fall of 2008 and, in particular, the collapse in the market for real estate and mortgage securities. Victims of the collapse included DWS RREEF Real Estate Fund, Inc. ("DWS I") and DWS RREEF Estate Fund II, Inc. ("DWS II"; together with DWS I, the "Funds"), two closed-end investment funds that invested on a leveraged basis in securities of real estate companies. Plaintiffs allege that they invested a total of $23,360.30 in DWS II and incurred losses when that Fund's holdings declined precipitously in value in the fourth quarter of 2008 as a result of the market turmoil.[1] Claiming now to have been unaware of the risks the Funds disclosed regarding their focused real estate investment strategy and leveraged capital structure, Plaintiffs allege that the Funds' investment manager and investment adviser, and two of the Funds' officers, committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

In a repetitive 44-page Amended Complaint, Plaintiffs seek to allege on behalf of a class of purchasers of the Funds' common shares during the period March 8, 2007 through November 17, 2008 that the Defendants misled them regarding the risks presented by the investments

---

[1]     As noted below, neither Plaintiff alleges that he purchased common shares of DWS I. See note 12, infra. Therefore, they lack standing to assert any claims relating to this Fund.

composing the Funds' portfolios and by the Funds' issuance of auction-rate preferred securities ("ARPS") as a means of providing leverage. According to Plaintiffs, Defendants collectively (because they make no effort to allege any conduct by any particular Defendant) misrepresented or omitted a laundry list of the "true facts and risks" relating to the quality of the Funds' investments and the degree and consequences of the leverage employed by the Funds in acquiring those investments.

Plaintiffs, however, consistently distort or ignore the clear and unambiguous statements of the Funds, including the statements made in the very documents that Plaintiffs claim were misleading. In several examples, the Funds' disclosures match almost exactly the "true facts and risks" that Plaintiffs nonetheless claim were misrepresented or omitted. Indeed, a review of the Funds' public statements – their offering materials and periodic reports to investors – demonstrates that the Funds disclosed early and often *all* of the information that Plaintiffs claim was concealed or misrepresented. Most significant, the Funds spelled out (i) the risks inherent in investing in a concentrated portfolio on a leveraged basis – risks which had permitted the Funds to reap large gains over many years in a positive market, but which manifested into losses when the market turned quickly in 2008; and (ii) the market process and regulatory requirements applicable to the ARPS and the risks posed to the Funds' shareholders resulting therefrom.

Because the Funds repeatedly and fully explained the nature of, and the risks inherent in, their investment strategies, and fully disclosed at each step along the way the relevant events in the market and the effects on the Funds, Plaintiffs have not stated a claim for securities fraud. Indeed, Plaintiffs fall far short of the particular pleading requirements of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

▪ <u>First</u>, the Funds' comprehensive disclosures preclude a finding of any fraud. Each purportedly concealed or misrepresented risk either was fully disclosed or is so basic and obvious that it is immaterial.  <u>See</u> Point I.A.

▪ <u>Second</u>, Plaintiffs' allegations do not approach the "strong inference of scienter" – on the part of *any* Defendant – required to support their claim.  Faced with the choice between Plaintiffs' illogical and unsupportable inference of intentional or reckless conduct and the more "plausible, non-culpable explanation" that the Funds were victims of very difficult market conditions, the requisite mental state for fraud has not been pled.  <u>See</u> Point I.B.

▪ <u>Third</u>, Plaintiffs do not (and cannot) allege the requisite element of loss causation, as the Amended Complaint and the public statements upon which it relies make clear that Plaintiffs' losses are attributable directly to the decline in value of the Funds' investments due to the severe market break, rather than from a revelation of any previously concealed risks.  Moreover, because Plaintiffs do not allege that they reasonably relied upon any of the claimed misrepresentations or omissions, and are not otherwise entitled to a presumption of reliance, the required element of reliance is lacking.  <u>See</u> Points I.C and D.

▪ <u>Finally</u>, because Plaintiffs fail to plead an underlying violation of Section 10(b) and fail even to attempt to plead culpable participation by *any* of the Defendants, their claim for violation of Section 20(a) necessarily fails as well.  <u>See</u> Point II.

For all of these reasons, the Amended Complaint should be dismissed.

## <u>STATEMENT OF FACTS</u>[2]

### A.  <u>Parties</u>

The Funds were issued to the public as closed-end investment companies organized under

Maryland law.[3]  (FAC ¶¶ 3, 31-32, 40.)  During the Class Period, common shares of DWS I and

---

[2]  This Statement is drawn from the Amended Complaint, documents referenced therein, and other matters of which the Court may take judicial notice on this motion to dismiss.  <u>See</u>, <u>e.g.</u>, <u>Alexandra Global Master Fund, Ltd. v. IKON Office Solutions, Inc.</u>, No. 06 Civ. 5383, 2007 WL 2077153, at *1 (S.D.N.Y. July 20, 2007) (Koeltl, J.) (citations omitted).

[3]  "Closed-end funds, unlike open-end funds, are not continuously offered.  There is a one-time public offering and once issued, shares of closed-end funds are traded in the open market through a stock exchange.  Shares of closed-end funds frequently trade at a discount to net asset value."  (Exs. K and L at 2 (DWS I and DWS II Annual Reports for year ended 12/31/06).)  Further, most closed-end funds list their shares on a securities exchange so that investors can purchase or sell the shares in the secondary securities markets.

DWS II traded on the American Stock Exchange under the symbols "SRQ" and "SRO," respectively. (Id. ¶ 2.)

Plaintiffs assert claims against four defendants. Defendants DIMA and RREEF are indirect, wholly-owned subsidiaries of Deutsche Bank AG. DIMA is the Funds' investment manager and, with certain exceptions, is responsible for managing the Funds' affairs and supervising all aspects of the Funds' operations. (Id. ¶¶ 25-26; see also, e.g., Ex. H ¶ 1 (Investment Mgt. Agreements).) RREEF, the Funds' investment adviser, is generally responsible for managing the Funds' investment operations and investment composition. (FAC ¶ 27; see also, e.g., Ex. I at ¶ 2 (Investment Advisory Agreements).)[4] Defendants Clark and Schubert are officers of the Funds. (FAC ¶¶ 28-30.)

There are two Lead Plaintiffs: Pasquale A. La Pietra and Barry King. The Amended Complaint alleges that both Plaintiffs purchased shares of DWS II. (Id. ¶¶ 23-24.) The Amended Complaint does not allege that either Plaintiff purchased shares in DWS I.

**B.    The Funds' Investment Objectives and Leverage**

DWS I and DWS II were organized and offered to the public by means of prospectuses in 2002 and 2003, respectively. "Under normal market conditions," each Fund was designed to invest in real estate securities and certain illiquid assets, in accordance with the following parameters:

> invest at least 90% of their respective total assets in income producing common stocks, preferred stocks and other equity securities issued by real estate companies, such as 'real estate investment trusts' ('REITs'). At least 80% of [DWS I's] and 70% of [DWS II's] total assets were to be invested in income-producing equity securities issued by REITs. The Funds could invest up to 10% of total assets in debt securities issued or guaranteed by real estate companies. The Funds were not to invest more than 20% of total assets in preferred stock or

---

[4]    The terms "Ex." or "Exs." shall refer to exhibit(s) annexed to the accompanying Declaration of Andrew W. Stern, dated February 8, 2010.

debt securities rate below investment grade (commonly known as 'junk bonds') or unrated securities of comparable quality. . . . [T]he Funds could invest up to 20% of their total assets in illiquid real estate investments.

(FAC ¶¶ 3-4, 31-32; Exs. A at 1, 5, 24 (DWS I Registration Stmt.); B at i (DWS I Stock Prospectus); C and D at i (DWS I 2003 and 2004 ARPS Prospectuses[5]); E at i (DWS II Registration Stmt.); F at i (DWS II Stock Prospectus); G at i (DWS II ARPS Prospectus).)

