UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————— x
PASQUALE A. LA PIETRA, Individually and  :   Case No. 1:09-cv-07439 (JGK)
on Behalf of All Others Similarly Situated,  :
                                    :
               Plaintiff,  :
                                    :
     vs.  :
                                    :
RREEF AMERICA, L.L.C., DEUTSCHE  :
INVESTMENT MANAGEMENT  :
AMERICAS, INC., MICHAEL G. CLARK  :
and PAUL H. SCHUBERT,  :
                                    :
            Defendants.  :
———————————————————— :x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

HORWITZ, HORWITZ & PARADIS
Michael A. Schwartz
Frank R. Schirripa
405 Lexington Ave, 61st Fl
New York, NY  10174
212/986-4500

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
Darren J. Robbins
Douglas Britton
Francis A. DiGiacco
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
619/231-1058

*Co-Lead Counsel For Plaintiffs and the Class*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

*The Funds* .......................................................................................................... 3

*Defendants' Strategy of Leveraging Through ARPS* ....................................... 4

*The Undisclosed Risks Associated with the ARPS Leveraging Strategy Materialize* ............... 6

ARGUMENT .......................................................................................................... 8

I.    THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATION OF SECTION 10(b) ............................................................................................................... 8

    A.    The Complaint Alleges Actionable Misrepresentations and Omissions ..................... 10

    B.    Stale Pre-Class Period Disclosures Do Not Immunize Defendants' Statements .......... 13

        1.    It Is Unreasonable to Presume That Plaintiffs Would Have Constructive Knowledge of Statements Made Up to Five Years Prior to the Start of the Class Period In Documents That Were Never Distributed to Plaintiffs ......................... 14

        2.    Defendants Had A Duty to Disclose New Facts and Update Statements Made Up to Five Years Earlier To Make Them Not Misleading ......................... 18

        3.    Defendants' Misstatements and Omissions Were Not Accompanied By Meaningful Cautionary Language ......................... 21

    C.    Plaintiffs' Allegations Raise a Strong Inference of Scienter ......................... 22

        1.    The Complaint Alleges Facts Demonstrating Defendants' Knowledge or Reckless Disregard of the Funds' Leveraging Through and Risks of ARPS ......................... 24

        2.    Defendants' Motive and Opportunity to Commit the Fraud Raises a Strong Inference of Scienter ......................... 28

    D.    The Complaint Adequately Pleads Loss Causation ......................... 30

    E.    The Presumption of Reliance Applies to Plaintiffs' Claims ......................... 32

II.    THE COMPLAINT STATES CONTROL PERSON LIABILITY UNDER §20(a) ......... 34

CONCLUSION ..................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)........................................................................................32, 33

*AIG Global Sec. Lending Corp. v. Banc of America Sec., LLC*,
No. 01-11448 (JGK), 2005 U.S. Dist LEXIS 21605 (S.D.N.Y. Sept. 26, 2005) ................8, 9

*Amorosa v. Ernst & Young LLP*,
2010 WL 329956 (S.D.N.Y. Jan. 20, 2010) ........................................................22

*Basic v. Levinson*,
485 U.S. 224 (1988)..............................................................................10, 33, 34

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................8

*Bertoglio v. Texas Int'l Co.*,
488 F. Supp. 630 (D. Del. 1980).....................................................................14

*Briskin v. Ernst & Ernst*,
589 F.2d 1363 (9th Cir. 1978) .....................................................................13

*Buxbaum v. Deutsche Bank AG*,
196 F. Supp. 2d 367 (S.D.N.Y. 2002)..............................................................10

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002).........................................................................18

*Chambers v. Time Warner*,
282 F.3d 147 (2d Cir. 2002)...........................................................................8

*Chiarella v. U.S.*,
445 U.S. 222 (1980)....................................................................................18

*Corwin v. Marney, Orton Invs.*,
843 F.2d 194 (5th Cir.) .............................................................................13

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir 1989)..............................................................................25

*Desai v. Gen. Growth Props.*,
No. 09 C 487, 2009 U.S. Dist. LEXIS 85271 (N.D. Ill. Sept. 17, 2009)................................27

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................30, 31

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).........................................................................24

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008).................................................29, 31, 34

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)........................................................................................8

*Fisher v. Plessey Corp.*,
    559 F. Supp. 442 (S.D.N.Y. 1983)................................................................15

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .......................................................................24

*Frigitemp Corp. v. Financial Dynamics Funds*,
    524 F.2d 275 (2d Cir. 1975).........................................................................18

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................. *passim*

*Glazer v. Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992).........................................................................18

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 ................................................................................................21

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008)..........................................................29

*In re Alcatel Sec. Litig.*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005)..........................................................11

*In re Ambac Financial Group, Inc. Sec. Litig.*,
    No. 08-CV-411 (NRB), 2010 U.S. Dist. LEXIS 16701 (S.D.N.Y. Feb. 22, 2010)...........28, 32

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)....................................................24, 25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................2, 25, 26

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008).....................................................10, 19

*In re Bristol-Myers Squibb Secs. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................................................27

*In re Citigroup Auction Rate Secs. Litig.*,
    No. 08 Civ. 3095 (LTS), 2009 WL 2914370 (S.D.N.Y. Sept. 11, 2009) ........................27, 29

*In re Columbia Sec. Litig.*,
    155 F.R.D. 466 (S.D.N.Y. 1994) .....................................................................................13

*In re Countrywide Financial Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................................32

*In re Crude Oil Commodity Litig.*,
    No. 06-CV-6677 (NRB), 2007 U.S. Dist. LEXIS 47902 (S.D.N.Y. Jun. 28, 2007) ..............10

*In Re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    No 98-4318 (HB), 2000 U.S. Dist. Lexis 13469 (S.D.N.Y. Sept. 20, 2000)...........................9

*In re Dynex Capital, Inc. Sec. Litig.*,
    No. 05-CV-1897 (HB), 2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19, 2009)...................9

*In re Dynex Capital, Inc. Sec. Litig.*,
    No. 05-CV-1897 (HB), 2006 U.S. Dist. LEXIS 4988 (S.D.N.Y. Feb. 10, 2006).....................9

*In re Indep. Energy Hldgs. PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001)................................................................................21

*In re Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 298 (S.D.N.Y. 2005)................................................................................30

*In re Loral Space & Comm'ns Ltd.  Sec. Litig.*,
    No. 01 Civ. 4388 (JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ...................................30

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)................................................................................34

*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008)................................................................................31

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008)................................................................................23

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)................................................................................13

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................................................22

iv

*In re Sotheby's Hldgs., Inc. Sec. Litig.*,
 No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)...............................26

*In re Take-Two Interactive Sec. Litig.*,
 551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................................28

*In re WorldCom, Inc. Sec. Litig.*,
 219 F.R.D. 267 (S.D.N.Y. 2003) ..........................................................................................34

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001)....................................................................................................8

*Kemp v. Universal Am. Fin. Corp.*,
 No. 05-9883 (JFK), 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007)............................................21

*Lapin v. Goldman Sachs Group, Inc.*,
 506 F. Supp. 2d 221 (S.D.N.Y. 2006)...............................................................................10, 19

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005).....................................................................................................31

*Ley v. Visteon Corp.*,
 No. 06-2237, 2008 WL 4460192 (6th Cir. Oct. 6, 2008) .......................................................28

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000).............................................................................................. *passim*

*P. Stolz Family Partnership L.P. v. Daum*,
 355 F.3d 92 (2d Cir. 2004)................................................................................................15, 22

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec.*,
 446 F. Supp. 2d 163 (S.D.N.Y. 2006)....................................................................................29

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)....................................................................................................22

*S. Ferry LP v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) ..................................................................................................25

*SEC v. Siebel Sys., Inc.*,
 384 F. Supp. 2d 694 (S.D.N.Y. 2005).....................................................................................22

*Sheppard v. TCW/DW Term Trust 2000*,
 938 F. Supp. 171 (S.D.N.Y. 1996)............................................................................................5

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
 No. 05-CV-1898 (SAS), 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006)................33

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  No. 05-cv-1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005) ...................9

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190, 194 (2d Cir. 2008)...........................................................................................24

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
  801 F. Supp. 1134 (S.D.N.Y. 1992), *aff'd* 985 F.3d 1198 (2d Cir. 1993).............13, 14, 15, 18

*Varghese v. China Shenghuo Pharm. Holdings*,
  No. 08-7422 (VM), 2009 U.S. Dist. LEXIS 114819 (S.D.N.Y. Dec. 9, 2009) ...................8, 9

*ZVI Trading Corp. Employees' Money Purchase Pension Plan & Trust v. Ross (In re
  Time Warner Sec. Litig.)*,
  9 F.3d 259 (2d Cir. 1993) .....................................................................................................18, 19

## STATUTES

15 U.S.C. § 77k(a) .........................................................................................................................15

15 U.S.C. §78j.........................................................................................................................*passim*

15 U.S.C. §78t(a) ...........................................................................................................................34

17 C.F.R. § 240.10b-5 ("Rule 10b-5").........................................................................8, 9, 18, 19

Private Securities Litigation Reform Act of 1995 ...................................................................9, 16

## OTHER AUTHORITIES

Fed. R. Civ. P. Rule 8(a)(2) ........................................................................................................30

Fed. R. Civ. P. Rule 9(b)..........................................................................................................8, 9

Fed. R. Civ. P. Rule 12(b)(6) ......................................................................................................13

Fed. R. Civ. P. Rule 23(b)(3) .....................................................................................................33

## PRELIMINARY STATEMENT

This is a straightforward case of securities fraud.  Defendants bulked-up DWS RREEF I and DWS RREEF II (the "Funds") with extraordinary leverage in a scheme whereby they caused the Funds to issue auction rate preferred securities ("ARPS") to highly leverage the Funds and garner tremendous and increased management fees.  At the same time, defendants repeatedly assured investors that the risks of investing in the Funds were being managed through investments in "high-quality" assets that were "fundamentally strong" while they concealed that they had increased the risks of the investment by leveraging the Funds with ARPS by as much as *35% of each Fund's total capital – far greater than other similar funds in defendants' peer group*.  The Funds' investments not only had to pay for the associated cost of the leverage, but they also ran the risk of being liquidated (at whatever the prevailing rate) if the auction mechanism for the ARPS failed, which would raise the interest rate paid under the ARPS to the "maximum rate."  At no time during the period of March 8, 2007 through November 17, 2008, (the "Class Period") did defendants disclose these risks to investors.

