UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

PASQUALE A. LA PIETRA, ET AL.,

                    Plaintiffs,            09 Civ. 7439 (JGK)

      - against -               <u>OPINION AND ORDER</u>

RREEF AMERICA, L.L.C., ET AL.,

                    Defendants.
————————————————————————————————

JOHN G. KOELTL, District Judge:

    This action is based on an amended putative class action complaint alleging violations of the federal securities laws related to the collapse of two real estate investment funds, DWS RREEF Real Estate Fund, Inc. and DWS RREEF Real Estate Fund II, Inc. (respectively, "DWS I" and "DWS II"; collectively, the "Funds"). The lead plaintiffs, Pasquale A. La Pietra and Barry King, sue on behalf of themselves and others (the "plaintiffs") who purchased shares of the Funds' common stock between March 8, 2007 and November 17, 2008 (the proposed "class period"). The plaintiffs allege that they were injured by omissions and allegedly false or misleading public statements made in relation to the Funds during the class period and assert claims against the Funds' investment manager, Deutsche Investment Management Americas, Inc. ("DIMA"); the Funds' investment advisor, RREEF America, L.L.C. ("RREEF"); the Funds' president, Michael G. Clark; and the Funds' treasurer and chief financial officer,

Paul H. Schubert (collectively, "defendants"). In their amended complaint, the plaintiffs assert (1) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against all defendants; and (2) violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t, against defendants Clark and Schubert.

The defendants moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). The defendants contend that the plaintiffs (1) have not alleged any material omissions or false or misleading statements; (2) have not alleged facts that support a strong inference of scienter; (3) have not claimed to have relied on the allegedly wrongful actions; and (4) have not pleaded loss causation. Defendants Clark and Schubert also move to dismiss the § 20(a) control person liability claim on the grounds that the plaintiffs have failed to plead a primary violation of the securities laws.

I

A

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all

reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of

which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Rorech, 673 F. Supp. 2d at 221. Of particular relevance, the Court may take judicial notice of documents filed with the SEC. See In re Morgan Stanley Info. Fund Secs. Litig., 592 F.3d 347, 354 n.5 (2d Cir. 2010).


                                    B


        The following facts are undisputed, unless otherwise indicated.

        The lead plaintiffs each purchased shares of DWS II during the class period. Plaintiff La Pietra purchased shares on October 8, 2007. (Am. Compl. ¶ 23.) Plaintiff King purchased shares on October 13 and 23, 2008. (Am. Compl. ¶ 24.)

        DWS I and DWS II were non-diversified, closed-end management investment companies, incorporated in 2002 and 2003, respectively. (Am. Compl. ¶¶ 3, 31-32.) At all relevant times, RREEF and DIMA were indirect, wholly owned subsidiaries of Deutsche Bank AG ("Deutsche Bank"). (Id. ¶¶ 25, 27.) As closed-end funds, each Fund initially issued common shares at a one-time public offering shortly after incorporation, shares that could thereafter be traded on market exchanges. (Id. ¶ 39) At the time each Fund issued its common shares, it also filed a

                                    4

prospectus disclosing information about the Fund to prospective investors (collectively, the "common share prospectuses" or the "prospectuses"). (Stern Decl. Exs. B at i, F at i.)

The stated objective of each Fund was to achieve "total return through a combination of high current income and capital appreciation potential by investing in real estate securities." (Am. Compl. ¶ 40; Stern Decl. Exs. B at i, F at i.) In pursuit of this objective, the common share prospectuses stated that the Funds intended to invest at least 90% of their respective total assets in equity securities issued by real estate companies, with 80% of DWS I's total assets and 70% of DWS II's total assets to be invested in income-producing equity securities issued by real estate investment trusts ("REITs"). (Am. Compl. ¶ 4; Stern Decl. Exs. B at i, F at i.)