Prospective investors were told from the outset that the Funds intended to employ leverage in connection with their investments. Thus, both Funds had a leveraged capital structure comprised of common stock and "preferred stock, commercial paper or notes and/or borrowings." (Exs. A at 2 and E at 3.) While DWS I intended to take on debt in the aggregate amount of approximately 33 1/3 percent of its total capital and DWS II intended to use a similar figure of approximately 35 to 38 percent, both Funds informed investors that the amount of debt could increase to 50 percent, or decrease, or not be utilized at all, depending on the prevailing market or economic conditions. (See, e.g., Exs. B at ii, 3, 10, 16-17, 37-38; C at 3, 19, 23; D at 3-4, 20, 24; F at ii, 3, 11, 16-17, 39-40; G at 4, 24-25.) Also, the Funds disclosed that they may enter into interest rate swaps in order to reduce the interest rate risk underlying their investments and capital structure. (See, e.g., Exs. A at 30; B at 3-4; E at 16-17; F at 19.)

## C.     Auction Rate Preferred Securities

The Funds informed investors that they would issue ARPS to provide the desired leverage. By prospectuses dated January 13, 2003 and January 9, 2004, DWS I issued two series of ARPS, with each series totaling 3200 shares and each share having a "liquidation value," or

---

[5]     The prospectuses concerning ARPS issuances are referred to herein as the "ARPS Prospectuses," and those concerning common stock issuances are referred to herein as the "Stock Prospectuses." Further, the DWS I ARPS Prospectus dated January 13, 2003 is referred to herein as the DWS I 2003 ARPS Prospectus, and the ARPS Prospectus dated January 9, 2004 is referred to herein as the DWS I 2004 ARPS Prospectus.

par amount, of $25,000, raising approximately $160 million of debt.  (Exs. C at i, 1; D at i, 1.)

By a prospectus dated November 17, 2003, DWS II issued five series of ARPS, with each series

totaling 2800 shares and each share having a liquidation value of $25,000, raising approximately

$350 million of debt.  (Ex. G at i, 1.)  ARPS were widely seen by entities like the Funds as an

attractive means of borrowing because, given the auction procedures described below, they

allowed the Funds effectively to issue long-term debt at short-term borrowing rates.  (Exs. B at 3;

F at 3.)

      The ARPS Prospectuses explained the auction procedures for ARPS.  Investors were

entitled to buy or sell ARPS at auctions that occurred typically every seven days.  (Exs. C at 1; D

at 1; G at 1; see also, e.g., Exs. K at 27 (DWS I 2006 Annual Report[6]); L at 28 (DWS II 2006

Annual Report).)  At those auctions, investors entered bids through broker/dealers by specifying

the number of shares they wished to purchase or sell; potential purchasers provided the lowest

dividend rate that they would accept.  The dividend rate (or "clearing rate") was established by

the lowest bid rate at which each ARPS share could be sold at par.  The clearing rate then would

be paid by the Funds on the entire issue until the next scheduled auction.  (Exs. C at 11-12; D at

11-12; G at 11-13.)[7]  This procedure determined the Funds' cost of borrowing for each period.  If

an insufficient number of clearing bids were received (i.e., an auction failed), sellers would be

---

[6]      The DWS I and DWS II Annual Reports for the periods ended December 31, 2006 and
December 31, 2007 shall be referred to herein as the "2006 Annual Reports" and "2007 Annual
Reports," respectively.  Likewise, the DWS I and DWS II Semiannual Reports for the periods
ended June 30, 2007 and June 30, 2008 shall be referred to herein as the "2007 Semiannual
Reports" and "2008 Semiannual Reports," respectively.

[7]      The ARPS dividend rate was a borrowing cost to the Funds for employing leverage, so
the Funds used interest rate swaps "to reduce the interest rate risk inherent in the Fund[s']
underlying investments and issued Preferred Shares."  (See, e.g., Exs. K at 25; L at 26.)

required to hold their ARPS until the next successful auction, maturity or redemption.  During that period, the dividend rate – effectively, the interest paid by the Funds – would adjust to the "maximum rate."  (See, e.g., FAC ¶¶ 67, 69.)[8]

**D.      Investment and Leverage Risk**

As each Fund invests primarily in securities of real estate companies (FAC ¶¶ 3, 31, 32, 40), the Funds disclosed the possibility of being impacted by numerous risks associated with the real estate market, all of which would be borne by the Funds' shareholders.  (See, e.g., Exs. A at 32 and E at 18 ("An economic downturn could have a material adverse effect on the real estate markets and on real estate companies in which the Fund invests, which in turn could result in the Fund not achieving its investment objectives."); B and F at 6 ("changes in the value of the Fund's portfolio . . . are borne entirely by the Common Shareholders.").)  Further, each Fund's investment risk was increased by its leveraged capital structure and, therefore, each Fund repeatedly disclosed that using leverage is a "speculative investment technique" and that its "leveraged capital structure creates special risks not associated with unleveraged funds having a similar investment objective and policies."  (Exs. A at 2, 9, 29, 36; B at ii, 18, 23; C at 3-4, 19, 23, 27; D at 5, 20, 24, 28; see also, e.g., Exs. E at ii, 16, 21; F at ii, 18, 23-24; G at 5, 21, 24-25, 29.)

The Funds also disclosed that certain asset coverage ratio requirements could impact their ability to maintain leverage with ARPS and to declare dividends on common shares.  Federal law, for example, prohibits the Funds from declaring any dividends on their common shares if, at

---

[8]      Although Deutsche Bank Trust Company Americas was the auction agent for the Funds' ARPS (see, e.g., FAC ¶ 7(b)), it was not the lead manager for the public offerings of the ARPS, and the Funds clearly disclosed its purely administrative role in the auctions.  (See, e.g., Exs. C at 1, 11-12; D at 1, 11-12; G at 1, 11-13.)

the time of the declaration, the Fund does not have a 200 percent asset coverage ratio.[9] (Exs. A at 27-28 and E at 14-15; <u>see also</u> 15 U.S.C. § 80a-18 (Section 18 of the Investment Company Act of 1940, as amended (the "1940 Act")).) The Funds also are subject to additional asset coverage restrictions beyond those imposed by the 1940 Act. In particular, in connection with their issuance of ARPS, the Funds agreed to comply with certain restrictions imposed by ratings agencies. For example, Moody's and Fitch guidelines mandated each Fund to maintain 200 percent asset coverage as of the last business day of each month, and a failure to do so could result in the mandatory redemption of ARPS (which would cause the Funds to reduce their leverage). (<u>See</u>, <u>e.g.</u>, Exs. B at 16-17; C at 21, 36; D at 22-23, 37; F at 16-17; G at 23, 39; J at Part I, Section 9 (DWS I and DWS II Articles Supplementary).)

E. **Fund Performance and Redemption of Auction Rate Preferred Securities**

With their leveraged capital structures and narrow investment focus, the Funds realized substantial gains in a favorable real estate securities market for several years. Indeed, from DWS I's inception in October 2002 until February 2007, its net asset value ("NAV") more than doubled, its share price rose by 87.80 percent, and its shareholders received regular dividends. (Ex. EE at 1-2 (Bloomberg historical price charts).) Likewise, from DWS II's inception in August 2003 until February 2007, its NAV nearly doubled, its share price rose by 42.13 percent, and its shareholders received regular dividends. (Ex. EE at 3-4.)

As the economy began to experience a severe downturn, however, particularly with respect to the real estate and mortgage markets, some of the risks disclosed by the Funds ultimately came to pass. On February 20, 2008, the Funds announced that the auctions for their

---

[9] A 200 percent asset coverage ratio means the value of the respective Fund's assets less liabilities other than borrowings is at least 200 percent of the liquidation value (<u>i.e.</u>, outstanding amount) of the ARPS issued by that Fund. (<u>See</u>, <u>e.g.</u>, Exs. A at 27-28 and E at 14-15.)

ARPS, like those for virtually all of other auction rate securities, had failed due to an insufficient number of "buy" bids versus "sell" bids, meaning that dividend rates for those securities increased to their maximum rates.  (Ex. O (2/20/08 Press Release and Q&A).)  The auction failures did not affect the value of the Funds' assets, but the Funds' borrowing costs increased.  (Id.)