To make matters worse, defendants concealed the fact that the Deutsche Bank entities that controlled every aspect of the Funds' operations were also effective guarantors of the ARPS markets that they were using to manipulate their fees.  In fact, the Deutsche Bank entities were responsible for preventing (and had prevented) the ARPS auctions from failing, which placed the very viability of the Funds directly in defendants' hands.  As the economy soured, the Deutsche Bank entities no longer found it economically viable to rescue the auctions and allowed them to fail.  Doing so accelerated the ARPS interest to maximum rates and directly led to the collapse and liquidation of the Funds.  Stunningly, defendants claimed later that they *"expected"* the leverage added by the ARPS to exacerbate poor performance.  In the end, defendants benefited

directly from massive "management fees" while investors lost almost everything as a result of the Funds' liquidation.

Defendants' motion is based almost entirely on a proposition that finds no support in the facts or the law – that they disclosed the risks that led to a collapse of the Funds.  Reading defendants' motion leaves one with the impression that their purported disclosures about the risks of the Funds' use of ARPS *accompanied* each of the statements that plaintiffs allege are materially false and misleading.  But that impression is based on a fallacy – defendants' purported "disclosures" did not accompany their statements or even precede those statements by any reasonable period of time.  What defendants fail to mention in their motion is that their "disclosures" were made *up to five years before the start of the Class Period* and were contained in documents that were stale as a matter of law.  There is simply no factual or legal basis for the claim that investors knew or should have known about the risks that defendants' ARPS strategy brought to the Funds.

Defendants' disclosure argument also renders illogical their claim that plaintiffs have not adequately alleged scienter.  Indeed, defendants' arguments are entirely inconsistent.  If defendants claim that investors were on notice of the true facts because of what they disclosed five years earlier, how can they then argue with any credibility that defendants were not in a position to know?  They cannot.  But even if the arguments were consistent, the law does not permit an executive to dismiss seriously deceptive behavior by claiming that plaintiffs have not alleged hyper-specifics about what they knew.  Under circumstances like those in this case where the ARPS were a core strategy of the Funds that defendants controlled and were directly responsible for increasing defendants' fees, the law imputes knowledge to individuals in a position to know the information.  *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,

2

324 F. Supp. 2d 474, 489-90 (S.D.N.Y. 2004) (Where false statements and omissions concern the core operations of a company, knowledge of falsity "can be imputed" to the defendants that are "key officers").   After all, defendants signed the very pre-Class Period documents that defendants claim revealed the true risks of investing in the Funds and the fact that their fees were tied to this high risk investment strategy.

Defendants' challenges to loss causation and reliance are equally baseless.  The failure of the ARPS market, which was caused by the Deutsche Bank entities abandoning the securities, directly caused the collapse of the Funds.  When they abandoned the ARPS, the Funds were left with no other option but to sell off assets at fire-sale prices to redeem the ARPS.  Doing so prevented the required distributions under the Internal Revenue Code and led to the Funds' liquidations.  Since plaintiffs have alleged that the Funds traded in an efficient market, which reacted swiftly to the stunning news about the failure of the Funds as a result of the strategy of leveraging through the issuance of ARPS, defendants' reliance arguments fail.  Their motion should be denied.

## STATEMENT OF FACTS

*The Funds*

DWS RREEF I and DWS RREEF II were non-diversified, closed-end management investment companies with an investment objective of total return through a combination of high current income and capital appreciation potential by investing in real estate securities. (Amended Complaint ("Cplt."), ¶40.)   The Funds were managed by defendant Deutsche Investment Management, which acted as the Funds' Investment Manager, and defendant RREEF America, which acted as the Funds' Investment Advisor.  (*Id*., ¶¶ 41, 42.)  In return, the Funds paid defendant Deutsche Investment Management a monthly investment management fee

3

computed at an annual rate of 0.85% of average daily total managed assets, which equaled the net asset value of common shares *plus* the liquidation preference of any preferred shares and the principal amount of any borrowings.  (*Id.*, ¶ 44.)  The larger the pool of assets, the more fees defendants would be paid.  (*Id.*)

As closed-end funds, shares of the Funds were traded on the American Stock Exchange ("AMEX") following the Funds' October 2002 and August 2003 initial public offerings.  (*Id.*, ¶¶ 39, 48.)  On June 30, 2006, DWS RREEF I traded at $21.94 and DWS RREEF II traded at $16.40.  (*Id.*, ¶ 52.)

### *Defendants' Strategy of Leveraging Through ARPS*

To increase their fees, defendants engaged in a strategy in which the Funds issued ARPS, which increased the assets (and the leverage) of the Funds.  (*Id.*, ¶ 45.)  The dividend rate for these securities was set through a process known as a "Dutch auction."  (*Id.*)  In a Dutch auction, investors enter bids through broker-dealers specifying how many shares they wish to purchase and the lowest interest rate they are willing to accept.  (*Id.*)  All offers are then ranked and the lowest bid establishes the interest rate, or "clearing rate."  (*Id.*)  Investors with bids that are at or below the clearing rate receive that rate whereas those whose bids are above receive nothing. (*Id.*) When the supply of shares outweighs the demand, however, the auctions fail and the offeror (*i.e.*, DWS RREEF I & II) is forced to pay the maximum mandatory interest rate to investors left holding the security.  (*Id.*)

From March 2007 to March 2008, defendants discussed the Funds' outstanding ARPS through the Funds' reports and press releases.  (*Id.*, ¶¶ 53, 55, 57, 60, 62, 64, 67, 69.)  But instead of disclosing the true facts and circumstances surrounding the scheme to leverage the Funds through ARPS, including the risks attendant thereto, defendants continually assured investors

that the risks of investing in the Funds would be managed because of "high-quality" assets that were "fundamentally strong."  Each time the Funds filed a report, defendants told investors that *"[g]oing forward, we will continue to maintain positions in the highest-quality assets and real estate markets that we believe to be fundamentally strong*."   (*Id.*, ¶¶ 54, 56, 59, 61.)  And they assured investors that "[t]he fund's leveraging activities had no material effect on [the Fund's] performance."  (*Id.*, ¶ 59.)

Defendants' statements were materially false and misleading.  Contrary to their suggestion that the risks of investing in the Funds would be limited by "high quality" real estate investments or that the ARPS shares were "triple-A rated," defendants' ARPS strategy had dramatically increased the risk of investing in the Funds.  Indeed, the strategy had increased the leverage in the Funds to an aggregate amount of approximately 35% of each Fund's total capital – far greater than other similar funds in defendants' peer group. (*Id.*, ¶¶ 49(a), 58(a), 63(a), 86, 94(a).)  As defendants knew, and later said they "expected," the leverage would cause common shareholders' returns to fall and exacerbate poor performance, especially when the Funds' portfolios were invested in securities that provided a lower rate of return than the default dividend rate of the ARPS.  (*Id.*, ¶¶ 58(b), 63(b), 86.)

Defendants had actual knowledge that their ARPS strategy could severely compromise the performance of the Funds.  Deutsche Bank related entities were in complete control of the Funds, including Deutsche Bank Trust Company Americas, an affiliate of the Investment Manager and the Investment Advisor, which was the auction agent with respect to the Funds' ARPS. (*Id.*, ¶ 7(b).)  They therefore knew that the Funds' ability to leverage and pay dividends would be severely compromised if at any time the Deutsche Bank entities stopped intervening in failed auctions for ARPS.  (*Id.*, ¶¶ 49(b)-(c), 58(c), 63(c), 94(b)-(c).)  They also knew that the

Funds were exposed to higher volatility of the net asset value and market value of the common shares in which any decline in the net asset value of the Funds' investments would be borne entirely by the common shareholders.  If the market value of the Funds' portfolio declined, the leverage would result in a greater decrease in net asset value to common shareholders than if the Funds were not so highly leveraged. (*Id.*, ¶¶ 49(d), 58(d), 63(d), 94(d).)