The common share prospectuses each stated that the relevant Fund intended to leverage these assets by issuing preferred shares and/or borrowing in an aggregate amount of "approximately 33 1/3% of the Fund's total capital" in the case of DWS I, and "approximately 35%" in the case of DWS II. (Stern Decl. Exs. B at ii, F at ii.) The prospectuses explained, among other things, that preferred shares would "pay dividends based on short-term rates (which would be redetermined periodically by an auction process)"; that the preferred shares and any other borrowing would have seniority over the common shares; and that if a Fund

did not maintain sufficient assets to cover twice the liquidation value of the outstanding preferred shares, the Fund could be required to redeem some or all of the preferred shares, and would not be permitted to declare cash dividends or other distribution on the common shares. (Stern Decl. Exs. B at 3-4, 16; F at 3-4.) The prospectuses further noted that they might use interest rate swaps to hedge against interest rate risks, and warned that a decline in interest rates could hurt the value of the common shares. (Stern Decl. Exs. B at 18, F at 19.) The prospectuses noted that management fees would be higher while the Funds used leverage, because the fees paid would be calculated based on the Funds' total managed assets. (Stern Decl. Exs. B at 6, F at 7.)

The prospectuses made detailed disclosures about the risks of investing in the Funds, which were concentrated in real estate and anticipated the use of significant leverage. The prospectuses explained that investors could lose their entire principal amount. (Stern Decl. Exs. B at 4, F at 4.) Investments in the Funds were indirect investments in REITs and other real estate investments. (Stern Decl. Exs. B at 4, F at 4.) The investments were closely linked to the real estate market and the prospectuses presciently noted that "[p]roperty values may fall due to increasing vacancies or declining rents." (Stern Decl. Ex. B at 4; DWS II Definitive Materials 5 (Form 497) (Aug.

27, 2003).) The prospectuses also noted that the leverage used
by the Funds created additional risks: there was a likelihood of
greater volatility of net asset value and market price for the
common shares because changes in the value of the Funds'
portfolio would be borne by the common shares and there was the
possibility that common share income would fall if the dividend
on the preferred shares rose, or that the value of the common
shares would fluctuate because the dividend on the preferred
shares or the interest rates on any borrowing by the funds
varied. (Stern Decl. Exs. B at 6, F at 6-7.)

As indicated in the prospectuses, the Funds issued
preferred shares as a means of leveraging their investments. In
2003 and 2004, they issued several series of auction-rate
preferred securities ("ARPS"), which paid dividends at a rate
set by weekly auctions. (Am. Compl. ¶ 45; Stern Decl. Exs. C, D,
G.) As explained in the prospectuses for these preferred shares
(the "preferred share prospectuses"), each week, holders of
preferred shares could elect to sell their shares at auction.
(Stern Decl. Exs. C at 1, D at 1, G at 1.) Potential purchasers
would enter bids specifying the number of shares they wanted to
purchase and the lowest minimum dividend rate they would accept.
(Stern Decl. Exs. C at 11-12, D at 11-12, G at 11-13.) If enough
purchasers bid on the shares to cover all shares offered, then
the auction would succeed, the shares would be sold to the

7

purchasers, and the clearing rate (the lowest dividend rate at which all the shares could be sold at par) would be applied to the entire issue. (Stern Decl. Exs. C at 11-12, D at 11-12, G at 11-13.) If there were insufficient bids, the auction would fail, all previous holders would be required to retain their shares, and the Funds would have to pay a high default dividend rate. (Am. Compl. ¶¶ 67, 69.)

The Funds thrived for the first several years of their existence, each roughly doubling its net asset value by February 2007. (Stern Decl. Ex. EE at 1-4.) In annual reports filed at the beginning of the class period (the "2006 Annual Reports"), the Funds declared their faith in "the longer-term outlook for REITs" and their belief that they "maintain[ed] positions in the highest-quality assets and real estate markets that [the Funds] believe[d] to be fundamentally strong." (Am. Compl. ¶¶ 54, 56.) The annual reports also explained the auction mechanism in part, listing the average annual dividend rate and noting the requirement that the Funds were each "required to maintain asset coverage of at least 200% with respect to the Preferred Shares." (Id. ¶¶ 55, 57.) The Annual Reports did not repeat all of the disclosures made in the common share prospectuses, however, omitting information such as the amount of leverage and the consequences of dropping below the 200% asset coverage threshold. (Id. ¶ 58.) Similarly, the Funds' 2007 Semi-annual

Reports, filed in August 2007, vouched for the strength of the "REIT market fundamentals," stated that "[t]he fund[s'] leveraging activities had no material effect on performance during the period, and noted that the Funds "currently plan[ned] to maintain approximately 20% of the fund[s'] net assets in preferred stocks because of their attractive yields." (Id. ¶¶ 59, 61.)