On March 6, 2008, the Funds filed their Annual Reports for the year ended December 31, 2007, which reported that several factors negatively impacted the Funds' performance:

> Three major factors detracted the most from fund returns for the period.  First, the fund's leveraged capital structure contributed to its underperformance versus the benchmark.  Second, the fund's holdings in mortgage REITs, which were hurt by problems in the subprime market and then the general credit crunch that pervaded financial markets, detracted from performance.  Third, the fund's overall preferred stock position represented a detractor. This is because of two individual issues held by the Fund . . . [that] became privately held, and as a result their preferred stock became illiquid.[10]

Exs. P at 8-9 and Q at 8-9 (DWS I and II 2007 Annual Reports, respectively).

On June 10, 2008, the Funds announced that, due to increased borrowing costs on their ARPS, they had secured a bank line of credit to facilitate the redemption of the Funds' ARPS, subject to further negotiation, and that the Funds intended to continue with a leveraged capital structure, by replacing outstanding ARPS with a line of credit.  (See Ex. R (6/10/08 Press Release).)  On September 4, 2008, the Funds filed their Semiannual Reports for the period ended June 30, 2008, which reported that several factors negatively impacted the Funds' performance. For example, DWS I reported:

---

[10]     This reference to preferred stock concerns the Funds' investment in such securities -- as opposed to the ARPS issued by the Funds.  As explained in every annual and semiannual report to shareholders, the Funds' holdings included both common stock and preferred stock issued by real estate companies.  See, e.g., Exs. S and T at 12-14 (DWS I and DWS II 2008 Semiannual Reports, respectively).

> In a volatile period for Real Estate Investment Trusts (REITs) that featured the continuation of the financial market credit crunch, sharply higher commodity prices and fears of recession, [the Fund] returned, for the semiannual period ended June 30, 2008, -4.52% based on net asset value (NAV). . . . During the second quarter, the real estate securities market continued to be volatile. . . During the six-month period, overall sector selection detracted from performance . . . [and] stock selection within the hotel sector detracted from performance during a period when the sector sold off sharply. . . . Lastly, the fund's position in preferred stock subtracted from returns as several preferred holdings were taken private and were consequently viewed as illiquid by investors. The fund's mortgage REIT positions also detracted from performance based on the severe shrinkage of liquidity within the mortgage market over the past six months.

(Ex. S at 5-7; see also Ex. T at 5-7 (reporting substantially the same for DWS II).)

On September 12, 2008, the Funds updated their prior announcement regarding the plan to replace ARPS with a line of credit, stating that, on August 26, they had entered into a secured credit facility that would be used to redeem the ARPS. (Ex. U (9/12/08 Press Release).) Very shortly thereafter, however, the market downturn became a market crisis. On September 14, 2008, due in substantial part to historic losses in real estate and mortgage investments, Lehman Brothers filed for bankruptcy, Merrill Lynch agreed to be sold to Bank of America to avert a possible bankruptcy, and AIG sought a $40 billion lifeline from the Federal Reserve. (Ex. V (9/15/08 New York Times Article).) In the following days and weeks, the increasingly volatile global financial markets nearly collapsed, and the Funds were not immune from the impact of those events. From September 12 to October 29, 2008, DWS I's market price per share dropped from $16.98 to $4.35, and DWS II's price per share dropped from $11.95 to $2.31.[11] On October 29, 2008, the Funds announced that, while they would be proceeding with plans to redeem outstanding ARPS, they would be postponing their previously announced plans to replace the ARPS with a bank line of credit. The Funds announced that, instead, leverage would

---

[11] During this period of sharp decline, on October 13 and 23, Plaintiff King allegedly purchased his DWS II shares. (FAC ¶ 24.)

be reduced.  (Ex. W at 1 (10/29/08 Press Release); <u>see also</u> Ex. X (10/29/08 DWS I Notice) (announcing DWS I ARPS redemptions for November 17, 2008).)

During the remainder of 2008 and early 2009, the severe downturn in the global markets did not let up and the Funds saw no recovery in their share prices.  On December 11, 2008, both Funds announced additional reductions in leverage through partial redemptions of ARPS and that they would be unable to make any dividend declarations in December 2008 "because market conditions have resulted in a decline in portfolio values causing the Funds to currently not meet the preferred share asset coverage ratio that is a precondition to the declaration of common share distributions under" the 1940 Act.  (Ex. Y (12/11/08 Press Release); <u>see also</u> FAC ¶¶ 15, 82, 84.) On February 18 and March 10, 2009, the Funds announced additional reductions in leverage through partial redemptions of outstanding ARPS.  (Exs. Z (2/18/09 Press Release); BB (3/10/09 Press Release).)

On March 18, 2009, DWS I's price per share closed at $1.43 and DWS II's price per share closed at $0.39.  On that day, the Boards of Directors for the Funds announced that the Funds would be presenting a proposal to liquidate and dissolve at a special meeting of shareholders.  (Ex. CC (3/18/09 Press Release).)  On January 29, 2010, a majority of the shareholders of each Fund approved the Boards' proposals to liquidate and dissolve the Funds. (Ex. DD (1/29/10 Press Releases).)

## F.  <u>Plaintiffs' Purported Fraud Allegations</u>

On August 24, 2009, Plaintiff La Pietra filed the initial complaint, which asserted Section 10(b) and 20(a) claims against the Funds and Defendants.  After the Court granted Plaintiffs' uncontested motion to be appointed co-lead plaintiffs, Plaintiffs filed the Amended Complaint, which omitted the Funds as defendants but included few other changes.  Ignoring the comprehensive disclosures and cautionary language contained in the Funds' public filings and

statements, and disregarding the impact of the global economic crisis on the Funds, Plaintiffs allege that they were damaged by false statements regarding the Funds' investment strategy and risks. (FAC ¶¶ 5, 77.) Plaintiffs contend that Defendants misled them by misrepresenting and omitting the "true facts and risks," including:

- the degree to which the Funds were leveraged with ARPS and the risks associated with such leverage;

- the effects of leverage on the Funds' NAV and common share price, and that the risks relating to these effects would be borne by the shareholders;

- the consequences of reducing leverage (by redeeming ARPS and not substituting other forms of debt), selling assets, and terminating interest rate swaps in adverse conditions;

- the Funds' alleged use of interest rate swaps for speculation rather than as a risk-reducing hedge, and alleged diversion from their required focus on publicly held investments in order to invest in a "risky private venture"; and

- the adequacy of the Funds' internal controls to prevent defendants from taking on excessive risk.

As detailed below, however, Plaintiffs' allegations are belied by the very disclosures by which Plaintiffs claim to have been misled and, therefore, they fail to state the elements of a securities fraud claim.

## ARGUMENT

To avoid dismissal of any claim under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). Although the Court must accept all well-pleaded allegations as true, a complaint must state a claim for relief that rises above the "speculative level," and must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65. Moreover, courts are required to credit neither unsupported inferences, Atlantic Mut. Ins. Co. v. Balfour Maclaine

Int'l, Ltd., 968 F.2d 196, 198 (2d Cir. 1992), nor factual allegations that are "contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." In re Livent, Inc. Noteholders Secs. Litig., 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).

Further, claims that sound in fraud also must satisfy the heightened pleading standards mandated by Federal Rule of Civil Procedure 9(b) and the PSLRA. See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007); ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) ("private securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal"); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005) (Rule 9(b) "is applied assiduously to securities fraud. This Circuit's strict pleading requirements in securities-fraud cases . . . were (essentially) codified in the [PSLRA].").
Plaintiffs' allegations fall short of these stringent pleading requirements.

## I.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 10(b)

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must plead (1) a material misrepresentation or omission by defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008). Furthermore, Section 10(b) claims are subject to the stringent pleading requirements of Rule 9(b) and the PSLRA. Rule 9(b) requires "[a] securities fraud complaint based on misstatements [to] (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI, 493 F.3d at 99. Likewise, the PSLRA mandates that "securities fraud

complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit</u>, 547 U.S. 71, 81-82 (2006) (citation omitted).