Defendants' ARPS strategy also compromised the very viability of the Funds.  If the asset coverage ratio fell below 200%, the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; the Funds would be required to sell Fund assets in order to redeem the ARPS; and the failure to pay the requisite amount of dividends or make distributions would result in the Funds ceasing to qualify as regulated investment companies under the Internal Revenue Code.  (*Id.*, ¶¶ 49(e), 58(e), 63(e), 65(a), 70(a), 94(e).)  To the extent that the Funds had to redeem any ARPS, the Funds would be required to liquidate investments to fund such redemptions or repayments, which in times of adverse economic conditions would result in capital losses and reduced returns to common shareholders.  And to make matters worse, any such redemption or prepayment would likely result in the Funds seeking to terminate early all or a portion of any swap or cap transaction, which could result in a termination payment by or to the Fund.  (*Id.*, ¶¶ 49(f), 58(f), 63(f), 65(b), 70(b), 94(f).)

***The Undisclosed Risks Associated with the ARPS Leveraging Strategy Materialize***

In early 2008, the risks that defendants failed to disclose began to materialize. The Deutsche Bank AG entities stopped intervening in the auctions, the auctions failed, and the Funds were required to pay the mandatory maximum interest rates on the dividend payments for the ARPS they had issued.  As defendants expected, the Funds could not pay the default maximum interest rates required by the ARPS, and were forced to redeem their ARPS.  Initially,

defendants told investors that the Funds had secured financing from two major financial institutions to facilitate the full redemption of the ARPS.  (*Id*., ¶¶ 71, 75.)  But what defendants failed to mention was that the financing was "secured" and that the Funds would not be able to use these lines of credit because of the deterioration of the Funds' "high-quality" assets.  Instead, the Funds were forced to liquidate the Funds' assets in a depressed market at fire-sale prices and suffered severe capital losses as a result.  (*Id*., ¶¶ 72, 76.)

On September 12, 2008, defendants announced that the Funds would begin redeeming the ARPS and that the full redemption would be complete sometime in the late third/early fourth quarter of 2008.  (*Id*., ¶ 78.)  As the market absorbed this information, the Funds' share prices plummeted.  By October 27, 2008, DWS RREEF I had dropped from $16.61 per share to $6.15 per share while DWS RREEF II had dropped from $11.75 per share to $2.10 per share.  (*Id*., ¶ 79.)

On October 29, 2008, defendants confirmed the previously undisclosed risk that the Funds would not be able to use financing to redeem the ARPS and would have to sell the Funds' assets into a depressed market.  (*Id*., ¶ 80.)  With these disclosures, it became clear that distributions to common shareholders would cease.  (*Id*., ¶ 82.)  As a result, the share prices for DWS RREEF I and DWS RREEF II dropped from $3.45 per share to $2.65 per share and from $1.90 per share to $1.42 per share, respectively, from November 14, 2008 to November 18, 2008.  (*Id*., ¶ 83.)

On December 11, 2008, after massive redemptions, defendants confirmed that the Funds would not be declaring distributions to common shareholders.  (*Id*., ¶¶ 84, 85.)  The Funds' share prices continued to decline and have never recovered.  (*Id.*)  Defendants' liquidation proposals for each Fund were approved at meetings held on January 29, 2010.

**ARGUMENT**

To survive a motion to dismiss, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Varghese v. China Shenghuo Pharm. Holdings*, No. 08-7422 (VM), 2009 U.S. Dist. LEXIS 114819, *11-12 (S.D.N.Y. Dec. 9, 2009).  A court must accept all well-pleaded factual allegations in the complaint as true and should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "'raise a right to relief above the speculative level.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see Chambers v. Time Warner*, 282 F.3d 147, 152 (2d Cir. 2002).  The task of the court in ruling on a motion to dismiss is "'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *AIG Global Sec. Lending Corp. v. Banc of America Sec., LLC*, No. 01-11448 (JGK), 2005 U.S. Dist LEXIS 21605, at *6 (S.D.N.Y. Sept. 26, 2005).

**I.     THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATION OF SECTION 10(b)**

To adequately state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a complaint must assert facts showing that "the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); *see AIG Global Sec. Lending Corp.*, 2005 U.S. Dist LEXIS 21605, at *6.  The Complaint must also allege a state of mind evidencing "'an intent to deceive, manipulate or defraud.'"  *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

A complaint must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  It can do

so by (1) specifying the statements that the plaintiff alleges were fraudulent, (2) identifying the speaker, (3) indicating when and where the statements were made, and (4) explaining why the statements were fraudulent. *See Varghese*, 2009 U.S. Dist. LEXIS 114819, at *13, 18-19 (finding that plaintiffs' allegations satisfied Rule 9(b) and PSLRA) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *see also AIG Global Sec. Lending Corp.*, 2005 U.S. Dist LEXIS 21605, at *31, 43 (sustaining plaintiffs' Rule 10b-5 claims where pleadings complied with Rule 9(b)). And under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See In re Dynex Capital, Inc. Sec. Litig.*, No. 05-cv-1897 (HB), 2009 U.S. Dist. LEXIS 96527, at *17 (S.D.N.Y. Oct. 19, 2009).

The Complaint satisfies each of these requirements. Defendants' motion fails to demonstrate that the facts and risks concerning an investment in the Funds during the Class Period "were fully and clearly disclosed." *See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs. Br."), pp 17-28. Indeed, defendants' arguments make it clear that Plaintiffs and the other members of the Class were deceived as to the risks of investing in the common stock of the Funds.[1]

---

[1]     Defendants' argument that Plaintiffs lack standing to assert claims on behalf of purchasers of DWS I because Plaintiffs purchased shares of DWS II (Defs. Br. at 15 n. 12) must fail because defendants made the exact same misrepresentations with respect to each security at issue. *See In re Dynex Capital*, 2009 U.S. Dist. LEXIS 96527, at *62 (holding that "at this stage of the litigation Plaintiffs have adequately alleged their standing to proceed on behalf of purchasers of both the Series 12 and Series 13 Bonds because they allege that Defendants made the exact same misrepresentations with respect to both series of bonds and that the bond collateral suffered from the same defects") (citing *In re Dynex Capital, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 4988, at *39-40 (S.D.N.Y. Feb. 10, 2006); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05-cv-1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *35 (S.D.N.Y. Sept. 6, 2005) (same); *In Re Dreyfus Aggressive Growth Mut. Fund Litig.*, No 98-4318 (HB), 2000 U.S. Dist. Lexis 13469, at *12-16 (S.D.N.Y. Sept. 20, 2000) (holding that plaintiffs could bring a class action on behalf of purchasers of other Dreyfus mutual funds even though plaintiffs did not purchase from each fund where plaintiffs alleged that funds made similar misrepresentations and omissions).

**A.      The Complaint Alleges Actionable Misrepresentations and Omissions**

A defendant is liable for a misstatement or omission if "the non-disclosure is a material one, or materially affects another disclosure made."  *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).  To fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Buxbaum v. Deutsche Bank AG*, 196 F. Supp. 2d 367, 376 (S.D.N.Y. 2002) (Koeltl, J.) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)).  "At the pleading stage, a plaintiff satisfies the materiality requirement … by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (quoting *Ganino*, 228 F.3d at 161).

Defendants' statements concerning the risks of investing in the Funds were materially false and misleading.  (Cplt., ¶¶ 54-57, 59-62, 64, 66-69, 71, 73-74, 75, 77.)  Defendants assured investors during the Class Period that "[t]he fund's leveraging activities had no material effect on [the Fund's] performance" and repeatedly represented that the Funds were investing in the "highest-quality assets and real estate markets" that they believed were "fundamentally strong" – a clear representation to investors that the risks of investing in the Funds were being controlled. (*Id.*, ¶¶ 59, 61.)  In fact, defendants assured investors that the ARPS were "triple-A rated" even after the collapse of the ARPS market in early 2008, and misrepresented that they were managing risk by "continu[ing] to maintain positions in the highest-quality assets and real estate

10

markets that we believe to be fundamentally strong," while scrambling to secure lines of credit to redeem the ARPS that were paying "maximum rate" dividends.  (*Id.*, ¶¶ 64, 75, 77.)[2]

Contrary to these representations, defendants' ARPS strategy had dramatically increased the risk of investing in the Funds.  The strategy had increased the leverage in the Funds to an aggregate amount of approximately 35% of each Fund's total capital – ***far greater than other similar funds in defendants' peer group***.  (*Id.*, ¶¶ 49(a), 58(a), 63(a), 86, 94(a).)  Only after the close of the Class Period did defendants admit that they "***expected***" overleveraging to cause common shareholders' returns to fall and exacerbate poor performance.  (*Id.*, ¶ 86.)  This startling admission was directly at odds with their positive claims about the Funds throughout the Class Period.  *See e.g., id.*, ¶¶ 59, 61. [3]

Defendants' statements also failed to disclose that Deutsche Bank related entities were in complete control of the Funds, and that the Funds' ability to leverage and provide dividends would be severely compromised if at any time the Deutsche Bank AG entities stopped intervening in failed auctions for ARPS.  (*Id.*, ¶¶ 7(b), 49(b)-(c), 58(c), 63(c), 94(b)-(c).)  In fact, defendants' ARPS strategy put the Funds' risks directly into defendants' hands.  The Funds were exposed to higher volatility of the net asset value and market value of the common shares, and

---

[2]     Defendants' reliance on *In re Crude Oil Commodity Litig.*, No. 06-CV-6677 (NRB), 2007 U.S. Dist. LEXIS 47902, at *19 (S.D.N.Y. Jun. 28, 2007) for the proposition that the Complaint "lumps" together all defendants and fails to satisfy the particularity requirement, *see* Def. Br. at 14, is misplaced. In *Crude Oil*, the complaint never "identif[ied] the market players … with whom defendants allegedly unlawfully conspired," nor "point[ed] to one specific instance in which defendants or their agents made misleading statements…."  2007 U.S. Dist. LEXIS 47902, at *19. Here, the Complaint alleges that defendants Clark and Schubert caused specific materially false and misleading statements to be made to investors. *See, e.g.,* Cplt., ¶¶ 54-57, 59-62, 64, 66-69.