As it turned out, the fundamentals of the real estate market, to put it mildly, were not strong. Auctions began to fail in February 2008, requiring the Funds to pay preferred shareholders at the high default dividend rate and thus increasing the Funds' borrowing costs. (Id. ¶ 75.) In February 2008, the Funds issued a press release explaining the auction process for the preferred shares, disclosing that some preferred share auctions had failed, and listing the then-current maximum applicable dividend rate and the most recent successful clearing rate. (Am. Compl. ¶ 64; Stern Decl. Ex. O at 1-3.)

As the Funds' assets fell toward the 200% asset coverage threshold, the Funds attempted to secure financing to redeem the now-problematic preferred shares. In June 2008, the Funds announced that they had "secured committed new financing" but acknowledged that "[t]here is no assurance that the proposed refinancing will be successfully negotiated and completed." (Am. Compl. ¶ 71, Stern Decl. Ex. R at 2.) Their communications

during this time remained somewhat positive, repeating the
Funds' confidence in their assets, noting that the preferred
shares continued to be rated AAA, and maintaining that the
hoped-for financing arrangement to redeem the preferred shares
would benefit the common shareholders. (Am. Compl. ¶¶ 64, 73-
77.)

Before the end of the class period on November 17, 2008,
the Funds' attempts to secure financing to redeem the preferred
shares fell through. The high default dividend rates required by
the failed auctions raised the costs of the Funds' borrowing,
and the Funds were forced to sell assets into the depressed
market to redeem the ARPS. (Id. ¶¶ 75, 78, 80.) Distributions to
common shareholders ceased entirely by the end of 2008. (Id. ¶¶
82, 84.) The common shares' value plummeted. (Id. ¶ 85.)
Ultimately, after the close of the class period and the filing
of the amended complaint, the Funds' shareholders voted to
liquidate and dissolve the Funds. (Stern Decl. Ex. DD.)


                                II


Section 10(b) makes it unlawful to "use or employ, in
connection with the purchase or sale of any security . . . any
manipulative or deceptive device or contrivance in contravention
of such rules and regulations as the [SEC] may prescribe." 15

                               10

U.S.C. § 78j(b). The SEC's Rule 10b-5 states that it "shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).

A claim under Section 10(b) sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the Complaint "specify each statement alleged to have been misleading[ and] the reason or reasons why the statement is misleading," and it adds the requirement that "if

11

an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also ATSI Commc'ns, 493 F.3d at 99.

The defendants argue that the plaintiffs' allegations fall short in four independently sufficient ways. They claim that the plaintiffs did not allege (1) any particular materially false statements or omissions of material fact; (2) scienter; (3) reliance; or (4) loss causation.[1]

---

[1] The defendants also argue in a footnote that the plaintiffs lack standing to raise claims regarding DWS I, because they only purchased shares of DWS II.  There is some support for this proposition. See Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530-32 (S.D.N.Y. 2008); In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885, 2005 WL 2677753, at *9-10 (S.D.N.Y. Oct. 19, 2005), vac'd on reconsideration on other grounds, 2006 WL 74439 (S.D.N.Y. Jan 11, 2006). However, other courts have held that such an objection is more properly dealt with in the class certification inquiry than as a matter of Article III standing. See In re Dynex Capital, Inc. Secs. Litig., No. 05 Civ. 1897, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006), vac'd in part on other grounds, 531 F.3d 190 (2d Cir. 2008); Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071, 2003 WL 21672085, at *5-6 (S.D.N.Y. July 16, 2003).
    In any event, standing questions may be deferred until after a class has been certified, because class certification issues are "'logically antecedent' to Article III concerns." Ortiz v. Fibreboard Corp., 527 U.S. 815, 830 (1999) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 612 (1997)). Because the plaintiffs unquestionably have standing to sue against the defendants' conduct as it relates to DWS II, and because the allegations against each Fund are the same and, as discussed below, must be dismissed, there is no need to reach the class certification inquiry and therefore no need to ascertain whether the named plaintiffs could represent a class of DWS I shareholders. Cf. Hevesi v. Citigroup Inc., 366 F.3d 70, 82 (2d Cir. 2004) ("Nothing in the PSLRA indicates that