At the outset, it bears emphasis that Plaintiffs do not identify a single particularized false statement made by any individual or corporate Defendant. Instead, Plaintiffs conclusorily contend that Defendants collectively are responsible for all of the Funds' disclosures, including any supposedly false or misleading statements made by the Funds. However, "where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement." <u>In re Crude Oil Commodity Litig.</u>, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007). Plaintiffs failed to heed this pleading maxim. Moreover, it is not enough simply to state conclusorily that, because Defendants Clark and Schubert signed certain of the Funds' public filings, a claim has been stated against them. <u>See</u>, <u>e.g.</u>, <u>Ley v. Visteon Corp.</u>, No. 06-2237, 2008 WL 4460192, at *9 (6th Cir. Oct. 6, 2008) ("We agree with the Eleventh Circuit that a 'Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.'") (citing <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1266 (11th Cir. 2006)); <u>In re Take-Two Interactive Secs. Litig.</u>, 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008) ("a Sarbanes-Oxley certification is probative of scienter only if the complaint alleges specific contrary information, such as 'glaring accounting irregularities or other 'red flags,' of which the certifying defendant had 'reason to know.'") (citing <u>Garfield</u>, 466 F.3d at 1256). Plaintiffs have failed to allege *any* such facts regarding Defendants Clark and Schubert.

As discussed in the following sections, the facts and risks of which Plaintiffs complain were fully and clearly disclosed. Investors in the Funds were aware of the Funds' investment strategies and the risks related thereto; courts have held repeatedly that the securities laws are not designed to insure the results of informed investment decisions. Moreover, Plaintiffs' Amended Complaint lacks the allegations required to establish a cogent and compelling inference of scienter on the part of any Defendant. Finally, Plaintiffs utterly fail to allege the necessary elements of reliance and loss causation. Thus, the Amended Complaint should be dismissed.[12]

### A. The Amended Complaint Fails Adequately to Allege An Actionable Misrepresentation or Omission

Plaintiffs allege that Defendants "caused the Funds to issue reports that misrepresented that the Funds would 'continue to maintain positions in the highest-quality assets and real estate markets that we believe to be fundamentally strong' and that the Funds focus on 'total return through a combination of high current income and capital appreciation potential by investing primarily in real estate securities.'" (FAC ¶ 5.) Plaintiffs also allege that Defendants "falsely and misleadingly" described the Funds' use of ARPS in the Funds' Annual and Semiannual Reports and certain press releases issued during the Class Period. (Id. ¶¶ 55, 57, 60, 62, 65, 67, 69.) Plaintiffs contend that these statements were false and misleading because Defendants

---

[12]    Moreover, Plaintiffs lack standing to assert any claims regarding DWS I because the Amended Complaint alleges that Plaintiffs only purchased shares of DWS II during the Class Period and does not allege that either Plaintiff purchased DWS I shares. See FAC ¶¶ 23-24; see also, e.g., Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008) ("Plaintiffs . . . cannot meet the injury requirement for claims relating to funds in which they have not purchased shares because they cannot claim to be personally injured by the violations relating to those funds."). While Plaintiff King's certification states that he purchased shares of DWS I (but not DWS II), the information therein concerning his alleged purchases (i.e., date, amount and share price) is identical to the allegations in the Amended Complaint concerning his alleged DWS II purchases. Also, a comparison of the alleged purchase prices/dates in the certification to historical prices of DWS I and DWS II reveals that, if anything, King purchased only DWS II. Compare Ex. C to Decl. of Schirripa (Docket No. 9) with Ex. EE.

allegedly caused the Funds to omit the "true facts and risks" or omit exposure to certain "undisclosed risks." (Id. ¶¶ 7, 49, 58, 63, 65, 70, 72, 76, 94.)

These allegations, however, are not supported by any well-pled facts. Instead, Plaintiffs seek to manufacture false statements by glossing over or simply ignoring the Funds' actual disclosures and then conclusorily alleging the existence of a false statement or material omission. Because Plaintiffs' allegations do not "state with particularity the specific facts in support of [Plaintiffs'] belief that [any of Defendants'] statements were false when made," the Amended Complaint cannot satisfy the stringent pleading requirements under Rule 9(b) and the PSLRA. Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004).

Throughout the Amended Complaint, Plaintiffs quote portions of, or purport to paraphrase the Funds' disclosures, followed by a simple assertion that such statements were false and misleading because Defendants purportedly concealed or misrepresented the supposed "true facts and risks." (See, e.g., FAC ¶¶ 7, 49, 58, 63, 65, 70, 94.) Courts routinely reject such blanket, conclusory allegations. See, e.g., In re Alcatel Secs. Litig., 382 F. Supp. 2d 513, 534-35 (S.D.N.Y. 2005) (rejecting complaint that "list[ed] various statements – often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts – then follow each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false"). That is because Plaintiffs "neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards." Id. (citations omitted).

Furthermore, and most important, each of the so-called "true facts and risks" supposedly

misrepresented or omitted by Defendants is, in reality, fully explained in clear and unambiguous statements in the Funds' disclosures.  See, e.g., Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) (dismissing claims against closed-end trusts' investment adviser and manager where "Trusts truthfully represented and adequately disclosed their investment strategies and the inherent risks therein") (citation omitted).  That each of Plaintiffs' allegations may be refuted by the Funds' public statements demonstrates that the Amended Complaint is comprised of nothing more than empty "fraud-by-hindsight" assertions that cannot be used to support a securities fraud claim.

### 1.  Each of the Allegedly Omitted "True Facts and Risks" Was Disclosed

As an initial matter, Plaintiffs concede that they knew that the Funds were focused exclusively on the real estate sector.  (FAC ¶¶ 3, 31, 32, 40, 49.)  Moreover, the Funds' disclosures were replete with warnings regarding the specific risks associated with their investment strategy.  For example, each Fund explained:

> Since the Fund concentrates its assets in the real estate industry, your investment in the Fund will be closely linked to the performance of the real estate markets. . . Because the Fund, as a non-diversified investment company, may invest in a smaller number of individual issuers than a diversified investment company, an investment in the Fund presents greater risk to you than in an investment in a diversified company. . . . An economic downturn could have a material adverse effect on the real estate markets and on real estate companies in which the Fund invests, which in turn could result in the Fund not achieving its investment objectives.

(Exs. A at 13, 17, 32, 38; E at 4, 6, 18, 23.)  Similarly, the Funds repeated this important warning in their Annual Reports, including, for example, in the reports released in March 2007:

> The fund is nondiversified and can take larger positions in few companies, increasing its overall risk profile.  The fund involves additional risk due to its narrow focus.  There are special risks associated with an investment in real estate, including credit risk, interest rate fluctuations and the impact of varied economic conditions. . . . The Fund concentrates its investments in real estate securities, including REITs. A fund with a concentrated portfolio is vulnerable to the risks of the industry in which it invests and is subject to greater risks and market

fluctuations than funds investing in a broader range of industries. Real estate securities are susceptible to the risks associated with direct ownership of real estate. . . .

(Exs. K at 2, 31; L at 2, 32.)

Likewise, with respect to each item on Plaintiffs' list of "true facts and risks," the Funds also made full disclosures so that each potential investor could make an informed decision prior to making an investment.

*Degree of Funds' Leverage and Risks Relating to the Funds' Issuance of ARPS*

Plaintiffs allege that, during the Class Period, the Funds did not disclose that:

- "Funds were leveraged to a much greater degree as compared to other real estate funds, and further, the Funds' leverage was in ARPS, a combination which proved fatal when the investments deteriorated in value and the auctions for the ARPS failed."

- "Funds were using the proceeds of the ARPS to highly leverage the Fund in an aggregate amount of approximately 35% of the Fund's total capital, in an effort to increase management fees paid to defendants."

- "Defendants' core strategy of leveraging the Funds through capitalizing with ARPS was an extremely risky strategy that could collapse the Funds if economic conditions soured and/or if Deutsche Bank AG entities (Deutsche Bank Trust Company Americas, an affiliate of defendants [DIMA] and [RREEF], was the auction agent with respect to the Funds' ARPS) refused to execute a clearing bid at each of the weekly auctions for the ARPS."

- "Once the auctions for the ARPS failed as a result of Deutsche Bank AG entities [sic] failure to step in an [sic] make bids, the Funds ability to leverage and pay dividends was severely compromised."

- "if the asset coverage ratio fell below 200%, (i) the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; (ii) the Funds would be required to sell Fund assets in order to redeem ARPS; and (iii) the failure to pay the requisite amount of dividends or make distributions would result in the Funds ceasing to qualify as a regulated investment company under the Internal Revenue Code, which would have a material adverse effect on the value of the Funds' common shares."