[3]     Unlike the complaint in *In re Alcatel Sec. Litig.,* 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005), a case upon which defendants rely for the proposition that the Complaint lacks specificity (Def. Br. at 16), here, the Complaint identifies the specific text that is materially false and misleading by quoting a specific isolated sentence or italicizing and bolding the misleading language contained in a block quotation. *See, e.g.*, Cplt., ¶¶ 54, 56, 59, 61, 66, 73-74, 77.

any decline in the net asset value of the Funds' investments would be borne entirely by the common shareholders if the Deutsche Bank entities abandoned the auctions. Defendants never disclosed during the Class Period that their high risk leverage strategy would result in a greater decrease in net asset value to common shareholders than if the Funds were not so highly leveraged and that they had the power to directly influence that risk. Indeed, when the Deutsche Bank entities abandoned the auctions, many of the Funds' investments were providing a rate of return lower than the default rate the Funds would have to pay to the holders of the ARPS. (*Id*., ¶¶ 49(d), 58(d), 63(d), 94(d).)

Defendants also failed to disclose that the Funds' ARPS strategy had compromised the very viability of the Funds. None of defendants' statements made during the Class Period specifically warned that if the Funds' asset coverage ratio fell below 200%, the Funds would not be permitted to declare any cash dividend or other distribution on its common shares; the Funds would be required to sell Fund assets in order to redeem ARPS; and the failure to pay the requisite amount of dividends or make distributions would disqualify the Funds as regulated investment companies under the Internal Revenue Code. (*Id.*, ¶¶ 49(e), 58(e), 63(e), 65(a), 70(a), 94(e).) Unbeknownst to investors, if forced to redeem any ARPS, the Funds would be required to liquidate investments – which in times of adverse economic conditions would be at fire sale prices – to fund such redemptions or repayment resulting in capital losses and reduced returns to common shareholders. (*Id.*, ¶¶ 49(f), 58(f), 63(f), 65(b), 70(b), 76, 94(f).) Common stockholder losses would be compounded by the fact that any such redemption or prepayment would likely result in the Funds seeking to terminate early all or a portion of any swap or cap transaction, which could result in a termination payment by the Fund. (*Id.*).

These facts, known to defendants, but never disclosed to investors during the Class Period, would have been significant to investors while making their decision to invest in the Funds. *See Ganino*, 228 F.3d at 161. Indeed, all of these omitted and misrepresented risks caused the Funds to ultimately have to sell off the Funds' assets at fire-sale prices, leading to the precipitous decline in the Funds' share prices. (*Id.*, ¶¶ at 79, 83.)

### B.       Stale Pre-Class Period Disclosures Do Not Immunize Defendants' Statements

Defendants argue that the Complaint fails to allege actionable misrepresentations or omissions during the Class Period because they disclosed the "true facts and risks." (Defs. Br. at 17-28.)[4]  For support, defendants repeatedly cite to the Funds SEC filings, including the Registration Statements and Prospectuses for each of the Funds (the "Prospectuses") (*see* Stern Decl. Exhs. A-G), but omit to inform the Court that the Funds' Prospectuses are dated October 28, 2002 and August 26, 2003, ***up to five years prior to the start of the Class Period***.  (Cplt., ¶¶ 1, 3, 31-32.)  They also fail to mention that the sales of the Funds' shares after the October 2002 and 2003 initial public offerings were ***not*** made pursuant to the stale Prospectuses, but pursuant to defendants' public statements contained in press releases and SEC filings during the Class Period.  *See, e.g.,* Cplt,. ¶¶ 54-57, 59-62, 64, 66-69, 71, 73-74, 75, 77.  Defendants' argument, therefore, fails as a matter of law.  *See United Paperworkers Int'l Union v. Int'l Paper Co*., 801 F. Supp. 1134, 1141 (S.D.N.Y. 1992) (public disclosure of information only relieves duty to

---

[4]       Defendants' assertion of a "truth-on-the-market" defense is inappropriate in a Rule 12(b)(6) motion.  *See Ganino*, 228 F.3d at 162 ("truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint to plead materiality"); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 529-31 (S.D.N.Y. 2009) (rejecting "truth-on-the-market" defense sustaining Section 10(b) complaint); *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1994) ("[D]efendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage").

disclose if "it is reasonable to conclude that the plaintiff should have been made aware of the fact as a result of that disclosure"), *aff'd*, 985 F.2d 1190 (2d Cir. 1993).[5]

> ## 1. It Is Unreasonable to Presume That Plaintiffs Would Have Constructive Knowledge of Statements Made Up to Five Years Prior to the Start of the Class Period In Documents That Were Never Distributed to Plaintiffs

The documents defendants claim contained the disclosures necessary to make the statements complained of not false and misleading were filed with the SEC between October 28, 2002 and January 9, 2004 (*see* Stern Decl. Exhs. A-G) — years prior to the commencement of the Class Period and Plaintiffs' purchases of shares of the Funds. (Cplt., ¶¶ 1, 23-24). Plaintiffs purchased their shares of the Funds on the open market and were not provided, nor required to receive and review, copies of the Prospectuses at the time of purchase. (*Id.*, ¶¶ 23-24). Nor, as defendants would have this Court find, would it be reasonable to presume that Plaintiffs would have received or reviewed the 2002 and 2004 prospectuses for the ARPS – *securities Plaintiffs had not purchased* – which were sold by defendants in order to leverage the Funds. *See* Defs. Br. at 5, 19, 21,24-25 and Stern Decl Exhs. C, D and G.

*United Paperworkers Int'l Union* is instructive. There, the court rejected an argument similar to the one defendants make here that the accuracy of statements contained in the company's proxy statement should be considered in light of other disclosures made in "the company's Form 10-K and press reports." *United Paperworkers Int'l Union.*, 801 F. Supp. at 1141-1142. The Form 10-K, though publicly available, was not mailed to shareholders, and, as the *Bertoglio* court noted, was not information reasonably within the constructive knowledge of

---

[5]     *See also Corwin v. Marney, Orton Invs.*, 843 F.2d 194, 198 (5th Cir.), *cert. denied*, 488 U.S. 924 (1988) ("An investor without reason to know of something untoward in the circumstances of the investment is not necessarily burdened with a duty to examine documents external to those normally used in the transaction"); *Briskin v. Ernst & Ernst*, 589 F.2d 1363, 1368 (9th Cir. 1978) (refusing to decide as a matter of law that a reasonably prudent person would check SEC filings to verify the terms of a transaction).

the typical security holder.  *Id.* (citing *Bertoglio v. Texas Int'l Co.*, 488 F. Supp. 630, 643 (D. Del. 1980)).  In affirming the holding in *United Paperworkers Int'l Union,* the Second Circuit held that SEC filings that have not been distributed to the shareholders, and news articles that pre-date the statements at issue, should rarely be considered part of the total mix of information reasonably available to those shareholders:

> In the present case, the district court properly rejected Paper Co.'s contention that public press reports and its 10-K Report should be viewed as part of the total mix of information reasonably available to shareholders. Though the Company argued that news articles should be considered, the articles were few in number, narrow in focus, and **remote in time**. . . .  Further, these articles were not published in the context of this proxy contest. Rather, they spanned more than a year; the latest of them had appeared more than two months before the Company's Proxy Statement was even issued; and all but one had appeared **more than six months earlier**. These articles were properly considered not to be part of the information that was reasonably available to shareholders.
>
> Nor was the Company's 10-K Report part of the reasonably available mix. That report was filed with the SEC, [and] not distributed to shareholders. Nothing in any of the documents sent to shareholders highlighted the 10-K Report. The Proxy Statement did not mention it at all; and the annual report made no reference to it in its description of the Company's environmental record.

*Id.* 985 F.2d at 1199 (emphasis added).  *See also Fisher v. Plessey Corp.,* 559 F. Supp. 442, 445-448 (S.D.N.Y. 1983) (holding that "of paramount importance ... is the direct availability to the investors of the information in question").