A

In determining whether an allegedly false statement or omission of fact is material, the Court looks at whether there is "a substantial likelihood that a statement or omission 'significantly altered the "total mix" of information made available,' as viewed by the 'reasonable investor.'" Ellenburg v. JA Solar Holdings Co., No. 08 Civ. 10475, 2010 WL 1983375, at *5 (S.D.N.Y. May 17, 2010) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). An omission is actionable under federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002). "[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . .

---

district courts must choose a lead plaintiff with standing to sue on every available cause of action."); Martens v. Thomann, 273 F.3d 159, 173 n.10 (2d Cir. 2001) ("[S]pecial standing rules exist for class representatives.").

13

materially misleading." In re Bristol Myers Squibb Co. Sec.
Litig., 586 F.Supp.2d 148, 160 (S.D.N.Y. 2008).

Although the plaintiffs repeatedly assert conclusorily in
their amended complaint and their opposition brief that the
defendants made false statements (e.g., Am. Compl. ¶¶ 55, 57,
60, 62, 65, 67, 69-70, 76; Pl.'s Mem. Opp. Def.'s Mot. Dismiss
("Pl.'s Mem.") 10-11), they fail to identify any misstatement of
a material fact. While the defendants' assertions of their
belief in the state of the real estate market and the quality of
the assets of the Funds may have been misplaced in hindsight,
the plaintiffs do not allege that the defendants did not
actually believe these statements when they made them, or that a
single factual representation made by the defendants was untrue.

Instead, the plaintiffs proceed entirely on the theory that
the defendants omitted material facts from their disclosures,
and that those omissions rendered some of the defendants'
affirmative statements misleading. (See Hr'g Tr. 17, June 2,
2010.) To summarize the plaintiffs' particular objections to the
defendants' disclosures, the plaintiffs claim that the
defendants did not disclose (a) the extent or risks of the
Funds' leveraging strategy; (b) the possibility that the Funds
might be required to redeem the preferred shares, and that doing
so would be adverse to the common shareholders' interests; (c)
that Deutsche Bank could participate in the preferred share

14

auctions, and that the auctions would be more likely to fail if
Deutsche Bank opted not to do so; (d) that the Funds were using
interest rate swaps as a speculative endeavor rather than a
risk-reducing hedge; (e) that "[t]he Funds were diverting from
their required focus on publicly held investments by investing
in a risky private venture"; or (f) that "[t]he Funds' internal
controls were inadequate to prevent defendants from taking on
excessive risk." (Am. Compl. ¶¶ 7, 49, 94.) In light of these
omissions, the plaintiffs allege, many of the defendants'
reassuring and factually accurate statements were materially
misleading.

The parties dispute which documents were in the total mix
of information reasonably available to a reasonable investor.
Both sides agree that the disclosures to the Funds' shareholders
made during the class period are in the total mix. The
defendants contend that the Court should also consider the
common share prospectuses, which were issued in 2002 and 2003—
four to five years before the class period began. The plaintiffs
disagree, arguing that the prospectuses were too stale for the
defendants to rely on their disclosures.[2]

---

[2] The defendants also argue that the disclosures in the preferred
share prospectuses should be included in the total mix of
available information. As the plaintiffs point out, however,
they did not purchase the preferred shares; it would be
unreasonable, they argue, to expect them to read the
prospectuses for shares they never bought. Because the