(FAC ¶¶ 6, 7(a)-(c), 7(e), 49(a), 51, 53, 58(a), 58(e), 63(a), 63(e), 65(a), 94(a), 94(e), 99, 100.)

These allegations do not withstand review of the disclosures at issue and, in many cases, are even

contradicted by Plaintiffs.

First, Plaintiffs' contention that the Funds did not disclose that they would use leverage via ARPS not only is separately contradicted by Plaintiffs (see FAC ¶ 45), but also is unequivocally belied by the Funds' clear statements: "After completion of the offering of Preferred Shares [i.e., ARPS], the Fund anticipates its total leverage from the issuance of Preferred Shares will be approximately 33 1/3% of the Fund's total assets. This amount may change, but total leverage will not exceed 50% of the Fund's total assets." (Ex. C at 3; see also, e.g., Exs. B at 37-38 (same); D at 3-4 (same); F at 39-40 (same, but anticipating approximately 35 percent); G at 4 (same, but anticipating approximately 38 percent).) Further, the Funds had no obligation to limit their leverage to that "of other [unspecified] real estate funds" (FAC ¶¶ 6, 7(a), 49(a), 94(a)). See, e.g., Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1020 (5th Cir. 1996) ("Plaintiffs' bare allegation about industry custom is precisely the type of conclusory allegation that motivated the heightened pleading standards of Rule 9(b) in the first place.").

Second, contrary to their allegation that the Funds did not disclose that using ARPS would result in increased management fees, the Funds flatly stated that the investment manager's fees would be calculated using the leveraged total of the Fund's assets, "giving the Investment Manager an incentive to utilize leverage." (Exs. C at 3-4, 19, 23; D at 4, 20, 24; G at 4, 21, 25; see also, e.g., Exs. B at 8; F at 8.)

Each Fund then periodically updated investors of its precise levels of leverage. For example, DWS I reported in its 2006 Annual Report and 2007 Semiannual Report that it used ARPS to leverage its capital as of December 31, 2006 and June 30, 2007, by 34.5 percent and 38.3 percent of net assets, respectively (or, on a total assets basis, approximately 24.59% and 25.12%, respectively). (See Exs. K at 17, 19; M at 14, 16 (DWS I 2007 Semiannual Rpt).)

Likewise, DWS II reported in its 2006 Annual Report and 2007 Semiannual Report that it used ARPS to leverage its capital as of December 31, 2006 and June 30, 2007, by 40.6 percent and 45.2 percent of net assets, respectively (or, on a total assets basis, approximately 26.49% and 27.80%, respectively). (See Exs. L at 18, 20; N at 14, 16 (DWS II 2007 Semiannual Rpt).) Each Report also reiterated that the Fund's computation of management fees would be based on a level of assets that included the par value – or "liquidation preference" – of the ARPS. (Exs. K at 29; M at 25; L at 29; N at 25.)[13]

Moreover, Plaintiffs must concede that the Funds fully disclosed the risks associated with possible failed ARPS auctions,[14] including the risk of increased dividend rates, which would mean increased borrowing costs for the Funds. (FAC ¶ 45.) Indeed, the Funds disclosed:

> AUCTION RISK[:] The dividend rate for the Preferred Shares normally is set through an auction process. In the Auction, holders of Preferred Shares may indicate the dividend rate at which they would be willing to hold or sell their Preferred Shares or purchase additional Preferred Shares. . . . If Sufficient Clearing Bids do not exist in an Auction, the Applicable Rate will be the Maximum Applicable Rate, and in such event, owners of Preferred Shares wishing to sell will not be able to sell all, and may not be able to sell any, of such

---

[13]    To the extent that Plaintiffs purport to allege that the Funds were obligated to repeat basic (and unchanged) information contained in prior disclosures (see, e.g., FAC ¶¶ 48, 49, 58(a)-(f), 63(a)-(f), 65(a)-(b), 70(a)-(b), 72, 76, 94(a)-(i)), they are wrong. See, e.g., Frigitemp Corp. v. Financial Dynamics Fund, 524 F.2d 275, 282 (2d Cir. 1975) ("reasonable belief that the other party already has access to the facts should excuse [defendant] from new disclosures which reasonably appear to be repetitive."); see also generally SEC v. Siebel Sys., Inc., 384 F. Supp. 2d 694, 708 (S.D.N.Y. 2005) (same, regarding Regulation FD).

[14]    As noted above, the Funds clearly disclosed that Deutsche Bank Trust Company Americas' limited role in the ARPS auctions was purely administrative. See note 8, supra. Further, Plaintiffs' vague allegation that unnamed Deutsche Bank affiliates "refused to execute a clearing bid" at the ARPS auctions (see, e.g., FAC ¶ 100) is irrelevant as Plaintiffs do not and cannot allege that Defendants ever represented that any of their affiliates would submit such bids and, in any event, the auction failures resulted only in higher borrowing costs and did not otherwise impact upon the Funds' use of leverage. (See, e.g., Exs. C at 5, 21, 41; D at 5, 22, 42; G at 5, 22, 42; O.)

Preferred Shares in the Auction.
(See, e.g., Ex. C at 5, 21, 41; D at 5, 22, 42; G at 5, 22, 42; see also, e.g., Ex. O.)[15]

Furthermore, each Fund disclosed that it would be *required* to redeem some or all outstanding ARPS if, in accordance with ratings agencies' guidelines, a Fund was unable to timely cure a breach of the 200 percent asset coverage ratio test. (See Exs. C at 36 ("The Fund is also required under the 1940 Act and rating agency guidelines to maintain, with respect to Preferred Shares, as of the last Business Day of each month in which any such shares are outstanding, asset coverage of at least 200% with respect to senior securities which are shares, including Preferred Shares. . . . In the event the Fund does not timely cure a failure to maintain [such asset coverage] . . . in accordance with the requirements of the rating agency or agencies then rating Preferred Shares, the Fund will be required to redeem Preferred Shares . . ."); D at 37-38 (same); G at 39 (same); see also Exs. B at 17 (rating agency "guidelines may impose asset coverage or portfolio composition requirements that are more stringent than those imposed on the Fund by the 1940 Act"); F at 17 (same).) Thus, while the Funds generally would have no obligation to redeem any outstanding ARPS, meaning that failed auctions did not put the Funds' leverage strategy at risk, the circumstances in which such mandatory redemptions could occur were fully disclosed.[16]

---

[15]     Plaintiffs also allege falsely that, during the Class Period, the Funds did not state that, "if the Funds' portfolios were invested in securities that provided a lower rate of return than the dividend rate of the ARPS, the leverage would cause common shareholders' returns to fall." (FAC ¶ 58(b), 63(b).) Despite little need (if any) to disclose that self-evident proposition (see Part I.A.2, infra), a February 20, 2008 press release and Q&A issued following the first failed ARPS auction stated that "[c]ommon shareholders of closed-end funds should be aware that prolonged auction failures may increase the cost of leverage for their fund. . . . If the cost of leverage exceeds the funds' long-term earnings, it could negatively impact the fund's return and dividend payments to common shareholders." (Ex. O.)

[16]     As noted above, Plaintiffs' vague allegations regarding the presence or absence of bids in
*Footnote continued*

Consistent with these disclosures, on February 20, 2008, following the initial market-wide failed auctions, the Funds issued a press release and Q&A entitled "Understanding auction rate securities and the recent auction failures," which reiterated that the Funds were not obligated to redeem the outstanding ARPS:

> [S]uch auction failures do not constitute a default – the preferred shares of affected DWS funds remain outstanding and continue to pay dividends, which, during a period of failed auctions, are at a 'maximum rate' determined in accordance with the specific terms of each such security.

(Ex. O.)  It was not until the Funds' asset coverage ratios fell below 200 percent during the market break in late 2008 that redemptions of ARPS were instituted in order to reduce the Funds' leverage.  (Exs. Y at 2; AA at 1-2 (3/6/09 Press Release).)