The same reasoning applies here.  Plaintiffs purchased their shares of the common stock of the Funds on the open market – the same way that all other common stock is purchased.  The law does not require, nor expect, a purchaser of securities to read a five-year-old prospectus to understand the risks of the investment.   Instead, Congress and the SEC have explicitly recognized the fact that disclosures made in registration statements go stale and can only be relied upon for twelve months after its effective date.  *See* 15 U.S.C. § 77k(a).  Defendants cannot extend that time to five years, especially for open market purchases.  *Id.*  Indeed, even the

PSLRA requires disclosures to be contemporaneous with the statements that they are intended to immunize. *See P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004).[6]

Defendants argue that had an investor read the 2002 and 2003 Funds Prospectuses (*see* Stern Decl., Exhs. A and B) and prospectuses for the ARPS, filed between October 28, 2002 and January 9, 2004, the investor would have learned the following true risks of investing in the Funds that were not disclosed during the Class Period:

- the Funds "would use leverage via ARPS," (Defs. Br. at 19 relying on Stern Exhs. B, C and D – the October 28, 2002 Prospectus, January 13, 2003 Prospectus and January 9, 2004 Prospectus, respectively, as the cure for the non-disclosure);

- the increase in management fees which resulted from defendants' use of ARPS to leverage the Funds incentivized defendants to over-leverage the Funds using ARPS, (*id.* relying on Stern Exhs. B, C, D, F and G – the October 28, 2002 Prospectus, January 13, 2003 Prospectus, January 9, 2004 Prospectus, August 26, 2003 Prospectus and November 17, 2003 Prospectus, respectively, as the cure for the non-disclosure);

- the Funds would be required to redeem some or all of the outstanding ARPS if the Funds were unable to timely cure a breach of the 200% asset coverage ratio, (*id.* at 21, relying on Stern Exhs. C, D and G – the January 13, 2003 Prospectus, January 9, 2004 Prospectus and November 17, 2003 Prospectus, respectively, as the cure for the non-disclosure);

---

[6]     Defendants' reliance on *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) for the proposition that investment strategies and risks disclosed in the prospectus absolve the Funds of alleged misrepresentation or omissions (Defs. Br. at 17), is misplaced.  In *Sheppard*, the alleged actionable misrepresentations and omissions were alleged to be ***in the prospectus*** –  and the statements that were alleged to cure the misstatements and omissions were in the very ***same prospectus***.  The same is obviously not true here.

- the impact of leverage on the Funds' NAV and common share prices (*id*. at 23, relying on Stern Exhs. A, B, E and F – the August 6, 2002 Registration Statement, October 28, 2002 Prospectus, May 6, 2003 Registration Statement and August 26, 2003 Prospectus, respectively, as the cure for the non-disclosure);

- that the "Fund may need to liquidate investments" to redeem ARPS and that "liquidation at times of adverse economic conditions may result in capital loss and reduce returns to Common Shareholders," (*id*. at 24-25, relying on Stern Exhs. A-G – the August 6, 2002 Registration Statement, the October 28, 2002 Prospectus, January 13, 2003 Prospectus, January 9, 2004 Prospectus, May 6, 2003 Registration Statement, August 26, 2003 Prospectus and November 17, 2003 Prospectus, respectively, as the cure for the non-disclosure); and

- the undisclosed use of interest rate swaps (*id*. at 26-27, relying on Stern Exhs. A, B, E and F – the August 6, 2002 Registration Statement, October 28, 2002 Prospectus, May 6, 2003 Registration Statement and August 26, 2003 Prospectus, respectively, as the cure for the non-disclosure).

Defendants add that "Plaintiffs must concede that the Funds fully disclosed the risks associated with possible failed ARPS auctions . . ." (Defs. Br. at 20, citing the Funds' Prospectuses.)[7]

Not true.  None of these disclosures were contained in the Funds' public statements during the Class Period, *e.g.,* the 2007 or 2008 Semi-Annual Reports to Shareholders or the other press releases and annual and semi-annual reports the Complaint alleges were materially false

---

[7]    Defendants' argument that "the auction failures resulted only in higher borrowing costs and did not otherwise impact upon the Funds' use of leverage (Def. Br. at 20, n.14), ignores the Complaint's allegations that these failures led to the liquidations of the Funds at fire-sale prices damaging Plaintiffs and the Class.  *See, e.g.,* Cplt. ¶ 7 (c) and (f).

and misleading during the Class Period.  *See* Cplt., ¶¶ 54-57, 59-62, 64, 66-69, 71, 73-74, 75, 77.

What was also never disclosed before or during the Class Period was the fact that the Deutsche

Bank entities (the auction agent with respect to the Funds' ARPS) were manipulating the

auctions for the these ARPS, and that once defendants' affiliates stopped doing so, the auctions

would fail, damaging the Funds and their investors.  (Cplt., ¶¶ 4(b-c), 49(b-c).)[8]

### 2. Defendants Had A Duty to Disclose New Facts and Update Statements Made Up to Five Years Earlier To Make Them Not Misleading

Where "an allegation of fraud is based upon nondisclosure, there can be no fraud absent a

duty to speak."  *Chiarella v. U.S.*, 445 U.S. 222, 235 (1980) (finding that silence is only

fraudulent if there exists a duty to disclose).  But once a defendant has elected to speak, Rule

10b-5 mandates that its speech must be truthful, accurate, and complete.  *See Caiola v. Citibank,*

*N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Upon choosing to speak, one must speak truthfully

about material issues.  Once [a company] chose to discuss its hedging strategy, it had a duty to be

both accurate and complete") (citations omitted).

Specifically, Section 10(b) and Rule 10b-5 "impose[] ... a duty to disclose … when

silence would make other statements misleading or false."  *Glazer v. Formica Corp.*, 964 F.2d

149, 157 (2d Cir. 1992) (quotations and citations omitted); *see also ZVI Trading Corp.*

*Employees' Money Purchase Pension Plan & Trust v. Ross (In re Time Warner Sec. Litig.)*, 9

---

[8]     Defendants' reliance upon *Frigitemp Corp. v. Financial Dynamics Funds*, 524 F.2d 275, 282 (2d Cir. 1975) for the proposition that the Funds were not obligated to repeat "basic" information contained in prior disclosures is misplaced. *See* Defs. Br. at 20 n.13.  First, as already discussed, the omitted information here is not "basic." In *Frigitemp*, the Second Circuit distinguished the case's facts from situations, such as the present case, where a defendant is required to disclose "market information" or "corporate inside information." *Id.* at 282. Here, unlike publicly tracked ownership interests and reported stock transactions at issue in *Frigitemp*, Defendants failed to disclose material information related to the risks of investing in the Funds, *e.g.,* Funds' use of ARPS to leverage the Funds.  Second, in *United Paperworkers Int'l.*, the court acknowledged *Frigitemp*, but held that it did not apply because it was unreasonable to conclude, as a matter of law, that press reports and company's Forms 10-K filed with SEC were part of total mix of information reasonably available to shareholders.  801 F. Supp. 1141-1142; *see supra*.

F.3d 259, 267-268 (2d Cir. 1993) (holding that duty to disclose arises whenever omitted information renders prior public statements materially misleading; not merely when that information completely negates public statements).  Even an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it – or other statements made – materially misleading.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).

Under the plain language of Rule 10b-5, it is impermissible "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (citing 17 C.F.R. § 240.10b-5.)  If a reasonable investor would so regard the omitted fact as having altered the "total mix" of information available, "it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure." *In re Time Warner Sec. Litig.*, 9 F.3d at 267-268; *Cf. Ganino*, 228 F.3d at 162 (recognizing that materiality of omissions are mixed questions of law and fact, courts often will not dismiss  securities fraud complaint at the pleading stage, unless reasonable minds could not differ on the importance of the omissions).

Even if defendants had disclosed the "true facts and risks" in the Funds' earlier Prospectuses (*see* Defs. Br. 19-27), those disclosures were stale and had to be updated prior to and during the Class Period to reflect changing economic conditions and the Funds' aggressive investment strategies.  Defendants creatively argue that they "periodically updated investors" as to the Funds' use of leverage and reiterated that the computation of management fees would be based on the level of assets that included the par value of the ARPS. (Defs. Br. at 19-20).  Defendants' "updates" did not come close to satisfying their duty to make a complete disclosure.  *See Lapin*, 506 F. Supp. 2d at 238 (finding plaintiff's claim to be actionable where defendants

"were aware of undisclosed facts that seriously undermined the accuracy of their professed opinions or beliefs").

While defendants disclosed in the Funds' 2006 Annual Report and 2007 Semi-Annual Report the dollar amount of the Funds' "Preferred Stock, at Liquidation Value," (Defs. Br. at 19-20, citing, *e.g.,* Stern Exh. L at 18, 20), this disclosure does not in any way, as defendants' claim, place investors on notice that the Funds "used ARPS to leverage its capital," or the percentages by which the capital was leveraged by use of ARPS.  *See* Stern Decl. Exhs. K-N.  These vague "disclosures" are found in line items of the Funds' financial statements and do not in any way disclose to investors that defendants' core strategy of leveraging the Funds through capitalizing with ARPS was a risky strategy that would collapse the Funds if economic conditions soured and/or if Deutsche Bank AG entities stopped manipulating the weekly auctions for the ARPS.[9] (Cplt., ¶¶ 58, 63.)