The common share prospectuses were part of the total mix of information reasonably available to the plaintiffs. See Ellenburg, 2010 WL 1983375, at *5. "[I]n today's world it is unrealistic to argue that documents available on the SEC website," such as the common share prospectuses, "are not readily accessible to the investing public." In re Keyspan Corp. Secs. Litig., 383 F. Supp. 2d 358, 373 (E.D.N.Y. 2003). And while a reasonable investor certainly should not be expected to pore through every filing in the life of a years-old fund, it is reasonable to hold such an investor responsible for knowledge of the disclosures in a fund's prospectus. Cf. Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993) (describing a prospectus as "the single most important document and perhaps the primary resource an investor should consult in seeking" information on an investment's risks); SEC, Closed-End Funds, available at http://sec.gov/answers/mfclose.htm (advising investors in closed-end mutual funds to "carefully read all of a fund's available information, including its prospectuses and most recent shareholder report[,] before purchasing mutual fund shares" (emphasis added)) (Stern Reply Decl. Ex. II.). When choosing such a specialized investment, a reasonable investor

---

plaintiffs' allegations are insufficient to make out a claim under section 10(b) whether or not the preferred share prospectuses are considered, it is unnecessary to decide whether the preferred share prospectuses are also in the total mix.

would naturally look to the prospectus as the most complete statement of a fund's objectives, strategies, and risks. Hence, the disclosures in the common share prospectuses were in the "total mix" of information reasonably available to the plaintiffs during the class period.

The plaintiffs rely on United Paperworkers International Union v. International Paper Co., 985 F.2d 1190 (2d Cir. 1993), for their argument to the contrary. That case, however, dealt with the specific situation of a proxy statement distributed by an issuer in advance of a vote on a shareholder proposal. The defendant in United Paperworkers argued that various press reports and a 10-K filing were part of the total mix of information reasonably available to shareholders. The Court of Appeals for the Second Circuit disagreed, stating:

> The mere fact that a company has filed with a regulatory agency documents containing factual information material to a proposal as to which proxies are sought plainly does not mean that the company has made adequate disclosure to shareholders under Rule 14a-9. Corporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders.

United Paperworkers, 985 F.2d at 1199. As subsequent decisions have recognized, United Paperworkers has limited application outside the context of a proxy contest. See

Garber v. Legg Mason, Inc., No. 08-1831-cv, 347 Fed. Appx.
665, 669 (2d Cir. Sept. 30, 2009) ("Because the instant
case is not about an allegedly misleading proxy statement
mailed to shareholders in connection with a shareholder
vote, the fact that corporate documents and news reports
were not mailed directly to potential investors is not
relevant to whether they can be considered part of the
total mix of information reasonably available."); Keyspan,
383 F. Supp. 2d at 374 n.6 ("[T]he universe of information
a shareholder would consider when voting in a proxy contest
concerning a specific issue is smaller than, or at least
different from, the corresponding universe an investor
would consider when deciding whether to purchase or a
retain a publicly traded stock in the first instance."). It
is certainly no bar to considering the original
prospectuses as part of the total mix of information
reasonably available to investors in a closed-end mutual
fund.[3]

_____

[3] The plaintiffs rely on P. Stolz Family Partnership L.P. v.
Daum, 355 F.3d 92, 96 (2d Cir. 2004), for the proposition that
any alleged disclosures must be contemporaneous with an alleged
failure to disclose. Stolz, however, does not stand for that
proposition. Stolz analyzed a specific alleged oral
representation and determined that there was sufficient language
that showed that the specific representations were within the
"bespeaks caution" doctrine. It did not address a situation such
as is presented in this case, where the plaintiff points to no
specific alleged misrepresentation but contends that the

The contents of the prospectuses and the defendants'
statements during the class period make clear that the
plaintiffs have not adequately alleged any material omissions or
misleading statements. Many of the facts that the plaintiffs
allege were omitted — most importantly, the nature and extent of
the Funds' leveraging strategy and the possibility that the
Funds would be required to redeem the preferred shares — were
disclosed in the 2002 and 2003 common share prospectuses. In
particular, they identify the approximate leverage target that
the Funds maintained; discuss the risks of both the Funds'
leveraging strategy and their specific focus on the real estate
market; and explain that a failure to maintain 200% asset
coverage could lead to redemption of the preferred shares and
would preclude declaring cash dividends or distributions on the
common shares. (Stern Decl. Exs. B at ii, 3-4, 6, 16; F at ii,
3-4, 6.) Much of this information, including the general risks
of concentration in the real estate market and the need to
maintain 200% asset coverage, were restated in annual and semi-
annual reports during the class period. (Stern Decl. Exs. K at
27, 31, L at 28, 32.) Thus there is no basis for the plaintiffs
to claim that the defendants failed to disclose the Funds'
strategies or their riskiness.