Likewise, contrary to Plaintiffs' unsupported assertion, the failed ARPS auctions did not preclude the Funds from paying dividends on their common shares.  Rather, as Plaintiffs contradictorily concede (see FAC ¶ 46), the Funds had disclosed previously that their ability to pay dividends would depend upon, among other things, compliance with federal law:

> Under the 1940 Act . . . the Fund is not permitted to declare any cash dividend or other distribution on its Common Shares unless, at the time of such declaration, the value of the Fund's total assets less liabilities other than borrowings is at least 200% of such liquidation value.

(See, e.g., Exs. A at 27-28; E at 14-15; see also 15 U.S.C. § 80a-18 (Section 18 of the 1940 Act).)[17]  Indeed, the failed ARPS auctions had no impact on the Funds' ability to continue to

---

the ARPS auctions by unnamed Deutsche Bank entities not only are erroneous, but also are irrelevant.  (FAC ¶¶ 7(a), 49(c), 53, 94(b), 100.)  As set out above, the possibility of failed auctions was fully disclosed and did not impose any risks to the Funds' strategy.

[17]     Moreover, reasonable investors are presumed to be on inquiry notice of the laws under which companies operate, such as the 1940 Act.  See, e.g., Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 (7th Cir. 1995) ("In today's society, with the advent of the 'information superhighway,' federal and state legislation and regulations, as well as information regarding industry trends, are easily accessed.  A reasonable investor is presumed to have information available in the public domain. . . ."); Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987

*Footnote continued*

declare dividends (other than the obvious negative impact of the higher borrowing costs).  It was not until December 2008, by which time the global economic crisis had caused each Fund's asset coverage ratio to fall below 200 percent, that the Funds halted the declaration of dividends. (Exs. Y at 2; AA at 1-2.)  Finally, the potential consequences of the Funds' failing to pay dividends also were specifically disclosed:

> USE OF LEVERAGE[:] . . . The failure to pay dividends or make distributions could result in the Fund ceasing to qualify as a regulated investment company under the Code, which could have a material adverse effect on the value of the Common Shares.

(Exs. A at 27-28; E at 14-15.)

*Impact of Leverage on the Funds' NAV and Common Share Prices*

Plaintiffs allege that the Funds did not disclose that, "[a]s a result of the highly leveraged nature of the Funds, (i) the Funds were exposed to higher volatility of the net asset value and market value of their common shares; (ii) any decline in the net asset value of the Funds' investments would be borne entirely by common shareholders, as a result, if the market value of the Funds' portfolio declined, the leverage would result in a greater decrease in net asset value to common shareholders than if the Funds were not leveraged."  (FAC ¶¶ 7(d), 49(d), 58(d), 63(d), 94(d).)  Once again, this allegation is directly refuted by the Funds' public statements:

> Leverage Risk.  Leverage creates two major types of risks for Common Shareholders: [1] the likelihood of greater volatility of net asset value and market price of Common Shares because changes in the value of the Fund's portfolio (including changes in the value of any interest rate swap, if applicable) are borne entirely by the Common Shareholders . . .
>
> *Any decline in the net asset value of the Fund's investments will be borne entirely by Common Shareholders.  Therefore, if the market value of the Fund's portfolio declines, the leverage will result in a greater decrease in net asset value to*

---

(9th Cir. 2008) (citing <u>Whirlpool</u> with parenthetical that "investors are presumed to know the law under which companies operate").

*Common Shareholders than if the Fund were not leveraged.* Such greater net asset value decrease will also tend to cause a greater decline in the market price for the Common Shares.

(Exs. A at 10, 29-30; B at 18; E at 6, 16; F at 18 (emphasis added).)

*Consequences of Reducing Leverage and Terminating Swaps in Declining Market*

Plaintiffs allege that the Funds did not disclose that: "[t]o the extent the Funds were required to redeem any ARPS, the Funds would need to liquidate investments to fund such redemptions or prepayments. Liquidation at times of adverse economic conditions would result in capital losses and reduce returns to common shareholders. In addition, any such redemption or prepayment would result in the Funds seeking to terminate early all or a portion of any swap or cap transaction, which would result in a termination payment by or to the Funds." (FAC ¶¶ 7(f), 49(f), 58(f), 63(f), 65(b), 70(b), 72, 94(f).)

These allegations also are refuted, in some cases word-for-word, by the Funds' express disclosures:

- "LEVERAGE RISKS[:] . . . To the extent that the Fund is required or elects to redeem any Fund Preferred Shares or prepay any Borrowings, the Fund may need to liquidate investments to fund such redemptions or prepayments. Liquidation at times of adverse economic conditions may result in capital loss and reduce returns to Common Shareholders. In addition, such redemption or prepayment would likely result in the Fund seeking to terminate early all or a portion of any swap or cap transaction. Early termination of the swap could result in a termination payment by or to the Fund. Early termination of a cap could result in a termination payment to the Fund." (Exs. A at 30; B at 18; E at 16; F at 18.)

- "An economic downturn could have a material adverse effect on the real estate markets and on real estate companies in which the Fund invests, which in turn could result in the Fund not achieving its investment objective." (Exs. A at 32; B at 20; C at 24; D at 26; E at 18; F at 21; G at 26.)

- "The Fund may be required to redeem Preferred Shares at a time when it is not advantageous for the Fund to make such redemption or to liquidate portfolio securities in order to have available cash for such redemption." (Exs. C at 21; D at 23; G at 23.)

Additionally, as discussed above, in response to the failure of ARPS auctions, the Funds initially arranged for bank lines of credit to replace the ARPS and announced this to their

shareholders.  (See pp. 9-10, supra.)  Because of the market turmoil that soon thereafter ensued, the Funds decided, instead, to reduce leverage by redeeming ARPS.  Plaintiffs allege that the Funds' June 10, 2008 press release and 2008 Semiannual Reports – issued *before* those events transpired – were false and misleading because they "failed to disclose the risk that as a result of the deteriorating real estate markets, the Funds would not be able to use these lines of credit, but would be required to liquidate the Funds' investments to fund such redemptions of the ARPS. . . ."  (FAC ¶¶ 72, 76.)

This is a classic allegation of fraud-by-hindsight.  As discussed above, the Funds informed investors that they intended to use leverage of approximately 33 1/3 percent, but the Funds also disclosed that leverage "generally will not be utilized" if a respective Fund "anticipates that it would result in a lower return to common stockholders over time," or may be reduced "in response to actual or anticipated changes in interest rates in an effort to mitigate increased volatility of current income and net asset value associated with leverage."  (Exs. C at 3, 23; D at 4, 24; G at 4, 24-25; see also Exs. B at 3 and F at 3 ("There is no assurance that the Fund will utilize leverage. . . .").)  In other words, the Funds were under no obligation to employ leverage and were permitted to exercise their business judgment to reduce or end the use of leverage.  As the Funds had explained, a reduction in leverage might require liquidating Fund assets -- even at a disadvantageous time.

In June 2008, when the Funds announced their intention to maintain leverage by replacing the ARPS with the lines of credit, the markets had not yet experienced the bankruptcy of Lehman Brothers, the near-collapse and fire sale of Merrill Lynch, the Federal Reserve's bailout of AIG, or the other economic catastrophes of the second half of 2008.  (See Ex. V.) Indeed, the Funds mailed their 2008 Semiannual Reports to shareholders in late August 2008 and

filed them on or around September 4, 2008, i.e., prior to the aforementioned market events. After the global markets absorbed these events, and due to "ongoing market volatility and market declines," the Funds determined that it no longer was in the interest of the Funds and shareholders to maintain their levels of leverage by replacing the ARPS with the bank debt.  (Ex. W.)  Accordingly, consistent with their earlier disclosures, the Funds elected to reduce leverage by selling assets and redeeming ARPS.[18]  Thus, the Funds disclosed both what they *could* do, and what they *were doing*.  The prudent decision to reduce leverage at this time cannot give rise to a claim for securities fraud.