Defendants' reliance on market conditions to argue that their intention to maintain leverage as of early June 2008 was justified is not only inappropriate, it is baseless.  (Defs. Br. at 25-26.)  While the Lehman Brothers bankruptcy had not yet occurred, the collapse of the residential real estate market and the mortgage-backed securities market started in late 2007 and the first half of 2008.  Given these circumstances, the Funds' assets could not be used as collateral for the line of credit needed to retire the ARPS.  Defendants' June 10, 2008 press release stating otherwise was plainly misleading.  (Cplt., ¶¶ 72, 78, 80.)[10]

---

[9] Defendants' argument that Deutsche Bank Trust Company America played a "limited role in the ARPS auction" and was "purely administrative," (Def. Br. p. 20 n. 14), is clearly a question of fact and is inappropriate on a motion to dismiss.  *See, e.g., Ganino,* 228 F.3d at 162.

[10] Defendants argue that their statements following the first failed ARPS auction were not misleading because they disclosed that "prolonged auction failure may increase the cost of leverage" for the Funds.  (Def. Br. at 20 n.15).  Defendants assertion in the same press release that the ARPS were

### 3. Defendants' Misstatements and Omissions Were Not Accompanied By Meaningful Cautionary Language

Defendants argue – without reference to a specific alleged misstatement – that "any isolated misstatement" was immaterial because cautionary language contained in separate documents issued by the Funds several years earlier bespoke caution. *See* Defs. Br. at 28.  The "'bespeaks caution' doctrine only applies to forward looking statements" and the cautionary language must "warn investors of **exactly** the risk that plaintiffs claim was not disclosed." *In re Indep. Energy Hldgs. PLC Sec. Litig.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) (citations omitted; emphasis added).  Defendants do not even identify their purported cautionary language; but rather argue that the Funds' ominous disclosures were contained somewhere in the universe of information available to investors.  *See* Defs. Br. at 28.  Defendants rely on *Kemp v. Universal Am. Fin. Corp.*, No. 05-9883 (JFK), 2007 WL 86942, at *11 (S.D.N.Y. Jan. 10, 2007) (citing *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352. 357 (2d Cir. 2002)), for the proposition that "cautionary language need not be in the same document that contains the forward-looking statement."  Defs. Br. at 28.  But in *Halperin*, the Second Circuit never held that the cautionary language need not be in the same document to be curative.  Rather, the Second Circuit held that:

> **[W]hen cautionary language is present, we analyze the allegedly fraudulent materials in their entirety** to determine whether a reasonable investor would have been misled.  The touchstone inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, **considered together and in context**, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

295 F.3d at 357 (emphasis added).  Indeed, the Second Circuit subsequently held that cautionary language must be "**within the same [document]** such that no reasonable investor would be

---

"triple-A rated," *see e.g.*, Cplt., ¶ 64, belies any claim that defendants disclosed the risks and consequences of failed auctions on February 20, 2008.  *See* Def. Br. at 21-22.

mislead about the nature and risk of the offered security." *P. Stolz Family Partnership L.P.*, 355 F.3d at 96; *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

As a matter of law, defendants' argument that cautionary language made in disclosures years before the Class Period can cure the defects in their Class Period statements must fail. Even if defendants had repeated their prior purported "cautionary language" verbatim along side defendants' misstatements made during the Class Period, however, the bespeaks caution doctrine would not apply because such disclosures would fail to warn investors of **exactly** the risks that existed during the Class Period.[11]

### C.    Plaintiffs' Allegations Raise a Strong Inference of Scienter

A plaintiff can raise a strong inference of scienter in the Second Circuit by pleading either (a) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, **or** (b) facts to show that defendants had both motive and opportunity to commit fraud.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  The Supreme Court's decision in *Tellabs* did not alter this pleading standard.  *See, e.g.*, *Amorosa v. Ernst & Young LLP*, 2010 WL 329956, at *9 (S.D.N.Y. Jan. 20, 2010) (discussing that plaintiffs may plead scienter under *Tellabs* using Second Circuit pleading standard).  In *Tellabs*, the Supreme Court held that in evaluating allegations of scienter courts must (1) accept all factual allegations in the complaint as true; (2) consider the allegations collectively; and (3) entertain only those plausible opposing inferences that can be rationally drawn from the facts alleged.  *See Tellabs,*

---

[11]    Defendants argue that "many" of the alleged misrepresentations and omissions are "quite 'basic'" and cannot be viewed as material.  *See* Defs. Br. at 28 (Relying upon *SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 708 n.13 (S.D.N.Y. 2005) (finding that statement "linked to or conditioned upon the performance of the economy" to be "so basic that a reasonable investor could be expected to know it does not constitute material facts.")).  However, here, the alleged misrepresentations are far more sophisticated and involve complex investment strategies and transactions – including leveraging risk and return through the use of auction rate preferred securities and secured lines of credit (Cplt., ¶¶ 71-72, 75-76), interest rate swaps and cap transactions (*id.*, ¶¶ 70(b), 72), and the ability for the Funds to continue to qualify as a regulated investment company under the Internal Revenue Code (*id.,* ¶ 70(a)).

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-25 (2007).  The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre," but simply "***cogent and compelling***, thus strong in light of other explanations."  *Id.* at 324 & n. 5.  To negate a strong inference of scienter, defendants must raise an inference that is ***more*** compelling than the inferences raised by plaintiffs' allegations of both conscious misbehavior and recklessness and motive and opportunity.  *Id.* at 313-16.

Where, as here, the inference of scienter is supported by allegations that defendants "'knew facts or had access to information suggesting that their public statements were not accurate,'" the scienter and falsity analysis are largely intertwined.  *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 639 (S.D.N.Y. 2008) (quoting *Novak*, 216 F.3d at 311).  In fact, "the question of scienter is implicitly resolved" where a complaint sufficiently pleads both the materiality of defendants' omission as well as defendants' knowledge.  *Id.* at 639.  Plaintiff's Complaint does exactly that.

Recognizing that ***all*** of the facts alleged in the Complaint, when considered ***collectively***, raise a strong inference of scienter, defendants try to diminish the significance of the allegations by addressing them individually and out of context (or ignoring them altogether) and then arguing that, standing on their own, the allegations are insufficient.  (*See* Defs. Br. at 29-32.)  By doing so, defendants fail to consider the aggregate effect of plaintiffs' scienter allegations, as the law requires.  *Tellabs*, 551 U.S. at 321-23.  As made clear below, a "holistic" review of the totality of the facts pled – facts demonstrating both defendants' knowledge or reckless disregard of the truth and their motive and opportunity to commit the fraud – demonstrates that Plaintiffs have more than satisfied their burden to plead scienter as to defendants.

1.     **The Complaint Alleges Facts Demonstrating Defendants' Knowledge or Reckless Disregard of the Funds' Leveraging Through and Risks of ARPS**

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (citing *Novak*, 216 F.3d at 311).  Thus, any examination of defendants' scienter naturally begins with an analysis of the allegations evidencing that they "'knew facts or had access to information suggesting that their public statements were not accurate'" or "'failed to check information they had a duty to monitor.'" *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

Here, the facts alleged remove any doubt that defendants knew of the risks that their ARPS leverage strategy added to the Funds. Specifically, defendants "knew facts or had access to information suggesting" that their core strategy of capitalizing through ARPS was an extremely risky strategy that could collapse the Funds if economic conditions soured.  (Cplt., ¶ 100.)  Not only were the Deutsche Bank entities responsible for all of the Funds' operations, but they were also responsible for preventing (and had been preventing) failed auctions by executing clearing bids at each of the weekly auctions for the ARPS.  (*Id.*, ¶¶ 2, 7(b), 25-27, 41-43, 49(b), 53, 94(b), 100.)  This direct involvement eliminates any claim that defendants did not know about the risks involved in the ARPS market or what would happen if the Deutsche Bank entities refused to prevent a failed auction. *See In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 219-20 (S.D.N.Y. 2004) (finding scienter was adequately plead where

corporate defendants had direct involvement in transactions as well as access to company financial information).

At the same time, defendants Clark and Schubert, who were the most senior executives of the Funds, signed every annual and semi-annual report referencing the ARPS and describing the Dutch auction process.  (*Id.*, ¶¶ 28, 29.)  Indeed, these defendants were responsible for issuing press releases on behalf of the Funds in early 2008 describing the failed auctions while simultaneously describing the ARPS as "Triple-A rated."  (*See, e.g.*, Cplt., ¶ 64.) And, of course, the ARPS were directly responsible for dramatically increasing the fees that the Deutsche Bank entities (and consequently Clark and Schubert) received from the Funds.  Under these circumstances, it would be absurd to suggest that these defendants were not aware of the ARPS or the risks that the ARPS market brought to the Funds' investors.  *See In re Atlas Air Worldwide Holdings*, 324 F. Supp. 2d at 489-90 ("the fact that the [misleading] statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made"); *see also Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir 1989) (imputing knowledge of import restrictions to company's directors where the restrictions would have "apparently eliminated a potentially significant source of income for the company"); *S. Ferry LP v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (scienter can be satisfied "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter").

Defendants' "opposing inference" that they were unaware or could not have known the true facts about the Funds' core leveraging strategy is simply not credible.  (Defs. Br. at 31.)  In fact, it is *im*plausible to suggest that defendants would ***not*** have known and had access to the true facts about the Funds' capitalization through ARPS and the inherent risks associated with this

leverage.  The use of ARPS leveraged the Fund in an aggregate amount of approximately 35% of the Funds' total capital – an amount defendants were undoubtedly aware of since they signed the reports that referenced the ARPS and benefited directly from the asset value that the ARPS added to the Funds. (Cplt., ¶¶ 45, 99.)  These efforts to raise capital for the Funds represented a core strategy that defendants are deemed to have known.  *See Atlas*, 324 F. Supp. 2d at 489-90 (knowledge of core operations "can be imputed" to "key officers").