---

defendants never disclosed various risks when the defendants had
in fact disclosed those risks.

It is irrelevant that the defendants did not make clear, for example, that the amount of leverage was "far greater than other similar funds in defendants' peer group" (Pl.'s Mem. 11), given that the defendants openly disclosed that their leveraging strategy could backfire in a bear market. Nor, in light of these disclosures, were the defendants' general expressions of optimism misleading. See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."); In re Nokia Oyj (Nokia Corp.) Secs. Litig., 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) ("[D]isclosure requirements are not intended to attribute to investors a child-like simplicity. Rather, investors are presumed to have the ability to be able to digest varying reports and data." (internal citation and quotation marks omitted)).

The remaining alleged omissions are equally immaterial or unsupported. The plaintiffs argue that the Funds should have disclosed that auctions could fail if their parent company, Deutsche Bank, opted not to enter a clearing bid at the weekly preferred share auctions. But the defendants did, in fact, disclose in the February 20, 2008 press release that "broker-dealers participating in [any given auction] may determine that

20

it is appropriate to submit bids for their own accounts to prevent a failed auction (although they are not obligated to do so)," and noted that some broker-dealers had been declining to do so during the financial crisis. (Stern Decl. Ex. O at 2.) The plaintiffs do not point to any disclosures that would reasonably have misled investors into believing that Deutsche Bank was required to prevent an auction from failing or that investors could rely on Deutsche Bank's participation in the auctions. The plaintiffs also do not allege that the defendants knew that the auctions were unsustainable. The plaintiffs have failed to show how the information provided about the conduct of the actions, with disclosures about redemption requirements in the initial prospectuses, was misleading.

The remaining omissions are unsupported by the facts alleged by the plaintiffs and the documents properly before this Court. The plaintiffs do not allege with any particularity how the defendants were using interest rate swaps as speculative endeavors, and both the prospectuses and the annual reports disclosed the Funds' intention to use interest rate swaps and the accompanying risks. (Stern Decl. Exs. B at 3, F at 3, K at 25, L at 26.) Nor are the plaintiffs' assertions that the Funds were improperly investing in "a risky private venture" and lacked internal controls pleaded with any particularity. The risks of investing in real estate as well as leveraging were

21

laid out with great particularity and the plaintiffs'
allegations of lack of controls is an insufficient conclusory
assertion without any factual support. See Iqbal, 129 S. Ct. at
1954 ("[T]he Federal Rules do not require courts to credit a
complaint's conclusory statements without reference to its
factual context.")

Accordingly, the Court finds that the plaintiffs failed to
plead any false statements or material omissions.


B


The defendants also argue that the Amended Complaint fails
to allege that the defendants acted with the "scienter"
necessary to support a Rule 10b-5 claim. The scienter required
to support a securities fraud claim can be "intent to deceive,
manipulate, or defraud, or at least knowing misconduct." AIG
Global Sec. Lending Corp. v. Banc of America Sec., LLC, No. 01
Civ. 11448, 2005 WL 2385854, at *8 (S.D.N.Y. Sept. 26, 2005)
(quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d
Cir. 1996)). The PSLRA requires that a complaint alleging
securities fraud must "state with particularity facts giving
rise to a strong inference that the defendant[s] acted with the
required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may
be inferred from (i) facts showing that a defendant had "both

22

motive and opportunity to commit fraud," or (ii) facts that
constitute "strong circumstantial evidence of conscious
misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99.
Further, "in determining whether the pleaded facts give rise to
a 'strong' inference of scienter, the court must take into
account plausible opposing references." Tellabs, Inc. v. Makor
Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint
sufficiently alleges scienter when "a reasonable person would
deem the inference of scienter cogent and at least as compelling
as any opposing inference one could draw from the facts
alleged." Id. at 324; see also ATSI Commc'ns, 493 F.3d at 99.