*Use of Interest Rate Swaps and Private Investments*

Plaintiffs allege that the "Funds were using interest rate swaps to such a level as to be speculating on interest rates rather than a risk-reducing hedge," and "were diverting from their required focus on publicly held investments by investing in a risky private venture."  (FAC ¶¶ 7(g)-(h), 49(g)-(h), 94(g)-(h).)  These allegations fail, too.  With respect to the swaps, Plaintiffs do not explain how the Funds supposedly were speculating through swaps, nor do they describe what would constitute an inappropriate "level" of use.  Moreover, each Fund disclosed its intention to use interest rate swaps and apprised investors of the risks associated with them:

> INTEREST RATE TRANSACTIONS[:] In order to reduce the interest rate risk inherent in the Fund's underlying investments and leveraged capital structure, the Fund may enter into interest rate swap or cap transactions.  The use of interest rate swaps and caps is a highly specialized activity that involves investment techniques and risks different from those associated with ordinary portfolio security transactions. . . . Depending on the state of interest rates in general, our use of interest rate swaps or caps could enhance or harm the overall performance of the Fund's Common Shares.  To the extent there is a decline in interest rates, the value of the interest rate swap or cap could decline, and could result in a

---

[18]    To the extent Plaintiffs claim that they needed to be told expressly that selling assets in a falling market could result in losses for shareholders, a failure to state the obvious is not actionable.  See Part I.A.2, infra.

decline in the net asset value of the Common Shares.

(Exs. A at 10-11, 30; E at 3, 17; <u>see</u> <u>also</u>, <u>e.g.</u>, Exs. B at 3-4; F at 3-4.)  Plaintiffs do not and cannot allege any facts to support their conclusory assertion that the foregoing statements somehow were materially false or misleading.

Likewise, with respect to the allegedly "risky private venture," as with their other allegations, Plaintiffs do not support it with a single well-pled fact.  Indeed, Plaintiffs provide no description of this so-called "risky private venture," nor do they explain how this purported investment somehow was at odds with the Funds' disclosed portfolio composition limits, which, as Plaintiffs concede, permitted the Funds to "invest up to 20% of their total assets in illiquid real estate investments."  (FAC ¶ 4.)  Plaintiffs' bare allegations plainly cannot support any fraud claim (or even meet the basic pleading requirements of Federal Rule of Civil Procedure 8).

*Inadequate Risk Controls*

Plaintiffs allege that the "Funds' internal controls were inadequate to prevent defendants from taking on excessive risk."  (FAC ¶¶ 7(i), 49(i), 94(i).)  This allegation, which is tantamount to alleging corporate mismanagement, cannot state a Section 10(b) claim.  <u>See</u>, <u>e.g.</u>, <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 479 (1977) (Section 10(b) does not "regulate transactions which constitute no more than internal corporate mismanagement") (citation omitted).  Nor do Plaintiffs even attempt to allege any particular misstatement regarding the Funds' internal controls or a connection with the Funds' losses.  Furthermore, Plaintiffs' use of pejorative terms, such as "excessive" in this allegation (and in other allegations, above), does not serve to aid Plaintiffs' otherwise deficient allegations.  <u>See</u>, <u>e.g.</u>, <u>Sheppard</u>, 938 F. Supp. at 175 (collecting cases for proposition that "Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested").  The Funds' clear warnings,

highlighted above, rendered immaterial any isolated alleged misstatement concerning the Funds' strategies, investments and risks.

### 2. The Remaining Alleged Misstatements and Omissions Are Immaterial

To the extent that Plaintiffs allege that any isolated statement was misleading, the statement was rendered immaterial because the meaningful cautionary language in the Funds' disclosures bespoke caution.  See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).  It is well settled that "cautionary information need not be in the same document that contains the forward-looking statement, but must instead be reasonably available to investors and affect the total mix of information."  Kemp v. Universal Am. Fin. Corp., No. 05 Civ. 9883 (JFK), 2007 WL 86942, at *11 (S.D.N.Y. Jan. 10, 2007) (citing Halperin, 295 F.3d at 357).

Moreover, many of the purported misrepresentations and omissions about which Plaintiffs complain are quite "basic" -- e.g., that a fund using leverage and focusing on real estate investments may experience greater investment losses in a bad economy, which would be borne by shareholders; or that terminating a swap agreement early *might* result in a payment *by or to* the Fund -- and thus cannot be viewed as material.  SEC v. Siebel Sys., Inc., 384 F. Supp. 2d 694, 708 n.13 (S.D.N.Y. 2005) ("Information which is so basic that a reasonable investor could be expected to know it does not constitute material facts."); see also, e.g., Levitin v. PaineWebber, Inc., 159 F.3d 698, 702-04 (2d Cir. 1998) (same, and collecting cases).  Indeed, courts "are supposed to 'bear in mind that disclosure requirements are not intended to attribute to investors a child-like simplicity.  Rather, investors are presumed to have the ability to be able to digest varying reports and data.'"  In re Nokia Oyj (Nokia Corp.) Secs. Litig., 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (citation omitted).  Accordingly, because Plaintiffs have not alleged a material misstatement with the requisite particularity, Plaintiffs' claims should be dismissed.

**B.  The Complaint Fails Adequately to Allege a Strong Inference of Scienter**

Scienter, which is a "mental state embracing intent to deceive, manipulate, or defraud," is an essential element of a Section 10(b) claim.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); see also 15 U.S.C. § 78u-4(b)(2) (1998).  "[A] complaint may establish the requisite 'strong inference' of fraudulent intent either (a) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (b) by alleging facts to show that defendants had both motive and opportunity to commit fraud."  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999) (citations omitted).  Moreover, "an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504-5 (2007).  Thus, "[t]he inquiry is inherently comparative," and a district court must consider on a Rule 12(b)(6) motion "plausible nonculpable explanations."  Id. at 2510.

As an initial matter, Plaintiffs do not allege, as they must, scienter with respect to *each* Defendant.  See, e.g., In re Cross Media Mktg. Corp. Secs. Litig., 314 F. Supp. 2d 256, 262-66 (S.D.N.Y. 2004).  Instead, Plaintiffs' allegations improperly lump all of the Defendants together and do not "specifically allege fraud perpetrated by each [D]efendant."  In re Crude, 2007 WL 1946553, at *6.  Likewise, simply citing an individual defendant's position as an officer of an entity that made purported fraudulent statements – which is all Plaintiffs have alleged with respect to Defendants Clark and Schubert (FAC ¶¶ 28-29) – does not sufficiently plead scienter.  See, e.g., In re Sotheby's Holdings, Inc. Secs. Litig., No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).

Moreover, Plaintiffs' scienter allegations are limited to bare assertions that Defendants were motivated to commit fraud in order to increase their fees. (FAC ¶¶ 9, 44, 51, 58(a), 63(a),

88, 97-101, 110.)  Allegations like these do not come close to what is required to plead a strong inference of scienter.  See, e.g., In re Citigroup Auction Rate Secs. Litig., No. 08 Civ. 3095 (LTS), 2009 WL 2914370, at *6 (S.D.N.Y. Sept. 11, 2009) ("Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter") (collecting cases); In re Loral Space & Comm'ns Ltd. Secs. Litig., No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *6 (S.D.N.Y. Feb. 27, 2004) (Koeltl, J.) ("Motives generally possessed by most corporate directors and officers do not suffice. . . . Therefore, the Court of Appeals has concluded that motive is not adequately pleaded where the plaintiffs allege that the defendants have a desire for the corporation to appear profitable or a desire to keep stock prices high in order to increase officer compensation") (citations omitted).

In any event, as noted above, each Fund clearly and expressly told investors that fees would be calculated using the leveraged total of the Fund's assets, thereby "giving the Investment Manager an incentive to utilize leverage."  (See p. 19, supra; see also FAC ¶ 44.) This structure, therefore, cannot support a conclusion that any Defendant "benefited in some concrete and personal way from the purported fraud."  Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) (citing Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000)); Loral, 2004 WL 376442, at *6 (same).

Furthermore, where a complaint fails adequately to allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater."  In re PXRE Group, Ltd., Secs. Litig., 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009) (citing Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).  "The Court of Appeals has noted that, even in the context of a motion to dismiss, 'this is a highly fact-based inquiry.' . . . The inquiry thus requires that the Court consider all of the allegations in the Complaint in their totality."  Loral,

2004 WL 376442, at *7 (citations omitted).  Here, the required inquiry reveals that there are no

particularized allegations that any Defendant engaged in conduct that was "'highly unreasonable

and which represents an extreme departure from the standards of ordinary care,'" <u>Defer</u>, 654 F.