To argue that the Complaint does not allege scienter with respect to each defendant, defendants ignore a number of allegations.  (*See* Defs. Br. at 29.)  Aside from the fact that defendants' false statements and omissions concerned a core strategy of the Funds, defendants Clark and Schubert signed the Funds' Annual and Semi-annual Reports to Stockholders, which were false and misleading.  (Cplt., ¶¶ 28, 29.)  Their signatures in addition to their positions as President and Treasurer/Chief Financial Officer demonstrate their ability to control the content of these public statements.  (*Id.*, ¶ 107.)  Even defendants' own case, *Sotheby's*, recognizes that these allegations are sufficient to raise a strong inference of scienter under these factual circumstances.  (Defs. Br. at 29 (citing *In re Sotheby's Hldgs., Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (finding allegations of direct involvement and signing of public filings by the chairman of the board and the president/chief executive officer sufficient to plead scienter)).

Defendants spend a majority of their brief asserting that they "indisputably" disclosed all the necessary facts and information related to the Funds' investment strategy and use of leverage through ARPS, only to claim later that they did not have knowledge of or access to this information.  (*See* Defs. Br. at 31.)  Defendants cannot have it both ways.  Plaintiffs' scienter allegations illustrating defendants' knowledge and access to contradictory information withstand

defendants' current claims of ignorance.  When properly assessed in light of uncontroverted facts establishing that raising capital through ARPS was central to the investment strategy of the Funds (as well as their ultimate collapse), it is clear that defendants must have known or had access to true information regarding the Funds' use of ARPS.  *See Desai v. Gen. Growth Props.*, No. 09 C 487, 2009 U.S. Dist. LEXIS 85271, at *60 (N.D. Ill. Sept. 17, 2009) ("While a court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue") (citation omitted).[12]

Defendants also attempt to shield themselves with the global economic crisis claiming that it is an "opposing inference" that should be considered by the Court.  (*See* Defs. Br. at 31.) This purely factual argument is not only baseless given that defendants' actions contributed to the economic crisis, but it is also entirely inappropriate at this stage of the proceedings.  As stated in *Tellabs*, any opposing inferences must be drawn ***from the facts alleged***, and thus, cannot be taken from facts or events outside the complaint.  *Tellabs*, 551 U.S. at 324.  By asserting that economic conditions somehow provide a blanket excuse for their misconduct, defendants have improperly ventured outside the Complaint.[13]

---

[12]     *In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) does not help defendants.  (Defs. Br. at 31.)  In that case, the alleged misstatements and omissions did not concern a core strategy of the defendant corporation, but instead, was a joint venture with another company.  *Id.* at 554.  Moreover, the court found that the defendants "openly discussed" their knowledge of the risks that plaintiffs alleged were omitted.  *Id.* at 562.  Here, defendants failed to specifically address and discuss the significant risks associated with the Funds' core strategy of leveraging through ARPS.

[13]     Defendants mistakenly rely on *In re Citigroup Auction Rate Secs. Litig.*, No. 08 Civ. 3095 (LTS), 2009 WL 2914370, at *6 (S.D.N.Y. Sept. 11, 2009), to justify their assertion of a purely factual matter. (*See* Defs. Br. at 30.)  In *Citigroup*, the court specifically noted that it was only considering "the very market conditions…***that Plaintiff cites in his Complaint*** in connection with Defendants' intent."  *Id.* Here, the Complaint does not allege market conditions as a motivation for defendants' extremely risky leveraging strategy.  Therefore, it is inappropriate for defendants to argue that these market conditions defeat Plaintiffs' well-pleaded allegations.

Another court in this District has recently rejected a similar argument. *See In re Ambac Financial Group, Inc. Sec. Litig.*, No. 08-CV-411 (NRB), 2010 U.S. Dist. LEXIS 16701, at *69-70 (S.D.N.Y. Feb. 22, 2010).   Recognizing the importance of considering the facts in the light most favorable to the plaintiff on a motion to dismiss, the court held that the defendants' reliance on the economic collapse "[did] not amount to a more compelling inference than that proffered by plaintiffs based on the facts alleged." *Id.* at 70.   The court characterized the defendants' argument as "a convenient confusion of cause and effect," reasoning that "[t]he conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business, and of the financial markets in general, rather than merely a passive victim." *Id.*   Here, defendants assert a similarly untenable position in light of the facts alleged in the Complaint. Their request that the Court weigh outside evidence of the economic collapse should be rejected.[14]

### 2.   Defendants' Motive and Opportunity to Commit the Fraud Raises a Strong Inference of Scienter

Allegations of motive are sufficient to establish scienter provided "plaintiffs…allege that defendants benefited in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.   The Complaint specifically identifies the "concrete benefits" that defendants could and ***did*** realize by failing to disclose the risks associated with significantly leveraging the Funds through ARPS.

---

[14]   Reading the complaint in piecemeal fashion, defendants mistakenly rely on *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008), and *Ley v. Visteon Corp.*, No. 06-2237, 2008 WL 4460192, at *9 (6th Cir. Oct. 6, 2008), for the proposition that a claim against Clark and Shubert cannot be made "simply" because they signed certain of the Funds' public filings.   Here, like in *Ambac*, "because of their executive positions, [the individual defendants] were able to control the conduct of [the company's] business, the information contained in its SEC filings and public statements." *In re Ambac Fin. Group, Inc.*, 2010 U.S. Dist. LEXIS 16701, at *84-85.

As alleged, defendants were motivated to heavily leverage the Funds in order to garner increased fees.  (Cplt., ¶ 98.)  These fees were calculated based on the Funds' total managed assets, which included both the liquidation value of the ARPS and the principal amount of any outstanding borrowings.  (*Id.*, ¶ 99.)  Using the proceeds from ARPS, defendants increased the Funds' total managed assets to the point where APRS represented approximately 35% of the Fund's total capital.  (*Id.*, ¶ 99.)  Because their management fees were directly correlated to the Funds' assets, as defendants continued to massively leverage the Funds through ARPS, they continued to generate equally massive fees.  There is no more of a "concrete benefit" than what defendants received from their fraudulent conduct in this case.  *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008) (finding that defendants' receipt of management fees contributed to sufficient allegations of scienter).

As defendants concede, they had "an incentive to utilize leverage" because doing so would result in increased management fees.  (*See* Defs. Br. at 19) (citing exhibits).  Despite this concession, defendants claim that these allegations illustrate only general motives that are insufficient for pleading scienter.  (*See* Defs. Br. at 29-30.)  But unlike other, more general motives, "a motive to generate increased fees based on inflated [asset] figures would be 'a concrete and personal benefit to the individual defendants resulting from the fraud.'"  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec.*, 446 F. Supp. 2d 163, 187 (S.D.N.Y. 2006) (quoting *Kalnit*, 264 F.3d at 139).  Defendants' view of the law ignores reality.[15]

---

[15]    Defendants cite to *Citigroup* and *Loral* for support.  *See* Defs. Br. at 30.  These cases are inapplicable.  Indeed, *Citigroup* (and the cases collected therein) did not involve management fees that were calculated based on fraudulently inflated assets of an investment fund, as is the case here. In fact, the fees in those cases were "unspecified" as to how they directly correlated to the fraud alleged.  *Citigroup*, 2009 WL 2914370, at *6. 2009 WL 2914370 at *1 (defendants' fees did not increase because of fraud); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) (defendants

Defendants also assert that motive cannot be alleged because they "disclosed" how management fees were calculated. (*See* Defs. Br. at 30.) Defendants cite no authority for this proposition, but only refer to the general principle from *Novak* that defendants must benefit in a concrete and personal way as it is cited in two cases from this District. *Id.* Any disclosure defendants may have made concerning the calculation of management fees does not remove their motive to commit fraud. Indeed, as discussed above, defendants' disclosure that they had an incentive to utilize leverage only supports the allegations that they had motive to significantly leverage the Funds without disclosing the risks associated with their misconduct. *See* Section I.B.1, *supra*.

### D. The Complaint Adequately Pleads Loss Causation

A plaintiff bringing a §10(b) claim must allege loss causation, which is a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). This requires a plaintiff to do nothing more than "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. Importantly, the Supreme Court rejected any heightened pleading standard for loss causation, affirming that the "ordinary pleading rules" of Rule 8(a)(2) provide a "simple test" that should not "impose a great burden upon a plaintiff." *Id.* at 346-47. Courts within this Circuit have expressly recognized that *Dura* did not alter or otherwise modify existing Second Circuit standards for pleading loss causation. *See., e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 301 (S.D.N.Y. 2005) ("*Dura* did not disturb Second Circuit precedent regarding loss causation").

---

received management fees regardless of fraud). In *Loral*, the plaintiffs did not allege that defendants were motivated to receive increased fees through the fraud. Instead, the motive allegations were limited to company viability, favorable financing, and professional reputation. *In re Loral Space & Comm'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK) 2004 WL 376442, at *6 (S.D.N.Y. Feb. 27, 2004). The same is not true here.