The plaintiffs first contend that they have pleaded a
strong inference of fraud because their complaint alleged both
motive and opportunity to commit fraud. The Court of Appeals has
explained that allegations of motive are sufficient if they
"entail concrete benefits that could be realized by one or more
of the false statements and wrongful disclosures alleged."
Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (internal
quotation marks omitted). The plaintiffs "must assert a concrete
and personal benefit to the individual defendants resulting from
the fraud." Id. Motives generally possessed by most corporate
directors and officers do not suffice. Id. Therefore, the Court
of Appeals has concluded that motive is not adequately pleaded
where the plaintiffs allege that the defendants have a desire

23

for the corporation to appear profitable or a desire to keep
stock prices high in order to increase officer compensation.
Id.; see also Novak, 216 F.3d at 307-08 (collecting cases). By
contrast, the Court of Appeals has held that motive is
adequately pleaded where the plaintiffs allege that the
defendants sold their own shares while at the same time
misrepresenting corporate performance in order to inflate stock
prices. See Kalnit, 264 F.3d at 139; Novak, 216 F.3d at 307-08
(collecting cases).

The plaintiffs' only allegation with regard to motive is
that the defendants were motivated to make material
misrepresentations by their desire to earn greater management
fees, because those fees were calculated based on the Funds'
total managed assets, including the liquidation value of the
preferred shares and the principal amount of any outstanding
borrowings. (Am. Compl. ¶¶ 98-99.) This allegation does not
adequately demonstrate motive under the PSLRA. "[T]he desire to
earn management fees is a motive generally possessed by
[investment] fund managers, and as such, does not suffice to
allege a 'concrete and personal benefit' resulting from fraud."
Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp.
2d 210, 227 (S.D.N.Y. 2008) (quoting Kalnit, 264 F.3d at 139).
Accord Cohen v. Stevanovich, --- F. Supp. 2d ----, 2010 WL
2670865, at *9 (S.D.N.Y. 2010); In re Citigroup Auction Rate

24

Secs. Litig., 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009); Steed Fin. LDC v. Laser Advisers, Inc., 258 F. Supp. 2d 272, 278 (S.D.N.Y. 2003). But see Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 446 F. Supp. 2d 163, 187 (S.D.N.Y. 2006) ("Unlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees . . . would be 'a concrete and personal benefit to the individual defendants resulting from the fraud.'" (quoting Kalnit, 264 F.3d at 139)).

The plaintiffs argue that, even if they failed to allege motive and opportunity, they have pleaded scienter on a "knowledge or reckless disregard" theory. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308. "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Id.

The plaintiffs' claim of recklessness fails because the plaintiffs have failed to allege a single false statement or material omission, much less one as to which the defendants should have been alerted to its deceptiveness. Because the amended complaint fails to allege sufficiently that the

defendants made any false or misleading statements (either affirmatively or through omissions), the amended complaint also fails to establish an inference of reckless or conscious misbehavior on the part of the defendants in making such statements. See Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 179 (S.D.N.Y. 1996).

Accordingly, because the plaintiffs have pleaded neither facts showing that a defendant had both motive and opportunity to commit fraud, nor facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, the plaintiffs have failed adequately to allege scienter.[4]

## IV

The plaintiffs' second claim is for control person liability under section 20(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108 (quotation marks omitted). Because, as discussed above, the plaintiffs have

---

[4] It is unnecessary to reach the other grounds for dismissal asserted by the defendants.

failed to allege a primary violation of the Exchange Act, their claim under section 20(a) must also be dismissed. See id.

CONCLUSION

For the reasons explained above, the defendants' motion to dismiss the amended complaint is **granted**. The Clerk is directed to enter judgment dismissing this action and closing this case.[5]

SO ORDERED.

Dated:     New York, New York
           September 14, 2010

                                      John G. Koeltl
                                 United States District Judge

---

[5] The plaintiffs chose to respond to the motion to dismiss the Amended Complaint rather than to filed a Second Amended Complaint. (See Stipulation and Scheduling Order filed Dec. 8, 2009 (dkt. 9).) Therefore, the Amended Complaint is dismissed with prejudice.