Supp. 2d at 219 (citation omitted), or that any Defendant had "knowledge of facts or access to

information contradicting their public statements." <u>PXRE</u>, 600 F. Supp. 2d at 535-36 (internal

quotations and citation omitted).  Rather, Plaintiffs' allegations are limited to boilerplate

statements, such as Defendants "knowingly or recklessly ignored" and "knew, but failed to

disclose."  (FAC ¶¶ 9, 51, 65, 70, 99, 100.)  Inasmuch as the Funds indisputably disclosed the

risks associated with their investment strategy and use of leverage (<u>see</u> Part I.A.1, <u>supra</u>), and

Plaintiffs do not "'specifically alleg[e] [D]efendants' knowledge of facts or access to information

contradicting [the Funds'] public statements,'" Plaintiffs have not alleged conscious misbehavior

or recklessness.  <u>In re Bristol-Myers Squibb Secs. Litig.</u>, 312 F. Supp. 2d 549, 562 (S.D.N.Y.

2004) (citation omitted).

Thus, Plaintiffs' theory of scienter plainly is neither "cogent" nor "compelling." <u>Tellabs</u>,

127 S. Ct. at 2404-5.  Further, when considered in light of "opposing inference[s] of non-

fraudulent intent" (<u>id.</u>) – <u>i.e.</u>, that the Funds fully disclosed the known risks of their stated

investment strategies and were victims of a calamitous global economic crisis – it is clear that the

Amended Complaint contains nothing more than improper "fraud-by-hindsight" allegations.

<u>See</u>, <u>e.g.</u>, <u>Citigroup</u>, 2009 WL 2914370, at *6 ("the very market conditions -- specifically the

'subprime crisis' -- that Plaintiff cites in his Complaint in connection with Defendants' intent to

continue receiving ARS-related fees, give rise to an opposing and compelling inference that

Defendants only engaged in bad (in hindsight) business judgments in connection with ARS, and

did not engage in the alleged conduct with an intent to deceive investors.").  In light of these

plainly "plausible nonculpable explanations," the requisite "comparative evaluation" precludes the "cogent and compelling" inference of scienter required by Tellabs. 127 S. Ct. at 2504, 2509.

## C. **The Complaint Fails Adequately to Plead Loss Causation**

Plaintiffs also fail to plead the essential element of loss causation. To state a claim under Section 10(b), the plaintiff must allege an injury that was proximately caused by the defendant's alleged misconduct. See 15 U.S.C. § 78u-4(b)(4); Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346-47 (2005). In other words, the complaint must include particularized allegations that the materialization of a *concealed* risk caused an investment loss. See Lentell, 396 F.3d at 172-73 (plaintiff's economic loss must be "foreseeable" and "caused by the materialization of the concealed risk"). Where, as here, a plaintiff fails to plead a causal connection between the alleged fraud and the losses claimed, the complaint must be dismissed. See Dura, 544 U.S. at 346-47; Lentell, 396 F.3d at 172-73.

Indeed, Plaintiffs do not specify how the Funds' share prices decreased upon the revelation of any purported "misrepresentations" or "omissions" by Defendants. That is not surprising because, contrary to Plaintiffs' unsupportable allegation that the "Funds' announcements during September 2008 to November 2008 began to correct the previously issued false and misleading statements by revealing that the Funds' holdings were much riskier than previously represented" (FAC ¶ 95; see also id. ¶¶ 10-14), the Funds informed investors at all times and in detail about the strategies underlying their investments, and expressly forecast the possibility of steep declines in share price in the event of a real estate market downturn. See Part I.A.1, supra; see also, e.g., In re Omnicom Group, Inc. Secs. Litig., 541 F. Supp. 2d 546, 551-52 (S.D.N.Y. 2008) (collecting cases for proposition that "disclosed fact must be new to the market[, and a] . . . recharacterization of previously disclosed facts cannot qualify as a corrective

disclosure"). Thus, totally absent from the Amended Complaint is any particularized allegation that a revelation of risk that previously had been concealed by the Funds "proximately caused" the market price drop in the Funds. Edison Fund v. Cogent Invs. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 229 (S.D.N.Y. 2008) (Koeltl, J.) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005)).

Also, where, as here, "the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that plaintiff's loss was caused by the fraud decreases, and a plaintiff's claims fail when it has not adequately plead facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." Lentell, 396 F.3d at 174 (citations omitted); see also Dura, 544 U.S. at 342-43 (change in price of security from date of purchase "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events"); In re IPO Secs. Litig., 399 F. Supp. 2d 261, 267 (S.D.N.Y. 2005) ("the [securities] statutes make private securities fraud actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause"), aff'd, 2006 WL 1423785 (2d Cir. May 19, 2006). Because the drop in the share price of the Funds (whose leveraged investment strategy focused on the real estate market) coincided with the collapse of the global real estate market, Plaintiffs' allegations do not plead loss causation.

### D.  **The Complaint Fails Adequately to Allege Reliance**

Plaintiffs also fail to plead direct reliance with particularity, i.e., that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189,

197 (2d Cir. 2003).  As a threshold matter, Plaintiffs cannot rely on the presumption of reliance established in <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153-54 (1972), where reliance is presumed if the claim rests *entirely* on an omission of material fact.  <u>See</u> <u>also</u> <u>Titan Group, Inc. v. Faggen</u>, 513 F.2d 234, 239 (2d Cir. 1975) (exception to requirement of pleading reliance for certain omissions claims is limited to narrow class of cases of "total non-disclosure"), <u>cert.</u> <u>denied</u>, 423 U.S. 840 (1975).  Indeed, the Amended Complaint's purported omissions are "simply the flip side" of the alleged misstatements:  Plaintiffs allege that the Funds misrepresented the risks of investing, while also alleging that the Funds omitted the "true facts and risks."  In the context of such a pleading, reliance may not be presumed.  <u>See</u> <u>Teamsters</u> <u>Local 445 Freight Div. Pension Fund v. Bombardier, Inc.</u>, No. 05 Civ. 1898 (SAS), 2006 WL 2161887, at *9 (S.D.N.Y. Aug. 1, 2006), <u>aff'd</u>, 546 F.3d 196 (2d Cir. 2008).

Despite Plaintiffs' pleading obligation, the Amended Complaint merely states that "Plaintiffs and the Class would not have purchased Fund shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements."  (FAC ¶ 109.)  In other words, Plaintiffs claims to have relied on a mistaken belief that the Funds did not disclose the risks regarding their investment strategy.  Absent from the Amended Complaint is any allegation as to the derivation of Plaintiffs' claimed misunderstandings or the reasonableness of such reliance in light of the existing disclosures.  <u>See</u>, <u>e.g.</u>, <u>Emergent Capital</u>, 343 F.3d at 195-96 (affirming dismissal of Section 10(b) claim where investor's alleged reliance was not reasonable). For this additional and independent reason, the Amended Complaint should be dismissed.

## II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 20(a)

Because Plaintiffs have failed to plead an underlying violation of Section 10(b), their

claim for "controlling person" liability under Section 20(a) must be dismissed as well. See, e.g., Edison Fund, 551 F. Supp. 2d at 231 (internal quotation and citation omitted). Moreover, Plaintiffs have not pled "some level of culpable participation at least approximating recklessness in the section 10(b) context." Id. This is particularly the case with respect to Defendants Clark and Schubert as to whom the Amended Complaint is utterly devoid of any allegations as to their state of mind or culpable participation of any sort. See, e.g., Sotheby's, 2000 WL 1234601, at *8 ("the Complaint contains no detailed allegations regarding the state of mind of the Financial Officer Defendants in making the alleged misstatements[, and thus], the Section 20(a) claim against the Financial Officer Defendants must be dismissed for failure to allege culpable participation in the fraud.") (citation omitted).

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice and grant such other and further relief as it deems just and proper.

Dated: New York, New York
       February 8, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP

By: _____
    A. Robert Pietrzak
    Andrew W. Stern
    Alex J. Kaplan
    787 Seventh Avenue
    New York, New York 10019
    (212) 839-5300
    rpietrzak@sidley.com
    astern@sidley.com
    ajkaplan@sidley.com

*Attorneys for Defendants*