To challenge plaintiffs' loss causation allegations, defendants repeat their contention that "the Fund informed investors at all times and in detail about the strategies underlying their investments." (Defs. Br. at 32.)  Again, defendants are wrong.  As discussed above, defendants concealed the true risks associated with raising capital through ARPS.  *See* Sections I.A and I.B.2, *supra*.  Because these risks materialized, from September 2008 to November 2008, the Funds were forced to disclose that they would have to redeem the ARPS.  (Cplt., ¶¶ 78, 80, 81.) As the market absorbed this information and learned that distributions to common shareholders would have to cease, the Funds' share prices dropped from $16.61 per share to $2.65 per share and from $11.75 per share to $1.42 per share.  (*Id*., ¶¶ 79, 83.)  In December 2008, defendants confirmed to the market the disastrous effect of their leveraging strategy through ARPS.  (*Id*., ¶ 84.)  The Funds' share prices continued to drop.  (*Id*., ¶ 85.)  The corrective disclosures of defendants' previously false and misleading statements and omissions caused the Funds' share prices to plummet.  (*Id*., ¶ 96.)[16]

Defendants also suggest that the collapse of the real estate market makes it impossible for the drops in the Funds' share prices to have been caused by their misconduct.  (*See* Defs. Br. at 33.)  But the cases relied upon by defendants do not foreclose the possibility that loss causation may be adequately pled even in light of overall market losses.[17]  Instead, defendants are left to

---

[16]   Because the disclosures revealing the true nature of the risks posed by defendants' ARPS strategy did provide the market with previously ***undisclosed*** facts, defendants' reliance on *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551-52 (S.D.N.Y. 2008) and the cases collected therein is misplaced. Defs. Br. at 32.  *Edison Fund*, 551 F. Supp. 2d at 230, on the other hand, actually supports Plaintiffs' allegations.  *See* Defs. Br. at 33.  As in *Edison*, the Complaint here alleges that defendants' failure to disclose information that they knew or should have known caused plaintiffs to invest in the Funds where they otherwise would not, and "[w]hen the true facts came to light…plaintiffs ultimately sold their interests at a substantial loss."  *Id*. at 230.

[17]   *See Dura*, 544 U.S. at 342-343 ("lower price ***may*** reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific facts, conditions, or other events"); *Lentell v. Merrill Lynch & Co.*, 396 F. 3d 161, 174 (2d Cir. 2005) ("a plaintiff's claim

attempt (again) to improperly inject factual evidence at the motion to dismiss stage.  The Court should reject their attempt.  *See In re Ambac Financial Group, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 16701, at *76.  Simply because defendants state that the Funds' losses were exclusively the result of the market collapse does not make it so.

In *In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008), the court dismissed a similar argument.  Deciding that it would "not be distracted by…macroeconomic arguments," the court determined that "[t]he issue at present is *whether* the alleged securities violations caused a loss.  Not *how much* of the loss the alleged violations proximately caused."  *Id.* at 1774.  It would be up to the finder of fact, the court held, "to determine which losses were proximately caused by Countrywide's misrepresentations and which are due to extrinsic or insufficiently linked forces."  *Id*.  The facts alleged in the Complaint adequately show that defendants' misconduct related to ARPS caused the losses suffered by plaintiffs.

### E.  The Presumption of Reliance Applies to Plaintiffs' Claims

As a last ditch effort, defendants argue that Plaintiffs' allegations that defendants made misleading statements and omissions in connection with publicly-traded securities are not worthy of a presumption of reliance.  (Defs. Br. at 33-34.)  Not true.  First, defendants misread *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  In *Affiliated Ute*, the Supreme Court held that where claims involve "***primarily*** a failure to disclose, positive proof of reliance is not a prerequisite to recovery."  *Id.* at 153.  As such, Plaintiffs' claims need not rest "entirely on an omission of material fact" to warrant the *Affiliated Ute* presumption as defendants suggest.  (*See* Defs. Br. at 34.)

---

fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements *as opposed to* intervening events'") (citations omitted).

Second, defendants misread the allegations of the Complaint.  The Complaint clearly states that defendants "failed to disclose" to investors the true risks that leveraging through ARPS added to the Funds.  (Cplt., ¶¶ 48, 53, 58, 63, 65, 70, 72, 76.)  The Complaint details the "true facts and risks concerning an investment in the Funds, which were **omitted** from the statements made by defendants during the Class Period."  (*Id.*, ¶¶ 7, 49.)  Indeed, the omitted facts known to the defendants, yet not disclosed, made the statements defendants did make misleading and false.  As such, Plaintiffs' claims are entitled to the presumption of reliance set forth in *Affiliated Ute*.

Even if Plaintiffs were not entitled to the *Affiliated Ute* presumption, they are still entitled to a presumption of reliance.  Plaintiffs have properly alleged that the market for the Funds was an efficient market, and thus, the fraud-on-the-market doctrine applies.  *Basic v. Levinson*, 485 U.S. at 227, 244.  Even the case on which defendants rely recognizes that there are *alternative* ways to allege reliance.  *See Teamsters Local 445 Freight Div. Pension Fund*, 2006 U.S. Dist. LEXIS 52991, at *18-22 ("In order to satisfy the predominance requirement of Rule 23(b)(3) on the issue of transaction causation, Teamsters must avail itself of the presumption of reliance under *either* of the following two theories: the *Affiliated Ute* presumption or the fraud on the market (*Basic*) presumption").  In *Basic v. Levinson*, the Supreme Court determined that an investor may invoke a rebuttable presumption of reliance in cases of misrepresentations where the investor "relied on the integrity of the price set by the market" in which "the market…ideally, transmits information to the investor in the processed form of a market price." 485 U.S. at 227, 244.  That is exactly what Plaintiff alleges here.

Plaintiffs' claims are entitled to a presumption of reliance based on the fraud-on-the-market theory.  As alleged in the Complaint, the Funds were listed and actively traded on the

33

AMEX, which is a highly efficient market.  (Cplt., ¶ 102(a).)  The Funds were required to file periodic public reports with the SEC and the AMEX; they regularly communicated with public investors through press releases and other wide-ranging public disclosures; and they were regularly followed and reported on by market and securities analysts.  (*Id.*, ¶ 102(b)-(d).)  As such, Plaintiffs have properly pled that the Funds' shares were traded in an efficient market and reliance may be presumed.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 358 (S.D.N.Y. 2008) (finding allegations that securities were publicly traded, defendants communicated with public investors via established market communication mechanisms, and the market promptly digested current information regarding the securities sufficient to plead fraud-on-the-market doctrine).  Defendants do not dispute any of these allegations and therefore concede that Plaintiffs are entitled to a presumption of reliance.

## II.    THE COMPLAINT STATES CONTROL PERSON LIABILITY UNDER §20(a)

Defendants move to dismiss the control person claim under §20(a) arguing that Plaintiffs have failed to plead an underlying violation of §10(b).  *See* Defs. Br. at 34-35.  As detailed in the Complaint, and argued above, Plaintiffs have adequately established a primary violation of §10(b).  Defendants also contend that Plaintiffs have not pled some level of culpable participation.  Although division exists as to whether such a pleading is even required in the Second Circuit, Plaintiffs have more than adequately plead scienter as to all defendants, including defendants Clark and Schubert, as discussed above.  *See* Section I.C., *supra*; *Edison Fund*, 551 F. Supp. 2d at 231 (noting division of authority and finding that plaintiffs' sufficient scienter allegations under §10(b) were also sufficient under §20(a)).  Nothing more is required for a §20(a) claim.

## CONCLUSION[18]

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint should

be denied in its entirety.

Dated:  New York, New York
        March 10, 2010

                                   HORWITZ, HORWITZ & PARADIS,
                                   ATTORNEYS AT LAW

                                   By: _/s Michael A. Schwartz
                                        Michael A. Schwartz
                                        Frank R. Schirripa
                                   405 Lexington Ave, 61st Fl
                                   New York, NY  10174
                                   Telephone:  212/986-4500
                                   Facsimile:  212/986-4501

                                   COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
                                     Darren J. Robbins
                                     Douglas Britton
                                     Francis A. DiGiacco
                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101-3301
                                   Telephone:  619/231-1058
                                   Facsimile: 619/231-7423

                                   *Co-Lead Counsel For Plaintiffs and the Class*

---

[18]     Pursuant to letter to the Court dated March 8, 2010, Plaintiffs' counsel requested permission to file a 35 page brief, the same relief granted to defendants on January 29, 2010.

**<u>Certificate of Service</u>**

I, Frank R. Schirripa, counsel for Plaintiffs certify that on March 10, 2010, I served the foregoing document on counsel for defendants via email.  Due to an interruption in service in the Court's electronic case filing (ECF) system from 3 p.m. March 10, 2010 until 8:30 a.m. March 11, 2010, Plaintiffs were unable to timely file the foregoing document with the Clerk of the Court.  As per the Clerk of the Court's instructions, today, after the ECF system became operable, Plaintiffs filed the foregoing document via ECF.

Date:  March 11, 2010

__/s Frank R. Schirripa
Frank R. Schirripa
